UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRACY MCCARTER,

                              Plaintiff,

              -against-

THE CITY OF NEW YORK, OFFICER
SAMANTHA CORTEZ, OFFICER SHAHEL
MIAH, DETECTIVE ALEXANDER CRUZ,
DETECTIVE CARLOS PAGAN,
INVESTIGATOR ROBERT DELANEY

                              Defendants.

---

**23-cv-9562**

**COMPLAINT AND
JURY DEMAND**

Plaintiff Tracy McCarter, by her attorneys, ZMO Law PLLC,

complaining of the Defendants, respectfully alleges as follows based on

information and belief:

## PRELIMINARY STATEMENT

1.       For more than two and a half years, Plaintiff Tracy McCarter was

subjected to a criminal prosecution based on a malicious lie: that she had

confessed to murdering her estranged, abusive husband. In fact, Plaintiff

repeatedly told police that her husband James Murray's death on March 2, 2020

was an accident. He came to her apartment that night in a drunken rage and

demanded money. She tried to ward him off peaceably but after he refused to

leave, put her in a headlock, and tried to strangle her, she grabbed a knife from the kitchen drawer. He came at her again, still uncontrollably drunk, and stumbled into the knife—this account of Murray's accidental death was confirmed by forensic experts hired by both the criminal defense team and by prosecutors.

2.      Murray died later that night of a single knife wound to the chest as Plaintiff, a nurse, pressed on his chest desperately trying to stop the bleeding. She called for help and a neighbor called 911.

3.      A team of New York City Police Department ("NYPD") Officers, including Officer Samantha Cortez, arrived at the apartment to find Plaintiff crying for help as she desperately tried to stop Murray's bleeding. Officer Cortez told the other officers at the scene that Plaintiff said she stabbed Murray because Murray tried to take her money, but Plaintiff never said that. Based on that fabricated confession, the officers placed Plaintiff in handcuffs, removed her from the scene, arrested her and charged her with second-degree murder in New York Criminal Court.

4.      The criminal complaint, sworn to by Detective Alexander Cruz, stated as the basis for probable cause, "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest.'"

5.      As a result, in the days, weeks and months after her husband's tragic death, Ms. McCarter spent 205 days in Rikers Island during the terrifying early phase of the COVID-19 pandemic. Investigators used the fabrication to obtain authorization to search Plaintiff's property, including her apartment, email, phone, and social media accounts. On December 2, 2022, at the request of District Attorney Alvin Bragg, Acting Supreme Court Justice Diane Kiesel dismissed the charge against Ms. McCarter.

6.      Tracy McCarter sustained serious physical and psychological harm as a result of being wrongfully arrested, charged, imprisoned, searched, and prosecuted. She now brings this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of her civil rights, as secured by said statutes, the common law, and the Constitutions of the State of New York and the United States.

## JURISDICTION

7.      Plaintiff brings this action for compensatory and punitive damages, affirmative and equitable relief, an award of costs and attorney fees, and such other and further relief as this Court deems equitable and just.

8.      This action is brought pursuant to 42 U.S.C. § 1983 et seq. to redress the deprivation under the color of law of Plaintiff's rights as secured by the United States Constitution.

9.      The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims brought under the laws of the State of New York.

11.     Tracy McCarter has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York on March 1, 2023.

12.     Said notice was served within the time required by New York General Municipal Law Section 50-e.

13.     More than thirty days have elapsed since the service of that notice and no offer of settlement has been made.

**VENUE**

14.     Venue is properly laid in the Southern District of New York under 28 U.S.C. § 1391(b) because this is the District in which the claim arose.

**JURY DEMAND**

15.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

16.      Plaintiff Tracy McCarter, a 48-year-old woman, is a citizen of the United States and a resident of the State of New York.

17.      Defendant CITY OF NEW YORK was and is a municipal corporation that is a political subdivision of the State of New York, was the employer of the Defendant Officers and was at all times relevant to this Complaint responsible for the administrative and managerial policies, practices and customs of the New York City Police Department ("NYPD").

18.      Officer Samantha Cortez was at all times relevant to this Complaint a duly appointed and acting officer of the NYPD, acting under color of law and within the scope of her employment in carrying out law enforcement functions. She is sued in her individual and official capacities.

19.      Officer Shahel Miah was at all times relevant to this Complaint a duly appointed and acting officer of the NYPD, acting under color of law and within the scope of his employment in carrying out law enforcement functions. He is sued in his individual and official capacities.

20.      Detective Alexander Cruz was at all times relevant to this Complaint a duly appointed and acting officer of the NYPD, acting under color of law and within the scope of his employment in carrying out law enforcement functions. He is sued in his individual and official capacities.

21.     Detective Carlos Pagan was at all times relevant to this Complaint a duly appointed and acting officer of the NYPD, acting under color of law and within the scope of his employment in carrying out law enforcement functions. He is sued in his individual and official capacities.

22.     Investigator Robert Delaney was at all times relevant to this Complaint an investigator for the District Attorney of New York, acting under color of law and within the scope of his employment in carrying out law enforcement functions. He is sued in his individual and official capacities.

23.     Defendants Does #1 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, supervisors, and/or other agents and employees of the City of New York, acting under color of law and within the scope of their employment in carrying out law enforcement functions, who participated in the misconduct described herein. They are sued in their individual and official capacities.

## FACTS

**A.     Plaintiff's abusive relationship with James Murray**

24.     In July of 2013, Plaintiff was working as a nurse in Texas.

25.     She met James Murray on a dating app.

6

26.     Murray had a history of severe alcoholism and was in Texas to attend in-patient alcohol abuse treatment.

27.     Murray returned to his home in New York City after completing treatment in Texas.

28.     In September 2014, Plaintiff relocated to New York City to take a job as a traveling nurse for Mount Sinai Beth Israel Hospital in Brooklyn.

29.     After Plaintiff moved to New York City, she and Murray developed a romantic relationship.

30.     The relationship grew more serious, and Plaintiff and Murray moved in together into an apartment in Hoboken, New Jersey in June of 2016.

31.     Unbeknownst to Plaintiff, Murray was violent when drunk.

32.     In 2009, Murray drunkenly assaulted his ex-wife and injured a police officer who responded to the scene.

33.     Murray began drinking again in late 2016, after he and Plaintiff moved in together.

34.     In or about December 2016, Plaintiff attempted to speak with Murray about his relapse.

35.     Murray responded by physically pushing Plaintiff out of the apartment.

36.     In early 2017, Murray, while drunk, choked Plaintiff until she began to asphyxiate, then kicked and punched her when she fell to the ground.

37.     Plaintiff moved out of the apartment at the end of lease and into an apartment in Manhattan.

38.     Plaintiff remained in the relationship despite Murray's relapses, hopeful that he would eventually overcome his alcoholism.

39.     In June 2018, Plaintiff stayed with Murray in Hoboken as she looked for another apartment.

40.     On June 15, 2018, Murray got drunk and attacked Plaintiff, pulling her hair and punching her before she fled the apartment.

41.     On June 16, 2018, Murray again kicked, punched, and choked Plaintiff.

42.     On June 17, 2018, Murray had to be physically restrained from attacking a pregnant woman in his building.

43.     Later that day, he hit several parked cars with a golf club.

44.     Murray then pushed a police officer who was trying to handcuff him.

45.     Murray was arrested for Aggravated Assault, Resisting Arrest, and Criminal Mischief.

46.     Murray attended inpatient rehabilitation several times in late 2018 and 2019.

47.     On May 24, 2019, Murray and Plaintiff married.

48.     Plaintiff and Murray moved into a new apartment on June 22, 2019.

49.     Murry again relapsed and continued to physically abuse Plaintiff, often by pulling her hair and choking her.

50.     On July 12, 2019, police arrived at their apartment in response to a call about a domestic dispute.

51.     Police gave Plaintiff a domestic incident report, which Plaintiff used to break the lease she and Murray co-signed.

52.     Plaintiff moved into a new apartment in Manhattan.

53.     On September 17, 2019, Murray was arrested after drunkenly walking on an interstate highway and punching a police officer who attempted to help him.

54.     In the fall of 2019, Plaintiff and Murray lived separately; however, Plaintiff allowed Murray to stay in her apartment on the condition that he remained sober.

55.     Nevertheless, Murray would show up drunk at Plaintiff's apartment.

56.     Murray would ring neighbors' doorbells when Plaintiff refused to let him in, and he sometimes passed out outside the building.

57.     The apartment management company sent Plaintiff a letter in October 2019 threatening to evict her if Murray continued to disturb neighbors with his drunken behavior.

58.     On some occasions, Plaintiff let Murray into her apartment to prevent him from disturbing neighbors.

59.     In December 2019, Plaintiff began looking to purchase an apartment outside of Manhattan in hopes that her new apartment would be far enough from Murray's Manhattan drinking locales to be safe from his violent and erratic behavior.

**B.     The events of March 2, 2020**

60.     On March 1, 2020, Murray left a sober-living facility in Connecticut and moved into an AirBnB apartment or room in Manhattan.

61.     He immediately began drinking alcohol.

62.     On March 2, 2020, Plaintiff worked a 7:00 am-to-7:30 pm shift at New York Presbyterian Hospital in Manhattan.

63.     At 6:50 pm, Murray called Plaintiff from a LinkNYC public kiosk and said he was locked out of the AirBnB without a wallet or phone.

64.     At 7:49 pm, Plaintiff emailed Murray's parents to tell them that Murray relapsed, and to express concern that Murray would be stuck outside at night in rainy, cold weather.

65.     Murray was waiting for Plaintiff at her apartment when she returned from her shift at the hospital.

66.     Plaintiff agreed to let Murray inside to get his Librium prescription (a medicine that prevents alcohol withdrawal) and sleep on her couch, and to pay for a ride back to the sober-living facility in the morning.

67.     Once inside the apartment, Murray immediately reneged on this agreement and demanded money, but Plaintiff refused.

68.     Murray then grabbed Plaintiff's purse.

69.     Murray put Plaintiff in a chokehold.

70.     Murray pushed Plaintiff into a large mirror leaning against a wall in the hallway of the apartment which began to fall on them, causing Murray to let go of Plaintiff.

71.     Plaintiff grabbed a bread knife, purposefully choosing it for its rounded tip, and held it out in front of her and demanded that Murray leave.

72.     Murray refused to leave even when Plaintiff put the bread knife near his neck and it nicked him.

73.     Terrified that even this threat did not work, Plaintiff put down the knife and agreed to give Murray money, but could not find her wallet, which made Murray angrier.

74.     Murray was between Plaintiff and the exit, and had Plaintiff's purse, which had her phone inside.

75.     Murray lunged towards Plaintiff.

76.     Plaintiff reached behind her and blindly grabbed a kitchen knife from the open knife drawer and held the knife out in front of her to deter Murray from continuing his attack.

77.     The knife she grabbed was a sharper knife than the bread knife she originally had held.

78.     Murray lunged at Plaintiff but tripped and fell into the knife, driving the blade through his chest.

79.     Murray recoiled backward and the knife slid out of his body.

80.     Murray fell backwards to the ground.

81.     Murray began bleeding profusely.

82.     Plaintiff applied pressure to Murray's wound in an effort to stop the bleeding.

83.     Plaintiff screamed for help.

84.     Plaintiff's neighbor arrived and called 911, handing the phone to Plaintiff who spoke to the operator while applying pressure to Murray's wound.

85.     Minutes later, a group of officers, including Officers Samantha Cortez and Shahel Miah, entered the apartment to find Plaintiff putting pressure on Murray's wound as she cried and screamed for help.

86.     According to police body cameras, Officer Cortez stated to another officer, "She said he tried to take her money and she stabbed him in the chest."

87.     That was false: Plaintiff never said she stabbed Murray.

88.     In fact, Plaintiff can be heard on police body camera recording flatly denying that she made that statement.

89.     Plaintiff can be heard on the police body camera footage, in the presence of Officer Cortez, describing how Mr. Murray attacked her.

90.     Officer Miah interrupted Plaintiff as she was explaining what happened, told her to stop talking, and handcuffed her.

91.     Officer Miah knew that Plaintiff did not make the alleged confession because Miah was present for the entire interaction between Plaintiff and Cortez.

92.     Officers Miah and Cortez arrested Plaintiff and removed her from the apartment.

13

93.     Murray was pronounced dead at St. Luke's hospital at approximately 9:43 pm.

94.     The same night, Officer Cortez repeated the lie in an NYPD Domestic Incident Report ("DIR").

95.     Under the section called "Victim Interview," Cortez wrote that Plaintiff stated, "I let him stay the night, I was trying to help. He went for my purse and I stabbed him."

96.     Plaintiff never made that statement.

**C.     Plaintiff is charged and detained based on a fabricated confession.**

97.     On March 3, 2020, NYPD Detective Alexander Cruz swore to a criminal complaint charging Plaintiff with second-degree murder.

98.     The complaint states, as the basis for probable cause, "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest'."

99.     The false statement contained in the complaint—that Plaintiff told police she stabbed Murray—was necessary to provide probable cause to arrest and prosecute Plaintiff.

100.    On March 3, 2020, Plaintiff was arraigned on the charge of second-degree murder in Manhattan Criminal Court.

101.   The prosecutor repeated at arraignment the false claim that Plaintiff admitted to stabbing Murray.

102.   Neither the prosecutor nor the complaint mentioned Plaintiff's actual statement, in which Plaintiff described being attacked by Mr. Murray.

103.   Both the Court and the prosecutor were unaware that Plaintiff had repeatedly stated she acted in self-defense and that Murray's action of lunging at her caused his wound.

104.   Plaintiff was remanded to Rikers Island, where she would remain incarcerated until September of 2020.

**D.     Police obtain search warrants based on the fabricated confession.**

105.   When interviewed by ADA Sara Sullivan during the course of the investigation, Officer Cortez again falsely stated that Plaintiff told Cortez that Plaintiff stabbed Murray and did so because he was trying to take her purse.

106.   Investigators relied on the fabricated confession to provide probable cause for eight search warrants authorizing searches of Plaintiff's property.

107.   Without the fabricated confession attributed to Plaintiff, there was no probable cause to support any of these searches.

108.    On March 2, 2020, NYPD Detective Carlos Pagan swore in an affidavit in support of a warrant to search Plaintiff's apartment, "I am informed by Officer Cortez that she spoke to Trace [sic] McCarter and Ms. McCarter stated in substance, 'I let him stay that night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'"

109.    Not only does this statement repeat the fabricated confession, it also indicates that Plaintiff gave a motive for the stabbing: to stop him from taking her purse.

110.    The same fabricated confession contained in the first search warrant was repeated in seven additional search warrants.

111.    On March 3, 2020, Detective Alexander Cruz obtained a search warrant for Plaintiff's cellphone and laptop.

112.    Cruz's supporting affidavit repeats the fabricated confession as a basis for probable cause.

113.    On March 10, 2020, Detective Alexander Cruz obtained a warrant to search Plaintiff's apartment for a second time.

114.    Cruz's supporting affidavit repeats the fabricated confession as a basis for probable cause.

115.   On March 10, 2020, Detective Cruz obtained a search warrant for Plaintiff's Facebook, Instagram, Apple iCloud and Gmail accounts, as well as Murray's Yahoo account.

116.   Cruz's supporting affidavit repeats the fabricated confession as a basis for probable cause.

117.   On August 20, 2020, DANY Investigator Robert Delaney obtained a warrant to search Plaintiff's Gmail account for a second time.

118.   Delaney's supporting affidavit repeats Plaintiff's fabricated confession as a basis for probable cause.

119.   On August 24, 2020, ADA Sara Sullivan obtained a seizure order for Plaintiff's property at Riker's Island, which included Plaintiff's wallet and jacket.

120.   ADA Sullivan's supporting affirmation repeats Plaintiff's fabricated confession as a basis for reasonable cause to search Plaintiff's property.

121.    On October 6 and November 2, 2020, Investigator Delaney obtained search warrants for Plaintiff's OkCupid and Tinder accounts.

122.   Delaney's supporting affidavits repeat Plaintiff's fabricated confession.

**E.     Police obtain a search warrant for a Google account used for activism on Plaintiff's behalf.**

123.    Plaintiff's case drew media attention, and large numbers of people advocated on Ms. McCarter's behalf, coordinated by Plaintiff and an advocacy organization for battered women called "Survived + Punished".

124.    Plaintiff opened a Google account called "StandWithTracy" in 2021.

125.    On August 14, 2023, Plaintiff was notified by Google that a search warrant was executed on the "StandWithTracy" Google account. Google produced the search warrant to Plaintiff.

126.    The search warrant was ordered based on information provided by "John Doe 1", a New York County District Attorney's Office employee.

127.    The warrant for the "StandWithTracy" Google account was issued by the Honorable Melissa Jackson on December 3, 2021.

128.    Plaintiff was never informed of this search warrant during the pendency of her case, a violation of New York State criminal discovery law, CPL §245.20.

129.    Upon information and belief, the search warrant application relied on false information received from members of the NYPD.

130.    After the dismissal of the case against Plaintiff, Plaintiff has continued to use the StandWithTracy account to draw attention to the injuries

done to her and to other survivors of domestic violence punished by the criminal legal system.

131.    Learning of this search has exacerbated Plaintiff's PTSD and mental anguish, and increased her fear of continued surveillance by NYPD during the course of her continued activism.

132.    This false information provided by members of the NYPD was used in an attempt to quell activism on Ms. McCarter's behalf.

**F.    Police investigation corroborates Plaintiff's account of March 2, 2020.**

133.    After arresting Plaintiff, investigators learned additional information that corroborated Plaintiff's account of the events of March 2, 2020.

134.    In Murray's AirBnB apartment, investigators found empty liquor bottles, indicating that he had been drinking heavily in the 24 hours leading up to his death.

135.    Murray's blood alcohol level was consistent with someone who had been drinking substantially, stopped drinking, and was nearing withdrawal.

136.    The prosecution's medical examiner and the defense's expert agreed that the wound in Murray's chest could have been caused without

Plaintiff applying any force and was consistent with Plaintiff's description of what occurred.

137.    Little pressure was needed to cause Murray's wound because the knife did not pass through any bone and only penetrated Murray's skin, muscle and lung.

138.    The defense's expert, Dr. Scott LaPoint, a medical examiner in Rochester, New York, observed that Murray's single wound was more consistent with an accident than an attack, as most knife attacks result in more than one stab wound.

139.    The prosecution's medical examiner and the defense's expert further agreed that a small cut on Murray's arm came from a serrated knife, such as the bread knife, and not the knife that caused the fatal wound.

## G.    Relying on the fabricated confession, the prosecution continues for two-and-a-half years.

140.    Officer Cortez's false description of Plaintiff's statement informed the entirety of the case. It continued to permeate the prosecution's description of, and understanding of, the case for years, replacing Plaintiff's actual description of a tragic accident during a domestic abuse incident with a supposed confession suggesting a decisive and forceful motion made to stab Murray due to a desire to protect her purse.

141.    In the months after Plaintiff was remanded to Rikers Island, her lawyers made several unsuccessful bail applications.

142.    At a preliminary hearing, Officer Cortez again falsely described Plaintiff's statement, though in a different manner that she had previously.

143.    At the hearing, Officer Cortez gave the following testimony: "She [Plaintiff] said, Why did he make me do this, why did I do this?"

144.    Officer Cortez's testimony was false.

145.    In response to the question, "And did she say anything else during the time that you were in the apartment?" Officer Cortez stated, "No. she repeated that over and over."

146.    Officer Cortez's testimony at the preliminary hearing was false.

147.    Ms. McCarter never made that statement but in fact made several other statements that were exculpatory.

148.    The prosecutor then asked Officer Cortez a leading question: "Do you recall her [i.e. Plaintiff] saying anything about money?" to which Officer Cortez replied, "She said, he tried to take my money."

149.    During cross examination, defense attorney Frank Rothman asked if Ms. McCarter had, in fact, stated, "I let him stay the night. I was trying to help. He went for my purse and I stabbed him."

150.    Officer Cortez replied, "She didn't tell me that."

151.   Mr. Rothman then showed the domestic incident report to Officer Cortez, and Officer Cortez testified that she had written that Ms. McCarter stated, "I let him stay the night. I was trying to help. He went for my purse and I stabbed him."

152.   Officer Cortez then testified that Ms. McCarter never made the statement to Officer Cortez, but she may have made it to someone else and that Officer Cortez may have watched the body camera before filling out the paperwork.

153.   After listening to this false testimony, and learning nothing of Ms. McCarter's detailed contemporaneous description of Mr. Murray's attack on her, Judge Marison Martinez Alonso ordered Ms. McCarter remanded to jail at Riker's Island.

154.   A grand jury was convened on September 10, 2020 in New York County Supreme Court.

155.   Officer Cortez repeated her lie before the grand jury, testifying that when she entered the apartment on March 2, 2020, Plaintiff was "screaming I stabbed him. You made me do it. Why did this happen."

156.   On September 10, 2020, an indictment was filed against Plaintiff charging her with Murder in the Second Degree.

157.    At a September 16, 2020 bail hearing, Justice Melissa Jackson ordered that Plaintiff be released to home confinement on electric monitoring.

158.    On September 22, 2020, Plaintiff was arraigned in New York Supreme Court on the indictment charging her with Murder in the Second Degree.

159.    On September 24, 2020, Plaintiff was released to home confinement on electric monitoring, with the condition that any request to leave her home be approved by the court.

160.    On June 1, 2021, Justice Jackson denied Plaintiff's application to be released from home confinement.

161.    On July 15, 2021, Justice Jackson granted Plaintiff's request to be allotted 40 hours per week outside the home while on electronic monitoring.

162.    On September 14, 2021, Justice Jackson issued an order allowing Plaintiff to leave her apartment at any time. Plaintiff remained on electronic monitoring.

163.    Justice Jackson, and later Justice Diane Kiesel and Justice Ellen Biben, repeatedly denied Plaintiff's application to be released from electronic monitoring so that she could obtain in-patient psychiatric treatment in Florida.

164. Justice Kiesel denied Plaintiff's applications to leave New York State to visit her family, including to support her daughter during and after the birth of Plaintiff's granddaughter.

165. On November 18, 2022, ten days before trial was scheduled to commence, Manhattan District Attorney Alvin Bragg filed a recommendation of dismissal seeking to abandon the prosecution on the ground that the People would be unable to prove the case beyond a reasonable doubt.

166. On December 2, 2022, Acting Supreme Court Justice Diane Kiesel issued a decision and order dismissing the indictment in the interest of justice.

## DAMAGES

167. Plaintiff suffered physical, psychological, economic, and emotional injuries as a result of Defendants' unlawful conduct.

168. Plaintiff was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and experienced suicidal ideations as a result of being wrongfully detained and prosecuted.

169. The restraints on Plaintiff's liberty prevented her from obtaining necessary in-patient psychiatric treatment.

170. The charges against Plaintiff resulting in Plaintiff being placed on unpaid leave at her job, causing her substantial economic losses.

171.   The charges against Plaintiff prevented her from obtaining alternative employment, causing her substantial economic losses.

172.   Plaintiff incurred substantial legal expenses for an employment lawyer as a result of the Defendants' conduct.

173.   Plaintiff had been in the process of purchasing an apartment when she was arrested. Her accepted offer had to be retracted due to her arrest, and she lost out on the substantial change in value of the apartment she had been in the process of purchasing.

174.   Plaintiff missed the birth of both of her first two grandchildren, who were born out of state. Plaintiff was unable to be physically present with her daughters during their first years of motherhood.

175.   Plaintiff incurred medical expenses, including substantial on-going expenses for treatment of her PTSD.

176.   Plaintiff suffered physical pain and suffering, as well as additional medical expenses, due to improper treatment of her gastro-intestinal condition while at Rikers Island.

177.   Plaintiff opted for a hysterectomy, rather than a more minor medical procedure, due to her fear of incarceration and insufficient medical treatment while incarcerated.

178.   Plaintiff suffered threats of physical violence from others held at Rikers Island.

179.   Plaintiff suffered through numerous strip searches at Rikers Island, including strip searches every time she accessed the computer to speak to her family.

180.   Plaintiff suffered the loss of her freedom for approximately two years and nine months, personal injuries, pain and suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, damage to reputation, and loss of natural psychological development, all of which continue to date and are likely to continue into the future.

## COUNT I

### False arrest under New York State Law – City of New York and Defendants Cortez and Miah

181.   Plaintiff hereby incorporates by reference the preceding paragraphs and further alleges as follows:

182.   On March 2, 2020, defendant officers arrested Plaintiff in her home without probable cause and without a warrant.

183.   The purported basis for the arrest was that Plaintiff confessed to stabbing James Murray, but Defendants Cortez and Miah knew that Plaintiff made no confession.

184.    As a result of the aforesaid conduct by the defendants, Plaintiff was subjected to illegal, improper, and false arrest by the defendants, taken into custody, and caused to be falsely imprisoned, detained, and confined, without probable cause, privilege, or consent.

185.    At all times relevant herein, Plaintiff was conscious of said confinement and did not consent to same.

186.    At all times relevant herein, the said confinement of Plaintiff was without probable cause and was not otherwise privileged.

187.    At all times relevant herein, the aforesaid actions by defendants constituted a deprivation of Plaintiff's rights.

188.    As a result of defendants' unlawful conduct, plaintiff has suffered physical pain and mental anguish, shock, fright, apprehension, embarrassment and humiliation and loss of freedom.

189.    Defendant City, as employer of the Defendant Officers, is responsible for the Defendant Officers' wrongdoing under the doctrine of *respondeat superior*.

190.    By reason of the foregoing, Plaintiff is entitled to punitive damages against the individual defendants named herein.

## COUNT II

## False imprisonment under New York State law – All Defendants

191.    Plaintiff hereby incorporates by reference the preceding paragraphs and further alleges as follows:

192.    As a result of the foregoing, Plaintiff was falsely imprisoned, her liberty was restricted for an extended period of time, she was put in fear for her safety, and humiliated and subjected to physical restraints.

193.    At all times relevant herein, Plaintiff was conscious of said confinement and did not consent to same.

194.    At all times relevant herein, said confinement of Plaintiff was without probable cause and was not otherwise privileged.

195.    At all times relevant herein, the aforesaid actions by defendants constituted a deprivation of Plaintiff's rights.

196.    As a result of defendants' conduct, Plaintiff has suffered physical pain and mental anguish, shock, fright, apprehension, embarrassment and humiliation and loss of freedom.

197.    Defendant City, as employer of the Defendant Officers, is responsible for the Defendant Officers' wrongdoing under the doctrine of *respondeat superior*.

198.    Plaintiff is entitled to punitive damages against the individual defendants.

## COUNT III

## New York Common Law Malicious Prosecution – City of New York and Defendant Cortez

199.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

200.    Defendant Cortez acted knowingly, willfully, intentionally, and with actual malice to initiate and/or continue criminal proceedings against Plaintiff, including by fabricating Plaintiff's confession, without probable cause and to cause all of her injuries and damages.

201.    The criminal proceedings terminated in Plaintiff's favor.

202.    Defendant Cortez engaged in these acts within the scope of her employment.

203.    Defendant City of New York is also liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## COUNT IV

## False arrest under Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 — Defendants Cortez and Miah

204.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

205.    Defendants intentionally subjected Plaintiff to illegal, improper false arrest, taking her into custody, and causing her to be falsely imprisoned, detained, and confined, without probable cause, privilege or consent.

29

206. The purported basis for the arrest was that Plaintiff confessed to stabbing James Murray, but Defendants Cortez and Miah knew that Plaintiff made no confession.

207. At all times relevant herein, Plaintiff was conscious of said confinement and did not consent to same.

208. At all times relevant herein, the said confinement of Plaintiff was without probable cause and was not otherwise privileged.

209. At all times relevant herein, the aforesaid actions by defendants constituted a deprivation of Plaintiff's rights.

210. Plaintiff is entitled to punitive damages against the individual defendants.

## COUNT V

**Malicious Prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 – Defendant Cortez**

211. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

212. Defendant Cortez knowingly, willfully, intentionally, and with actual malice caused the initiation and continuation of Plaintiff's prosecution, including by fabricating Plaintiff's confession, and caused her liberty to be curtailed or taken away, without probable cause.

213. The prosecution terminated in Plaintiff's favor.

214.     Defendant Cortez thereby violated or caused the violation of

Plaintiff's right not to be deprived of his liberty without probable cause, in

violation of the Fourth, Fifth, and Fourteenth Amendments to the United States

Constitution, and caused all of her injuries and damages.

215.     Defendant Cortez is liable to Plaintiff pursuant to 42 U.S.C. §

1983.

## COUNT VI

### Denial of Due Process and a Fair Trial under Fourth, Fifth, Sixth, and Fourteenth Amendments – Fabrication of Evidence, pursuant to 42 U.S.C. § 1983 – Defendant Cortez

216.     Plaintiff hereby incorporates by reference all of the foregoing

paragraphs and further alleges as follows:

217.     Defendant Cortez knowingly, willfully, intentionally and/or

recklessly created, or caused the creation, of false evidence likely to influence a

jury's decision, including Plaintiff's fabricated confession, and forwarded that

information to prosecutors.

218.     The false evidence she forwarded caused such prosecutors to

initiate or continue Plaintiff's prosecution for murder and caused Plaintiff to be

held in custody in lieu of bail or to have her pretrial liberty otherwise curtailed,

caused the grand jury to indict her for second-degree murder, and caused all her

injuries and damages.

219.    Defendant Cortez's conduct violated Plaintiff's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution, and Cortez is liable to her for all her injuries and damages pursuant to 42 U.S.C. § 1983.

## COUNT VII

**Unreasonable Searches and Seizures under Fourth, Fifth, Sixth, and Fourteenth Amendments – Fabrication of Evidence, pursuant to 42 U.S.C. § 1983 – Defendants Cortez, Cruz, Pagan and Delaney**

220.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

221.    Defendant Cortez knowingly, willfully, intentionally and/or recklessly created, or caused the creation, of false evidence used to justify and conduct unlawful and unreasonable searches and seizures.

222.    Defendants Pagan, Cruz and Delaney knew this evidence was false, yet included it in applications for searches in seizures.

223.    Investigators relied on the fabricated confession to provide probable cause for eight search warrants for Plaintiff's property.

224.    Without the fabricated confession attributed to Plaintiff, there was no probable cause to support any of these searches.

225.    On March 2, 2020, NYPD Detective Carlos Pagan relied on Officer Cortez's false statement to obtain a search warrant for Plaintiff's

apartment, and subsequently searched Plaintiff's apartment and seized her belongings.

226.    On March 3, 2020, Detective Alexander Cruz relied on Officer Cortez' false statement to obtain a search warrant for Plaintiff's cellphone and laptop, and subsequently searched Plaintiff's phone and laptop.

227.    On March 10, 2020, Detective Alexander Cruz relied on Officer Cortez' false statement to obtain a warrant to search Plaintiff's apartment for a second time, and subsequently searched Plaintiff's apartment and seized her belongings.

228.    On March 10, 2020, Detective Cruz relied on Officer Cortez' false statement to obtain a search warrant for Plaintiff's Facebook, Instagram, Apple iCloud and Gmail accounts, as well as Murray's Yahoo account, and subsequently seized and searched said accounts.

229.    On August 20, 2020, DANY Investigator Robert Delaney relied on Officer Cortez' false statement to obtain a warrant to search Plaintiff's Gmail account for a second time, and subsequently seized and searched said account.

230.    On August 24, 2020, ADA Sara Sullivan relied on Officer Cortez' false statement to obtain a seizure order for Plaintiff's property at Riker's

Island, which included Plaintiff's wallet and jacket, and subsequently seized said items.

231.    On October 6 and November 2, 2020, Investigator Delaney relied on Officer Cortez' false statement to obtain search warrants for Plaintiff's OkCupid and Tinder accounts, and subsequently seized and searched said accounts.

## COUNT VII

**Excessive Pretrial Detention in violation of the Fourth and Fourteenth Amendments – Defendant Cortez**

232.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

233.    Plaintiff had a right, pursuant to the Fourth and Fourteenth Amendments to the Constitution, to be free from pretrial detention owing to law enforcement officials' fabrication of inculpatory evidence.

234.    In violation of that right, Defendant Cortez willfully, intentionally, recklessly and/or negligently fabricated evidence and forwarded the evidence to prosecutors, foreseeably resulting in Plaintiff's detention following her initial Criminal Court arraignment and subsequent indictment.

235.    Defendant Cortez's actions were shocking to the conscience.

236.    Therefore, pursuant to 42 U.S.C. §1983, Defendant Cortez is liable for all Plaintiff's resultant damages.

## COUNT VIII

## First Amendment Violation – Defendant Cortez and John Doe 1.

237.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

238.    Plaintiff's advocacy on her behalf, and her coordination of said advocacy is protected by the First Amendment.

239.    Defendant Cortez and John Doe 1 caused false statements to be used to justify a search of Plaintiff's Google account for the sole purpose of infringing on Plaintiff's constitutional rights.

240.    These actions by Defendant Cortez and John Doe 1 caused mental anguish and fear to Plaintiff, including fear related to retaliation by NYPD for her continued activism on behalf of herself and other criminalized survivors of domestic violence.

241.    Defendant Cortez and John Doe 1 thereby violated or caused the violation of Plaintiff's right to free speech, in violation of the First Amendment to the United States Constitution, and caused all of her injuries and damages.

242.   Defendant Cortez and John Doe 1 are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

Dated:      New York, New York

November 2, 2023

ZMO LAW PLLC

BY: _*Tess M. Cohen*_____

TESS COHEN
ZACHARY MARGULIS-OHNUMA
BENJAMIN NOTTERMAN
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999

*Attorneys for Plaintiff Tracy McCarter*