UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRACY MCCARTER,

PLAINTIFF,

- AGAINST -

THE CITY OF NEW YORK, OFFICER SAMANTHA
CORTEZ, OFFICER SHAHEL MIAH, DETECTIVE
ALEXANDER CRUZ, SERGEANT JORGE AGUILA,

DEFENDANTS.

23 Civ. 9652 (GHW)(KHP)

---

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
tc@zmolaw.com
*ATTORNEYS FOR DEFENDANT TRACY MCCARTER*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................. 1

PRELIMINARY STATEMENT ........................................................................................................ 4

FACTS .......................................................................................................................................... 6

    I.    PLAINTIFF TRACY MCCARTER, A NURSE AND MOTHER OF FOUR, ENDURES YEARS OF ALCOHOL-INDUCED ABUSE AT THE HANDS OF HER ESTRANGED HUSBAND, JAMES MURRAY. ................................................................................. 6

    II.    IN A DRUNKEN RAGE, MR. MURRAY ASSAULTS MS. MCCARTER ON MARCH 2, 2020. ........................................................................................................................ 7

    III.    OFFICERS MIAH AND CORTEZ AND SERGEANT AGUILA RESPOND BY WRONGFULLY ARRESTING MS. MCCARTER AS SHE WAS WORKING TO SAVE MR. MURRAY'S LIFE. ..............................................................................................10

    IV.    OFFICER CORTEZ FALSELY ATTRIBUTES AN INCULPATORY STATEMENT TO MS. MCCARTER AT THE SCENE, AND THEN FALSELY STATES THE SOURCE OF THE INFORMATION IN HER DEPOSITION. ..............................................................11

    V.    MS. MCCARTER'S NEIGHBOR, WILLIAM VAULTZ, PROVIDES EXCULPATORY EVIDENCE TO THE POLICE. ...........................................................................................12

    VI.    RELYING ON EVIDENCE FABRICATED BY OFFICER CORTEZ AND IGNORING THE POLICE-OBSERVED EFFORT TO SAVE MR. MURRAY'S LIFE, NYPD DET. ALEXANDER CRUZ CHARGES MS. MCCARTER WITH MURDER IN THE SECOND DEGREE, SENDING HER TO RIKERS ISLAND. .........................................13

    VII.    PROSECUTORS REPEATEDLY RELY ON OFFICER CORTEZ'S FABRICATION IN COURT TO KEEP MS. MCCARTER IN JAIL AND OBTAIN UNREASONABLE SEARCH WARRANTS ...........................................................................................................14

STANDARD OF REVIEW.............................................................................................................19

ARGUMENT................................................................................................................................19

    I.    PROBABLE CAUSE TO ARREST IS A MIXED QUESTION OF FACT AND LAW FOR THE JURY, WHICH COULD REASONABLY FIND THAT THE DEFENDANTS WILLFULLY FAILED TO CONSIDER (A) MS. MCCARTER'S EXPLANATION OF HER HUSBAND'S INJURIES AND (B) POLICE-OBSERVED EFFORTS TO SAVE HIS LIFE [ANSWERING DEFENDANTS' POINT I]. .......................................................20

    II.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM [ANSWERING POINT II]. ......23

        A.    Defendants lacked probable cause and therefore their prosecution of Ms. McCarter was not privileged [Answering Point II(A)]....................................23

        B.    There is ample evidence to conclude that Officer Cortez acted with malice [Answering Point II(B)]..............................................................................................26

III. THE INDEPENDENT JUDGMENT OF PROSECUTORS DOES NOT SEVER THE CHAIN OF CAUSATION AS TO THE MALICIOUS PROSECUTION BECAUSE OFFICER CORTEZ FABRICATED EVIDENCE [ANSWERING POINT III]. ..............27

IV. THE FABRICATION OF EVIDENCE CLAIM SURVIVES SUMMARY JUDGMENT [ANSWERING POINT IV]..................................................................................................28

    A.   Cortez fabricated evidence [Answering Point IV pgs. 20-21, headed "Nothing Was Fabricated"]. ..........................................................................29

    B.   The evidence fabricated by Officer Cortez was material [Answering Point IV pgs. 21-22, headed "Even Assuming For Argument's Sake That Something Was Fabricated, It Was Not Material"].............................................31

    C.   There is ample evidence for a jury to conclude that Officer Cortez's fabrication caused Ms. McCarter a loss of liberty [Answering Point IV pgs. 22-23, headed "Even Assuming For Argument's Sake That Something Was Fabricated, Plaintiff Cannot Establish Causation"]. ..........................................32

V. OFFICER CORTEZ AND DET. CRUZ ARE LIABLE FOR THE INVASIVE AND EXTENSIVE SEARCHES OF MS. MCCARTER'S HOME, INTERNET ACCOUNTS, LAPTOP, PHONE, AND PRISON PROPERTY [ANSWERING POINT V]. ................33

VI. DEFENDANT CORTEZ IS LIABLE FOR PLAINTIFF'S EXCESSIVE PRETRIAL DETENTION [ANSWERING POINT VI]..........................................................................37

VII. QUALIFIED IMMUNITY DOES NOT PROTECT OFFICERS WHO DESTROYED MS. MCCARTER'S LIFE ON THE BASIS OF INTENTIONALLY FABRICATED EVIDENCE [ANSWERING POINT VII]. ...............................................................................39

VIII. DEFENDANTS PROVIDE NO BASIS TO DISMISS THE CLAIM OF FALSE IMPRISONMENT AGAINST ALL DEFENDANTS UNDER NEW YORK STATE LAW.................................................................................................................................40

CONCLUSION.................................................................................................................................41

## TABLE OF AUTHORITIES

### Cases

*Alba v. City of New York*, 2024 WL 5359912 (S.D.N.Y. 2024)......................................................22, 24

*Alexander v. City of Syracuse*, 132 F.4th 129 (2d Cir. 2025) ........................................................23, 34

*Amore v. Novarro*, 624 F.3d 522 (2d Cir. 2010)...................................................................................40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................................................19

*Ashley v. City of New York*, 992 F.3d 128 (2d Cir. 2021)......................................................................29

*Barnes v. City of New York*, 68 F.4th 123 (2d Cir. 2023)......................................................................31

*Betts v. Sherman*, 751 F.3d 78 (2d Cir. 2014) ......................................................................................40

*Boughton v. State*, 37 N.Y.2d 451 (1975) .......................................................................................40, 41

*Brogdon v. City of New Rochelle,* 200 F. Supp.2d 411, (S.D.N.Y. 2002) ..........................................27

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ........................................................................26

*Chiverini v. City of Napoleon, Ohio*, 602 U.S. 556 (2024) ..................................................................23

*Colon v. City of New York*, 60 N.Y.2d 78 (1983)..................................................................................21

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) ........................................................................20

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010).........................................................................35

*Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017)................................................................27, 28

*Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012)................................................................................34

*Farid v. Ellen*, 593 F.3d 233 (2d Cir. 2010)..........................................................................................35

*Frost v. N.Y.C. Police Dep't*, 980 F.3d 231 (2d Cir. 2020) ...................................................................31

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016)..............................................29, 32

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir.1991).....................................................................34

*Hernandez v. United States*, 939 F.3d 191 (2d Cir. 2019) ....................................................................20

1

Case 1:23-cv-09652-GHW-KHP    Document 88    Filed 08/01/25    Page 5 of 44

*Husbands ex rel. Forde v. City of New York*, 335 Fed.Appx. 124 (2d Cir. 2009) (summary order) .......................................................................................................................... 27

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ........................................................ 20

*Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003) .................................................................... 21

*Kinzer v. Jackson*, 316 F.3d 139 (2d Cir. 2003) .................................................................... 23

*Kravits v. Purcell*, 87 F.4th 111 (2d Cir. 2023) .................................................................... 34

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) ............................................ 24, 27

*Manganiello v City of New York*, 612 F.3d 149 (2d Cir. 2010) ................................... 21, 26, 27

*McCrae v. Town of Brookhaven*, 759 F.Supp.3d 372 (E.D.N.Y. 2024) ................................... 21

*Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010) ...................................................................... 35

*Moroughan v. County of Suffolk*, 514 F.Supp.3d 479 (E.D.N.Y. 2021) ............................... 24, 26

*Newson v. City of New York*, 2019 WL 3997466 (E.D.N.Y. 2019) ........................................... 39

*Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997) .............................. 29, 32, 40

*Rothstein v. Carriere*, 373 F.3d 275 (2d Cir. 2004) .............................................................. 27

*Rounseville v. Zahl*, 13 F.3d 625 (2d Cir. 1994) .................................................................... 27

*Russo* v. *City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) ...................................... 37, 38, 39

*Satchell v. Dilworth*, 745 F.2d 781 (2d Cir. 1984) ................................................................ 38

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) ...................................................... 26

*Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020) ............................................................ 34

*Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999) .................................................... 28

*U.S. v. Agurs*, 427 U.S. 97  (1976) ....................................................................................... 29

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) .................................................................. 19, 32

**Statutes**

2

42 U.S.C. § 1983 ..................................................................................................................................... passim

NY Penal L. § 125.25(1) ...................................................................................................................... 24

**Rule**

Fed. R. Civ. P. 56(a) ............................................................................................................................... 20

## PRELIMINARY STATEMENT

Plaintiff Tracy McCarter—an African-American board-certified registered nurse—was screaming for help and trying to save her husband's life when New York City police officers walked into her apartment on March 2, 2020. James Murray, who is white, was lying on the floor bleeding profusely from a chest wound. Ms. McCarter was urgently trying to stanch the blood flow, desperate for additional medical assistance.

Rather than help, the police pulled Ms. McCarter off Mr. Murray, hastening his death by applying CPR that increased blood flow. A few minutes later, for no discernable reason, the officers placed Ms. McCarter under arrest and shortly thereafter charged her with intentionally killing Mr. Murray. The police *saw* that Ms. McCarter was trying to save her husband; she *told* them that the death was an accident. So, to justify their reckless false arrest, the police fabricated evidence against Ms. McCarter: Defendant Officer Samantha Cortez falsely claimed—over and over again, at the scene, to the grand jury, in written reports—that Ms. McCarter confessed at the scene to killing her husband on purpose, because he was trying to "take her money." But Ms. McCarter never said she purposely tried to harm Mr. Murray or uttered the words that Officer Cortez attributed to her, which, over almost three years that the case was pending, became crucial false evidence used to justify Ms. McCarter's wrongful imprisonment and prosecution. Officer Cortez's lies cost Ms. McCarter seven months at Rikers Island at the height of the Covid-19 pandemic when her services as a nurse were desperately needed in the community. Officer Cortez's lie ruined Ms. McCarter's career, humiliated her in public, restricted her liberty and destroyed her psychological well-being.

4

As a result, Ms. McCarter sued Officer Cortez and the other responsible New York City Police Department ("NYPD") officers for false arrest, false imprisonment, unwarranted pretrial detention, fabrication of evidence, and unreasonable searches of her electronic accounts pursuant to 42 U.S.C. § 1983, the Fourth and Fifth Amendments of the U.S. Constitution, and analogous New York State authorities.

Defendants now ask the Court to apply hyper-technical interpretations of § 1983 and the common law to deny Ms. McCarter a jury trial on her meritorious claims. They ask the Court to find, as a matter of law, that the police were free to arrest Ms. McCarter, charge her with murder, keep her locked up, pursue the case against her, and comb through her personal information based on Officer Cortez's repeated lie. But, as explained below, drawing all reasonable inferences in favor of Ms. McCarter, there is no question that a reasonable jury could conclude, based on all the admissible facts and circumstances, that Ms. McCarter's arrest was not supported by even arguable probable cause because the police saw Ms. McCarter trying to save her husband, not kill him; that her extended pretrial detention was tainted by the false evidence that the police provided to the prosecutors; that Officer Cortez and the others fabricated evidence against her for use at a trial; and that the false statement caused the illegal searches of her electronic devices, all causing devastating damage that Ms. McCarter lives with to this day.

Summary judgment should be denied.

5

## FACTS

**I.    Plaintiff Tracy McCarter, a nurse and mother of four, endures years of alcohol-induced abuse at the hands of her estranged husband, James Murray.**

In 2020, Ms. McCarter was working as a nurse at NewYork-Presbyterian Hospital. Pl. Ex. 2:[1] 2023 Plaintiff Deposition at 10:8-15. After raising her four children, she obtained her bachelor's degree in nursing in 2012 at the age of 37. Pl. Ex. 3: 2025 Plaintiff Deposition at 26:1-6. She was planning to purchase a home in New York City and was enrolled in a master's degree nursing program at Columbia University. Pl. Ex. 2: 2023 Plaintiff Deposition at 53:1-8.

Ms. McCarter had also been in a relationship for several years with James Murray, who suffered from a severe addiction to alcohol. *Id.* at 14:19-15:4. When sober, Mr. Murray was a loving partner, but when he was drunk, he frequently became violent. *Id.* at 22:1-24:23; 29:25-30:8; 33:23-35:5; 39:22-41:15. On multiple occasions between 2018 and 2020, two of which were documented,[2] he placed Ms. McCarter in a dangerous chokehold.[3] *See e.g. id.* at 22:1-25; 24:1-23.

---

[1] Exhibits labeled "Pl. Ex." are attached to the August 1, 2025 declaration of Tess Cohen filed in support of plaintiff's opposition to defendants' motion for summary judgement. Exhibits labeled "Def. Ex." are attached to the June 13, 2025 declaration of Brian Francolla filed in support of defendants' motion for summary judgement.

[2] On one occasion, Ms. McCarter recorded a video of Mr. Murray when he pulled her hair and then placed her in a chokehold, only releasing her when she threatened him with a pair of scissors. Pl. Ex. 4: Video of Chokehold. The other occasion was documented through a prompt outcry in the form of text messages. Pl. Ex. 6: Text Messages from Plaintiff to Ashley Gray ("Ashley I am so scared. And I didn't tell you but he punched me and kicked me several times. And tried to choke me. I had to squeeze his balls to get away.")

[3] As a nurse, Ms. McCarter knew the ease with which someone could be accidentally killed by being placed in a chokehold. She also knew that in a domestic relationship, prior incidents of choking are associated with a more than seven-fold increase in the likelihood that a homicide will occur. Glass, N, et. al. "Non-fatal strangulation is an important risk factor for homicide of women." J Emerg Med. 2008 Oct; 35(3): 329–335, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2573025/.

Mr. Murray went through several cycles of rehabilitation treatment and relapse after June 2018, including sporadic and unpredictable instances of violence. *Id.* at 47:18-48:12; Pl. Ex. 3: 2025 Plaintiff Deposition at 109:14-16. Ms. McCarter married him after a period of sobriety, and then moved out of their shared home in the summer of 2019 when he relapsed once again. Pl. Ex. 2: 2023 Plaintiff Deposition at 36:1-22; 43:9-12.

Ms. McCarter moved to a rental apartment on the Upper West Side. Pl. Ex. 3: 2025 Plaintiff Deposition at 107:19-23. Mr. Murray frequently arrived at the apartment drunk, ringing her and her neighbors' doorbells at all hours of the night demanding entrance. *Id.* at 35:2-5; 35:19-21. In October of 2019, Ms. McCarter was sent a letter by her building demanding she vacate the apartment as "on a number of occasions [her] roommate/boyfriend was found passed out drunk in front of the building." Pl. Ex. 5: Letter from Building Management. Ms. McCarter convinced Mr. Murray to go back to rehab and avoided eviction. Pl. Ex. 2: 2023 Plaintiff Deposition at 50:3-52:13. In January of 2020, Mr. Murray finished his last stint in rehab and was staying in a sober living facility in Connecticut. *Id.* Mr. Murray, unfortunately, left the sober living facility, relapsed, and moved into an AirBnB in Manhattan. *Id.*

## II.    In a drunken rage, Mr. Murray assaults Ms. McCarter on March 2, 2020.

On a Monday just before the Covid-19 lockdowns began, Ms. McCarter went to her job as a nurse at NewYork-Presbyterian Hospital. Pl. Ex. 3: 2025 Plaintiff Deposition at 27:5-22. At work, she began receiving calls from Mr. Murray from the New York City Link Kiosk system, which provides free calling from the street. Pl. Ex. 7: 2020-03-02 Email from Ms. McCarter to Ked Murray. Ms. McCarter emailed Mr. Murray's parents, writing, "Jim called me from a street kiosk, drunk. He says he locked himself out of the Airbnb and his stuff is maybe

all inside, including his phone and his keys to my place. I have no idea where he is currently. I am at work but leaving soon. He will likely find his way to my place at some point. I don't want to deal with this anymore. I'm not sure what to do about it. FYI 50 degree but supposed to rain overnight." *Id.* Ms. McCarter's email reflected her concern that if she did not help Mr. Murray, he would be left to sleep outside in the rain. *Id.*

Ms. McCarter feared being threatened again with eviction but was worried about Mr. Murray sleeping outside in cold weather. *Id.* She agreed to allow Mr. Murray into her home under the condition that he take his medication (which prevented dangerous alcohol withdrawal), slept on her couch overnight, and then returned to sober living the next day. Pl. Ex. 2: 2023 Plaintiff Deposition at 56:11-20. Mr. Murray initially agreed, but once in the apartment immediately began demanding money from Ms. McCarter, repeating over and over "give me money, give me money." *Id.* at 57:13-14.

Ms. McCarter refused. *Id.* 57:20-25. She and Mr. Murray both grabbed her purse, which he began to fight her for. *Id.* at 58:17-60:2. He placed her in a chokehold, and she could feel herself starting to lose consciousness. *Id.* at 59:15-19. A huge mirror leaning against the wall began to tip over. *Id.* at 60:19-23. Mr. Murray released her as they both instinctively reached up to stop the mirror from falling on them. *Id.* at 60:24-60:2.

Once the mirror was steady, Ms. McCarter grabbed a bread knife, knowing the tip was dull, and held it out to Mr. Murray, demanding he leave her home. *Id.* at 60:10-16; 69:15-22. He refused to leave. *Id.* at 60:16-22. She placed the serrated blade next to his neck, causing

two small nicks, but he still refused to move. *Id*. As she lowered the blade, she apparently caused a small cut on his arm.[4]

Terrified that this tactic did not work, Ms. McCarter scrambled to find her wallet, but when she could not find it, Mr. Murray became enraged and lunged at her, saying something like "fucking liar." *Id.* at 60:23-61:22. Ms. McCarter reached blindly to the open knife drawer behind her and grabbed what turned out to be a sharp chef's knife. *Id.* at 61:17-20. She held the knife in front of her. *Id.* As Mr. Murray came towards her, he tripped and fell forward onto the blade; his body was bent at the waist with his upper body nearly parallel to the floor when he hit the knife. *Id.* at 61:19-24. The blade slid through Mr. Murray's upper chest and into his lung, causing massive bleeding without ever passing through any part of his body more difficult to pierce than his skin. *Id.* Mr. Murray stood up off the blade and fell backwards.[5] *Id.*

Ms. McCarter screamed for help and applied pressure to the wound.[6] *Id.* at 62:17-63:5. Her neighbor entered, one of them called 911, and Ms. McCarter spoke to the 911. operator. *Id.* at 63:11-22. A recording of the 911 call captures Ms. McCarter frantically begging for help. Def. Ex. A: 911 Call; Def. Ex. B: Transcript of 911 Call. Ms. McCarter stated, "I stabbed my

---

[4] The cuts on Mr. Murray's arm was made by a serrated blade, according to the grand jury testimony of the medical examiner. Def. Ex. R at 33:2-16. Thus, the knife that caused the arm cut was a different blade from the knife that caused the fatal wound, which was not serrated. Pl. Ex. 8: Photo of Knife.

[5] Though the defendants claim that this is inconsistent with the physical wounds, there is nothing in the record that establishes that. In truth, the prosecution medical examiner, Dr. Lauren Mecca, and the defense witness, Dr. Scott LaPoint, both stated the fatal wound to Mr. Murray was consistent with Ms. McCarter's description of what occurred. Declaration of Tess Cohen, dated August 1, 2025 ("Cohen Decl.") at ¶ 5-12.

[6] Her neighbor, Mr. Vaultz, testified in the grand jury that he heard her yelling for help, and when he arrived at her apartment, she was holding her hand on Mr. Murray's chest where the wound occurred. Def. Ex. R at 6:14-7:5.

husband on accident," "he tried to take my money and attacked me," and "I stabbed him trying to protect myself." *Id.* She then stated, "My ex-husband came drunk and attacked me. He tried to take my money." *Id.* The 911 operator asked, "What did you do to him?" In a panic, Ms. McCarter falsely replied, "He had a knife." *Id.* She never repeated that false statement to the police, nor did she ever use the word "stabbed" while talking to the police. When she stated, "I stabbed him accidentally" she meant she had caused a stab wound—consistent with her having held a knife to protect herself and him tripping onto it.

### III.    Officers Miah and Cortez and Sergeant Aguila respond by wrongfully arresting Ms. McCarter as she was working to save Mr. Murray's life.

Officers arrived at the scene and removed Ms. McCarter from Mr. Murray as she was attempting to save his life. Plaintiff 56.1 Statement ("Pl. 56.1 Stmt.") at ¶ 17; Pl. Ex. 2: 2023 Plaintiff Deposition at 64:23-64. The initial officers at the scene, defendant Officer Shahel Miah and Officer Morsi, performed chest compressions without compressing the wound in Mr. Murray's chest, causing blood to gush from his wound while Ms. McCarter watched helplessly. *Id.* at 73:18-74:2; Pl. 56.1 Stmt. at ¶ 20. Defendant Officer Cortez and her partner Officer Kraljevic arrived next. Pl. 56.1 Stmt. at ¶ 25.

In the presence of Officer Cortez, Officer Miah asked Ms. McCarter, "What exactly happened?" Def. Ex. H: PO Miah Body Cam at 21:12:17. She replied, "So. I was at work. He left. He was staying in the AirBnB, and, he started drinking again, and I didn't want him here. And he – he called me from the kiosk and he – he said can he just come, can I help him? And so I said, fine you – and he started trying to take my money. He said just give me money. And I was not giving him my money. And he pushed me. He went into, into the glass. I thought we were gonna fall. I thought the glass was gonna fall." *Id.* at 21:12:18-13:06.

10

As Ms. McCarter was speaking, defendant Sergeant Jorge Aguila entered the apartment. Immediately upon entrance, he asked, "that's the, that's the perp?" Pl. 56.1 Stmt. at ¶ 34. Upon receiving an affirmative answer, he ordered Ms. McCarter to be cuffed. *Id.* at ¶ 35.

Officer Miah handcuffed Ms. McCarter. *Id.* at ¶ 35-36. She screamed, "He was fighting me. I don't understand. I was screaming for help, you can ask my neighbor," "I just came home from work." *Id.* at ¶ 32. Officer Miah than stated, "[M]a'am, ma'am, we got it," in a manner indicating he wanted Ms. McCarter to stop talking. *Id.*

**IV.    Officer Cortez falsely attributes an inculpatory statement to Ms. McCarter at the scene, and then falsely states the source of the information in her deposition.**

Body-worn camera footage captured Officer Cortez telling her supervisor, falsely: "[S]he said he tried to take [her] money and she stabbed him in the chest." Pl. 56.1 Stmt. at ¶ 44. Officer Cortez repeated a variation of the false statement in a domestic incident report, writing that Ms. McCarter stated, "I let him stay the night, I was trying to help. He went for my purse and I stabbed him." Def. Ex. M: Domestic Incident Report at 1.

Officer Cortez admitted that she fabricated the statement by Ms. McCarter. In her deposition, when asked, "[Ms. McCarter] never used the word stab while you were there, right?", Officer Cortez replied, "No, she did not." Pl. Ex. 10: Deposition of Officer Cortez at 56:24-57:1.

Officer Cortez then lied in her deposition. When asked when she heard the words she attributed to Ms. McCarter in the domestic incident report, Officer Cortez explained, "So like I mentioned before I did – I did the paperwork while I was on the scene, then back at the precinct. So I kind of summarized everything, what I heard while I was there, after speaking

11

with a neighbor,[7] and then watching body camera footage when I got back." *Id.* at 98:2-6. However, this testimony was demonstrably false; Sgt. Aguila's body camera video revealed that Officer Cortez told Sgt. Aguila, "[S]he said, he tried to take my money and she stabbed him in the chest" before Officer Cortez spoke to the neighbor, Mr. Vaultz. Pl. 56.1 Stmt. ¶ 44. During her deposition, Officer Cortez was forced to concede that she did not rely on Mr. Vaultz when making the statement to Sgt. Aguila, which mirrored her later fabrications. Pl. Ex. 10: Deposition of Officer Cortez at 159:12-160:2.

## V.    Ms. McCarter's neighbor, William Vaultz, provides exculpatory evidence to the police.

Immediately after the incident, Captain Yaguchi speaks to Mr. Vaultz, which is recorded on Captain Yaguchi's body worn camera. Pl. 56.1 Stmt. ¶ 70. Mr. Vaultz told Captain Yaguchi that Mr. Murray has "been a problem", that Mr. Murray does not live in the apartment and had heard Mr. Murray "banging on her door." *Id.* They then had this exchange:

Yaguchi: What happened that night, did you hear anything?

---

[7] Officer Cortez's claim that the neighbor, Will Vaultz, told Officer Cortez that Ms. McCarter stated she stabbed Mr. Murray is not credible. Pl. 56.1 Stmt. ¶ 70. All statements by Ms. McCarter in the presence of Mr. Vaultz are recorded on the 911 call, during which Ms. McCarter stated that she stabbed Mr. Murray *on accident* and that Mr. Murray attacked her. *Id.* On body camera footage, Mr. Vaultz is asked by Captain Yamaguchi what Ms. McCarter said, and Mr. Vaultz replied, "She said he attacked her." *Id.*

Furthermore, while Officer Cortez was at the scene, Detective Carlos Pagan asked Officer Cortez what Mr. Vaultz stated to her. *Id.* Det. Pagan wrote in a report the same day that, "PO Cortez further states that Mr. Daultz [sic] had informed her that he walked to the apartment of the suspect, and he opened the door and saw the suspect laying on the floor." *Id.* In his deposition, Det. Pagan stated that Officer Cortez did not tell him that the neighbor (*i.e.* Will Vaultz) said Ms. McCarter said she stabbed Mr. Murray. *Id.*

12

Mr. Vaultz: I heard a little bit. She was trying to get him out of the house, and he wouldn't leave.

Yaguchi: Did you hear anything verbally like 'get out' or anything?

Vaultz: Yeah.

*Id*. Mr. Vaultz goes on to explain, "I think he tried to take something of hers, and I heard a push." *Id*. Later in the conversation, Captain Yaguchi asked Mr. Vaultz, "What did she say to you at the time?" and Mr. Vaultz replied, "She says she—he he attacked her." *Id*.

## VI.    Relying on evidence fabricated by Officer Cortez and ignoring the police-observed effort to save Mr. Murray's life, NYPD Det. Alexander Cruz charges Ms. McCarter with Murder in the Second Degree, sending her to Rikers Island.

The evening of the incident, defendant Detective Alexander Cruz was assigned as investigator into Mr. Murray's death. Ex. 26: Deposition of Det. Cruz at 38:5-14. Officer Cortez told Det. Cruz, "[Ms. McCarter] had stabbed Mr. Murray because of a dispute over money." *Id.* at 42:2-7. Though Det. Cruz does not recall when he reviewed the body-worn camera, he confirmed that he would have "watched it at some point, yes, within that [first] 24 hours." *Id.* at 45:19-46:6. Det. Cruz further stated that he would have told Assistant District Attorney Sara Sullivan prior to the arraignment that Officer Cortez said Ms. McCarter stabbed Mr. Murray due to a dispute over money. *Id.* at 53:21-54:5.

At the arraignment on March 3, 2020, the People presented Judge Angela Badamo with a complaint stating, "I am informed by Officer Cortez that the defendant stated in substance, "I stabbed him in the chest." Def. Ex. W: Criminal Court Complaint. Det. Cruz was the affiant on the complaint. *Id.* The complaint omitted any mention of Ms. McCarter's exculpatory statements to police that Mr. Murray "pushed" her and "was fighting" her. *Id*. The complaint was signed at 5:20 p.m. on March 3, 2020. *Id.*; *see also* Pl. Ex. 26: Deposition of

13

Det. Cruz at 58:20-22. The incident happened at approximately 9:00 p.m. on March 2, 2020. Pl. 56.1 Stmt. ¶¶ 1-2. As Det. Cruz stated he watched the body-worn camera footage within the first 24 hours, and he signed the complaint over 20 hours after the incident, he likely had viewed the body-worn camera footage by the time he signed the complaint. Pl. Ex. 26: Deposition of Det. Cruz at 45:19-46:6, 58:20-22. The body-worn camera footage contradicted the statement contained in the complaint that Ms. McCarter stated, in the presence of police, "I stabbed him in the chest."

ADA Sullivan asked the court to detain Ms. McCarter pending trial. Def. Ex. O at 3:2-3. To justify her request, ADA Sullivan relied on Officer Cortez's false statement that Ms. McCarter "did admit to stabbing the complainant." *Id.* at 3:17. Judge Badamo ordered Ms. McCarter remanded to Rikers Island. *Id.* at 6:19-20.

## VII. Prosecutors repeatedly rely on Officer Cortez's fabrication in Court to keep Ms. McCarter in jail and obtain unreasonable search warrants.

The same night of the incident, Det. Pagan obtained a search warrant for Ms. McCarter's apartment, drafted by ADA Sullivan, and signed by the Honorable Nicholas W. Moyne. Pl. Ex. 13: 2020-03-02 McCarter Apt Warrant 1. The search warrant application stated, "I am informed by Officer Cortez that she spoke to Tracey [*sic*] McCarter and Ms. McCarter stated in substance: 'I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'" Pl. Ex. 13: 2020-03-02 McCarter Apt Warrant 1 at 2. Det. Pagan memorialized his conversation to that effect with Officer Cortez and confirmed it occurred during the deposition. Pl. Ex. 11: Pagan Interview Report with Cortez DEF 609; Pl. Ex. 28: Detective Carlos Pagan Certified Transcript at 42:10.

Also on March 3, 2020, at 3:43 p.m., Det. Cruz obtained a search warrant for Ms. McCarter's phone and computer. Pl. Ex. 14: Cellphone Warrant. The search warrant

14

application stated, "I am informed by Officer Cortez that she spoke to Tracey [*sic*] McCarter and Ms. McCarter stated in substance: 'I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'" *Id.* at ¶ 1(c).[8]

On March 10, 2020, Det. Cruz obtained two more search warrants, one for Ms. McCarter's apartment and one for Ms. McCarter's social media and email accounts, both ordered by Judge Melissa Jackson, the applications for which again stated, "I am informed by Officer Cortez that she spoke to Tracey [*sic*] McCarter and Ms. McCarter stated in substance: 'I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'" Pl. Ex. 15: 2020-03-10 Apt Warrant 2 at 2; Pl. Ex. 16: Social Media Warrant at 4.

As noted *supra*, Det. Cruz testified during his deposition that he would have reviewed the body-worn camera footage with 24 hours of Ms. McCarter's arrest meaning he certainly had watched the footage by the time he obtained the warrants signed on March 10, 2020, and he likely watched the footage before he obtained the search warrant signed on March 3, 2020. Ex. 26: Deposition of Det. Cruz at 45:19-46:6. Thus, he would have known the body-worn camera footage contradicted Officer Cortez's statement.

On March 12, 2020, Investigator Robert Delaney obtained a search warrant for Mr. Murray's phone which stated, "Police Officer Cortez also saw a woman later identified as Tracy McCarter was the only other person inside of the apartment. Tracy McCarter was crying and stated, 'I let him stay the night, I tried helping him, and then he was taking my purse, I stabbed him in the chest.'" Pl. Ex. 17: Murray Cellphone Warrant at 8(ii). The warrant was ordered by Judge Melissa Jackson. *Id*. at TM_0000131.

---

[8] There are two paragraph 1s in the search warrant application. This is contained within the second paragraph 1 on the page marked TM_0000148.

15

On April 30, 2020, during a bail application, the prosecutor again relied on Officer Cortez's false description of Ms. McCarter's statements. ADA Sullivan stated to the Court, "She throughout the night says to the police officer, He tried to take my money; I wasn't going to let him take my money. Why would he come over to the apartment? Why would he try to take my money? There's no allegations by her that night to police that this was self-defense." Pl. Ex. 18: April 30, 2020 Bail Hearing at 27:13-19. Judge Diane Kiesel presided over the hearing and ordered remand to continue; however, she stated in her decision, "if she were indicted for a manslaughter, I definitely would see that remand would be inappropriate . . . I have to say I have some concerns about whether this woman is a victim of domestic violence and whether this is not part and parcel of a long history in which she felt some need to defend herself, but, you know, I'm not handling a preliminary hearing right now." *Id.* at 30:14-19.

Officer Cortez testified at a preliminary hearing on May 21, 2020. Def. Ex. Q: Preliminary Hearing Transcript. She again failed to mention Ms. McCarter describing Mr. Murray pushing or fighting her. Cortez testified as follows on direct examination:

> Q: While this was happening, what was the defendant doing?
>
> A: She was screaming and crying on the floor.
>
> Q: And was she saying anything?
>
> A: Yes. She said, Why did he make me do this, why did I do this.[9]
>
> Q: And did she say anything during the time that you were in the apartment?
>
> A: No. She repeated that over and over.

---

[9] This is also false. As Officer Cortez conceded in the deposition, Ms. McCarter repeatedly stated, "Why did you do this?" and "Jim, why did you do this?" and did not say "Why did I do this?" Pl. Ex. 10 at 68:11-18; 69:16-19. 83:6-17.

16

Q: Okay. Do you recall her saying anything about money?

A: Yes.

Q: What do you recall her saying?

A: She said, He tried to take my money.

*Id.* at 11:18-12:9. On cross-examination, defense counsel read from the domestic incident report written by Officer Cortez, resulting in the following exchange:

Q: Didn't [Ms. McCarter] say to you, and I quote, "I let him stay the night. I was trying to help. He went for my purse and I stabbed him?"

A: She didn't tell me that.

*Id.* at 16:16-19. At the end of the preliminary hearing, Judge Marisol Martinez Alonso determined "there exists probable cause to believe that the defendant committed a felony," and declined to hear a bail application from the defense at that time. *Id.* at 24:13-14.

Even after the preliminary hearing, Officer Cortez's fabrication continued to be used during bail and warrant applications by ADA Sullivan, several of which occurred in quick succession before Judge Melissa Jackson, who had already approved three prior warrants whose applications contained Officer Cortez's fabricated statement.

On August 20, 2020, Inv. Delaney obtained a search warrant for Ms. McCarter's email account, which was signed by Judge Jackson. Pl. Ex. 19: Gmail Search Warrant. His affidavit in support of the search warrant attached as an exhibit and incorporated the March 10, 2020 search warrant which stated, "I am informed by Officer Cortez that she spoke to Tracey McCarter and Ms. McCarter stated in substance: 'I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'" *Id.*; Pl. Ex. 16: Social Media Warrant at 4.

17

ADA Sullivan obtained an order for the seizure of property from Rikers on August 24, 2020 from Judge Jackson. Pl. Ex. 20: Sullivan Seizure Order Application. ADA Sullivan swore to the application in support of the order herself, swearing, "I am further informed by Officer Cortez that she heard the defendant state, in substance, 'I tried to help him, he tried to take my purse, and I stabbed him in the chest.' I am also informed the defendant stated, in substance, 'he tried to take my money, I was not going to let him take my money.'" *Id.*; Pl. Ex. 16: Social Media Warrant at 4.

The same day that this seizure order was signed, August 24, 2020, Judge Jackson heard a bail application by Ms. McCarter, asking to be released from Rikers to electronic monitoring. Pl. Ex. 21: August 24, 2020 Application for Bail Review Hearing Transcript. Ms. McCarter's lawyer argued that "this case is a very strong self-defense case." *Id.* at 5:15-16. ADA Sullivan, relying on the fabricated statement provided by Officer Cortez, inaccurately responded that the self-defense theory was "different from what [Ms. McCarter] told police officers that night[.]" *Id.* at 14:13-18. Judge Jackson—who had not seen the body-worn camera footage, had not learned of the substance of Ms. McCarter's actual statements at the scene, and who had reviewed five different warrant applications which falsely stated Ms. McCarter stated, "he tried to take my purse, and I stabbed him in the chest"—continued remand. *Id.* at 15:9-10.

On September 16, 2020, the District Attorney's Office abruptly changed its stance and consented to Ms. McCarter's release to electronic monitoring; however, the monitoring amounted to home confinement with only a few hours allowed out of her apartment per week. Pl. Ex. 22: September 16, 2020 Bail Hearing at 4:15-19.

On September 10, 2020, Officer Cortez testified falsely before the grand jury. She testified that Ms. McCarter "was screaming I stabbed him. You made me do it. Why did this happen." Def. Ex. R: Grand Jury Transcript at 14:7-8. During her deposition, Officer Cortez conceded this testimony was false. Pl. Ex. 10: Cortez Deposition at 126:22-127:9. Once again, she falsely attributed statements to Ms. McCarter that Ms. McCarter never made *and* omitted any mention of Ms. McCarter's exculpatory statements. *Id.*

On December 2, 2022, after more than 33 months of prosecution, Judge Diane Kiesel dismissed the indictment against Ms. McCarter on the recommendation of New York County District Attorney Alvin Bragg. Def. Ex. T: Dismissal Decision.

## STANDARD OF REVIEW

Summary judgment may be granted only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854-55 (2d Cir. 1996); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

We respectfully submit that summary judgment is not a close call as to Ms. McCarter's claim for fabrication of evidence and malicious prosecution for the charge of intentional murder, given the overwhelming evidence from which a reasonable jury could conclude that Officer Cortez made up a confession that was used to prosecute Ms. McCarter from the

19

moment her husband passed away until the district attorney's office finally agreed to dismiss the case more than 33 months later.

**I.      Probable cause to arrest is a mixed question of fact and law for the jury, which could reasonably find that the Defendants willfully failed to consider (a) Ms. McCarter's explanation of her husband's injuries and (b) police-observed efforts to save his life [Answering Defendants' Point I].**

The Amended Complaint, ECF No. 56 (hereinafter "the Complaint") alleges false arrest claims against defendants City of New York, Officer Cortez, Officer Miah, and Sgt. Aguila pursuant to New York State law (Count I) and against defendants Officer Cortez, Officer Miah, and Sgt. Aguila pursuant to 42 U.S.C. § 1983 (Count 4). Summary judgment is not warranted on the false arrest or malicious prosecution claims because a genuine issue of material fact remains as to whether the defendant officers ignored information available to them showing that Ms. McCarter's actions were legally justified, negating probable cause for the arrest and prosecution.

A false arrest claim requires proof that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (internal citations and quotations omitted). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal citations and quotations omitted). However, when, as here, "an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). The defendants have not met this burden and are not entitled to summary judgment.

20

As the Second Circuit has explained:

> [U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause. Under New York law, defenses are either exculpatory (eliminating culpability) or mitigating (reducing culpability). *People v. Valles,* 62 N.Y.2d 36, 476 N.Y.S.2d 50, 464 N.E.2d 418, 419 (1984). Justification, including both emergency measures and self-defense, is an exculpatory defense. *Id.*; N.Y. Penal Law §§ 35.05, 35.15 (McKinney 1997). In *Valles*, the New York Court of Appeals held that exculpatory defenses must be presented to a grand jury, whereas mitigating defenses need not, because exculpatory defenses are relevant to the grand jury's role in "protect[ing] citizens from having to defend against unfounded accusations" to which there are complete defenses. *Valles*, 476 N.Y.S.2d 50, 464 N.E.2d at 419. Although a grand jury's decision of whether probable cause exists to indict is distinct from the probable cause determination of whether an arrest is privileged, the interest in protecting the public against improper arrests is parallel to the interest in protecting the innocent against the burden of answering to an indictment. Defenses which negate the existence of a crime should similarly negate probable cause.

*Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). Furthermore, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause,'" *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010), *quoting Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983). When a defendant police officer is presented with exculpatory evidence negating probable cause, the officer is not entitled to unreasonably disregard the exculpatory evidence in determining whether there is probable cause for the arrest. *See e.g. McCrae v. Town of Brookhaven*, 759 F.Supp.3d 372 (E.D.N.Y. 2024) (denying motion for summary judgment on false arrest claim where defendant officer ignored exculpatory evidence presented to him by the Plaintiff in part because the defendant officer believed the exculpatory evidence to be fake).

21

Here the officers arresting Ms. McCarter ignored that: (1) Ms. McCarter was providing lifesaving aid to Mr. Murray when they arrived, Pl. 56.1 Stmt. at ¶ 17; (2) Ms. McCarter described being attacked by Mr. Murray, who had "pushed" her and "was fighting" her, *id.* at ¶ 32; and (3) Mr. Vaultz told an officer at the scene that Ms. McCarter stated Mr. Murray "attacked her," *id.* at ¶ 70. Moreover, when Ms. McCarter tried to explain what happened, she was interrupted by Officer Miah who refused to allow her to complete her narrative of the terrifying moments before Mr. Murray's fatal injury occurred. *Id.* at ¶ 32. Not only did the defendant officers ignore exculpatory evidence and fail to investigate when a reasonable officer would do so, they affirmatively thwarted Ms. McCarter's attempts to explain what happened, and why her actions were justified.

The motion-to-dismiss case relied on by the defendants, *Alba v. City of New York*, is distinguishable on its face. There the magistrate judge dismissed a false arrest case, because the plaintiff did *not* assert self-defense: "at no point during his interrogation did plaintiff make any statement to the effect that he feared for his life or was trying to prevent a robbery." *Alba v. City of New York*, 2024 WL 5359912 at *28 (S.D.N.Y. 2024) (internal citations and quotations omitted).[10] Here, in contrast, Ms. McCarter told her neighbor (who then told the police) that Mr. Murray attacked her, described a physical altercation with the police, and was interrupted when explaining the situation to the defendant officers at the scene. She was observed by police trying to save her husband's life. As such, Officers Miah and Cortez and Sgt. Aguila cannot meet their burden to show probable cause for their warrantless arrest. Their motion for summary judgment should be denied.

---

[10] The District Court adopted this report and recommendation by Magistrate Judge Barbara Moses except that the District Court gave Plaintiff an opportunity to amend the complaint. *Alba v. City of New York*, 2025 WL 26771 (S.D.N.Y. 2025).

II.     **Genuine issues of material fact preclude summary judgment on Plaintiff's malicious prosecution claim [Answering Point II].**

The Complaint alleges malicious prosecution claims against defendants City of New York and Officer Cortez under New York State law and against defendant Officer Cortez pursuant to 42 U.S.C. § 1983. A claim for malicious prosecution requires a plaintiff to show: "(1) that the defendant commenced or continued a criminal proceeding against [the plaintiff]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) (internal citations omitted).

"[U]nlike Fourth Amendment claims of false arrest, in the Fourth Amendment malicious prosecution context, probable cause must support *each* charge brought by the prosecution," *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025) (emphasis added). "[I]f an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated. And that is so even when a valid charge has also been brought." *Chiverini v. City of Napoleon, Ohio*, 602 U.S. 556, 563 (2024).[11]

    A.    **Defendants lacked probable cause and therefore their prosecution of Ms. McCarter was not privileged [Answering Point II(A)].**

        1.    **There was no arguable probable cause to charge Ms. McCarter with Murder in the Second Degree.**

As with their argument in the false arrest claim, defendants contend that probable cause existed to support the prosecution of Ms. McCarter, and thus the malicious prosecution

---

[11] The reasoning behind requiring probable cause for the actual crime charged is particularly stark here, where early in the case Judge Kiesel remarked, in continuing remand: "if she were indicted for a manslaughter, I definitely would see that remand would be inappropriate." Pl. Ex. 18: April 30, 2020 Bail Hearing at 30:14-19.

claim should be dismissed. However, defendants make no attempt to argue what they must: that there was probable cause to believe that Ms. McCarter was guilty of the main crime she was charged with, Murder in the Second Degree, *i.e.* that "[w]ith the intent to cause the death of another person, [s]he cause[d] the death of such person." N.Y. Penal L. § 125.25(1).

In raising the defense of probable cause in a malicious prosecution claim, defendant officers may not ignore exculpatory evidence. "Probable cause to prosecute not only dissipates when police officers uncover new evidence after an arrest, but in certain cases, can also dissipate when police officers fail to examine evidence already available to them." *Moroughan v. County of Suffolk*, 514 F.Supp.3d 479, 524 (E.D.N.Y. 2021); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.")(internal citations omitted). Thus, for the same reasons stated in in Section I, *supra*, there are clear questions of material fact as to whether there was probable cause to initiate and continue the proceeding against Ms. McCarter.

The defendants again rely on *Alba*, ignoring the differences between Ms. McCarter's case and *Alba,* where the judge relied on the fact that "at no point during his interrogation did plaintiff make any statement to the effect that he feared for his life or was trying to prevent a robbery." *Alba v. City of New York*, 2024 WL 5359912 at *28 (S.D.N.Y. 2024). Ms. McCarter, in contrast, told police, the 911 operator and her neighbor that there was a physical confrontation with Mr. Murray. Pl. 56.1 Stmt. ¶¶ 3-7; 32. Her neighbor, in turn, told police that Ms. McCarter stated that Mr. Murray attacked her. *Id.* at ¶ 70.

Here, since no lesser crime was charged, the Court must find there was probable cause to charge Ms. McCarter specifically with Murder in the Second Degree. The defendants

24

have conflated whether there is probable cause to believe Ms. McCarter caused the fatal wound to Mr. Murray with whether there is probable cause to believe that Ms. McCarter committed Murder in the Second Degree,

The actual evidence of the case reveals the following:

- Ms. McCarter was providing lifesaving aid to Mr. Murray when they entered, which police prevented her from continuing. Pl. 56.1 Stmt. ¶¶ 3-7.

- Ms. McCarter told police that Mr. Murray "pushed her" and "was fighting her." Pl. 56.1 Stmt. ¶¶ 3-7.

- Ms. McCarter stated on the 911 call, "I stabbed my husband *on accident.*" Pl. 56.1 Stmt. ¶ 3 (emphasis added).

- Ms. McCarter can be heard on the 911 call telling Mr. Vaultz, "I stabbed him trying to protect myself." Pl. 56.1 Stmt. ¶ 5.

- Mr. Vaultz told Capt. Yaguchi that Mr. Murray caused problems in the building, would bang on Ms. McCarter's door trying to get in, that he heard a push, heard Ms. McCarter say "get out," and that Ms. McCarter told the neighbor that "he attacked her." Pl. 56.1 Stmt. ¶ 70

Given the totality of the circumstances, there is no arguable probable cause to believe that Ms. McCarter committed Murder in the Second Degree, *i.e.* that she intended to cause the death of the man she was desperately trying to save when police arrived. When Officer Cortez told Det. Cruz that Ms. McCarter stated "she killed [Mr. Murray] in a dispute over money," Officer Cortez fabricated the only evidence which plausibly justified bringing a Murder in the Second Degree charge against Ms. McCarter. Ex. 26: Deposition of Det. Cruz at 42:2-7. There exists a genuine issue of material fact as to whether there was probable cause to support the Murder in the Second Degree charge, and thus summary judgment should be denied.

**2.    Any presumption of probable cause based on the grand jury indictment does not apply here because the grand jury relied on perjured testimony from Officer Cortez.**

Plaintiff bears the "burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino v. City of New* York, 331 F.3d 63, 73 (2d Cir. 2003). However, "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Manganiello v. City of New* York, 612 F.3d 149, 162 (2d Cir. 2010) *quoting Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003).

Officer Cortez conceded during her deposition that she falsely testified in the grand jury that Ms. McCarter "was screaming I stabbed him" when she was inside the apartment. Def. Ex. R at 14:7-8. Moreover, Officer Cortez did not inform the grand jury, when asked about statements made by Ms. McCarter, that Ms. McCarter had described a physical altercation between herself and Mr. Murray. *Id*. Thus, the presumption of probable cause arising from the grand jury indictment is rebutted by this concededly false testimony.

For these reasons, a genuine issue of material fact remains as to whether probable cause for the prosecution of Ms. McCarter existed, and whether such probable cause was negated by the exculpatory evidence ignored and suppressed by the defendant officers.

**B.    There is ample evidence to conclude that Officer Cortez acted with malice [Answering Point II(B)].**

Defendants argue for summary judgment on the basis that Plaintiff cannot establish malice. "Claims for malicious prosecution brought under § 1983 are substantially the same as claims for malicious prosecution under state law." *Moroughan v. County of Suffolk*, 514

26

F.Supp.3d 479, 523 (E.D.N.Y. 2021). "New York courts traditionally consider the issue of malice to be a jury question." *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994). "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (internal citations omitted).[12]

Here there is evidence in addition to the lack of probable cause to support malice. Officer Cortez falsely told Det. Cruz that Ms. McCarter confessed to kill Mr. Murray "in a dispute over money" and falsified paperwork to state that Ms. McCarter said, "[h]e tried to take my purse, and I stabbed him in the chest." Ex. 26: Deposition of Det. Cruz at 42:2-7; Pl. Stmt. 56.1 ¶ 76. Cortez's repeated, varying lies about Ms. McCarter's statements indicate not only a lack of probable cause, but that she acted with actual malice toward Ms. McCarter. *See, e.g., Manganiello v City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) ("seemingly inexplicable false statements" supported inference of malice). Summary judgment should be denied.

### III.  The independent judgment of prosecutors does not sever the chain of causation as to the malicious prosecution because Officer Cortez fabricated evidence [Answering Point III].

"[W]hen a plaintiff pursues a claim of malicious prosecution against police officers based on an 'unlawful arrest' the 'intervening exercise of independent judgment' by a prosecutor to pursue the case usually breaks the 'chain of causation' unless the plaintiff can produce evidence that the prosecutor was 'misled or pressured' by the police." *Dufort v. City*

---

[12] Notably, in all the cases cited by the defendants in support of their argument for dismissal due to lack of malice, the Court also found there was probable cause to support the arrest and prosecution. *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411 (S.D.N.Y. 2002); *Rothstein v. Carriere*, 373 F.3d 275 (2d Cir. 2004); *Husbands ex rel. Forde v. City of New York*, 335 Fed.Appx. 124 (2d Cir. 2009) (summary order).

*of New York*, 874 F.3d 338, 352 (2d Cir. 2017) *quoting Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). As discussed in detail *infra* § IV, Officer Cortez repeatedly lied about the statements made by Ms. McCarter, and the prosecutor continued to rely on those statements at arraignment, during bail hearings, in the grand jury, and in at least seven warrant applications. This, as in *Dufort*, ensures that the chain of causation is not severed by the prosecutor's judgment. *Dufort*, 874 F.3d 338, 353 (2d Cir. 2017) (finding summary judgment on malicious prosecution claim improper where the Plaintiff "has at least established a question of material fact as to whether prosecutors and the grand jury were aware of the limited nature of [the witness'] identification and the highly suggestive manner in which it was procured, such that their determinations break the chain of causation.").

Moreover, to the extent that the prosecutor *did* know that Officer Cortez's recitation of Ms. McCarter's statement was a fabrication, her continued use of that fabricated evidence ensures that the chain of causation is not broken by her intervening judgment. While the Second Circuit noted that such independent judgment "usually" breaks the chain of causation absent prosecutors being "misled or pressured", *Dufort*, 874 F.3d at 352, a scenario where a prosecutor colludes in a malicious prosecution is another instance where causation is not severed. The prosecutor could not have relied on the fabricated evidence if it did not exist, thus Officer Cortez remains the beginning link in the causal chain. To rule otherwise would create an absurd result in which police officers would be immunized from liability only because a prosecutor colluded with them to maliciously prosecute a plaintiff.

## IV.    The fabrication of evidence claim survives summary judgment [Answering Point IV].

The Complaint alleges fabrication of evidence against defendant Officer Cortez pursuant to 42 U.S.C. § 1983 (Count VI). "To succeed on a fabricated-evidence claim, a

28

plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] a deprivation of life, liberty, or property as a result.'" *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021) *quoting Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Probable cause is not a defense to a claim of fabrication as:

> "No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process."

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) *quoting U.S. v. Agurs*, 427 U.S. 97, 104 (1976). In order to succeed in a summary judgment motion the defendants must show there is no genuine issue of material fact regarding whether or not Officer Cortez fabricated evidence. Not only can the defendants not meet this burden; there is ample evidence to definitively prove Officer Cortez fabricated material evidence which resulted in a deprivation of liberty for Ms. McCarter.

### A. Officer Cortez fabricated evidence [Answering Point IV pgs. 20-21, headed "Nothing Was Fabricated"].

Body-worn camera footage captured Officer Cortez saying falsely, minutes after she entered Ms. McCarter's apartment, "She said he tried to take her money and she stabbed him in the chest." Pl. 56.1 Stmt. ¶ 44. Officer Cortez repeated a variation of the false statement in a domestic incident report, writing that Ms. McCarter stated, "I let him stay the night, I was trying to help. He went for my purse and I stabbed him." *Id.* ¶ 76. She then testified falsely in

29

the grand jury, claiming Ms. McCarter was screaming, "I stabbed him." *Id.* ¶ 103. This is a fabrication for numerous reasons.

*First*, Ms. McCarter did not say she stabbed Mr. Murray in the presence of Officer Cortez; she was interrupted by Officer Miah before she reached the point in the narrative where Mr. Murray experienced his fatal injury. *Id*. ¶ 32.

*Second*, Officer Cortez's statement *omits* the fact that Mr. Murray was attacking Ms. McCarter, even though Ms. McCarter explained that Mr. Murray "pushed" and "was fighting" her. *Id*. ¶ 32.

*Third*, the statement suggests that Ms. McCarter said she stabbed Mr. Murray *because* he tried to take her purse, triggering a false inference that Ms. McCarter stabbed Mr. Murray without legal justification to protect her personal property. Officer Cortez solidified that inference by telling Det. Cruz that Ms. McCarter stated that she killed him in a dispute over money. Ex. 26: Deposition of Det. Cruz at 42:2-7. The false claim that Ms. McCarter, while still at the scene, said "he went for my purse and I stabbed him" also unfairly prejudiced the defense's ability to demonstrate that all of Ms. McCarter's actions were taken in self-defense.

That Ms. McCarter stated during the 911 call, outside of Officer Cortez's presence "I stabbed my husband on accident," "I stabbed him trying to protect myself," and "he got stabbed with it," does not permit Officer Cortez to claim that she heard Ms. McCarter state, "He tried to take my purse, and I stabbed him in the chest."

Neither does the neighbor's testimony in the grand jury save Officer Cortez. As discussed *supra* n. 7, the evidence indicates Officer Cortez lied about what Mr. Vaultz told her on the night of the incident to cover for her fabrication of evidence. Pl. 56.1 Stmt. ¶ 70. Furthermore, as shown on Sgt. Aguila's body worn camera, she first falsified this statement

30

before she spoke to Ms. McCarter's neighbor. *Id.* ¶ 44. Finally, even if Mr. Vaultz told Officer Cortez that Ms. McCarter confessed to stabbing Mr. Murray—he did not—that does not mean Officer Cortez can claim to have heard Ms. McCarter make that statement. This is for good reason—to the extent that Mr. Vaultz said at any point that Ms. McCarter stated only that she stabbed Mr. Murray, and not that she "stabbed him on accident" and "stabbed him trying to protect [her]self," those statements by Mr. Vaultz are demonstrably inaccurate as revealed by the 911 call. *Id.* ¶¶ 3-5. Even if the Court is inclined to believe that Officer Cortez received this inaccurate information from Mr. Vaultz, Officer Cortez claiming to have herself heard this statement had the effect of duplicating and amplifying false testimony.

**B.        The evidence fabricated by Officer Cortez was material [Answering Point IV pgs. 21-22, headed "Even Assuming For Argument's Sake That Something Was Fabricated, It Was Not Material"].**

Officer Cortez's fabricated evidence was material. In their argument claiming the fabrication was immaterial, Defendants focus on the element requiring that the fabricated evidence "is likely to influence a jury's verdict." Defendants argue that because ADA Sullivan testified in her deposition that she did not intend to call Officer Cortez at trial, the materiality element has not been satisfied. But Second Circuit law is clear and on point: "there may be a violation of due process based on fabricated evidence even without the use of fabricated evidence at trial because the 'fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury.*'" *Barnes v. City of New York*, 68 F.4th 123, 130 (2d Cir. 2023) *quoting Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020) (emphasis in original). This deprivation of liberty is not confined to post-conviction incarceration, but contemplates a variety of liberty interests including

decisions related to bail and collateral consequences such as reputational harm. *See e.g. Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277-279 (2d Cir. 2016) (discussing as deprivations of liberty rights the setting of bail and collateral consequences of false information, including damage to an individual's reputation).

The defendants also argue that because the Court determined in the *Mapp/Dunaway/Huntley* hearing that there was probable cause absent Officer Cortez's fabrication summary judgment is required. This argument ignores black letter law in the Second Circuit that probable cause is *not* a defense to the fabrication of evidence. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129-30 (2d Cir. 1997) (explicitly rejecting defendants' argument that because there was probable cause for the arrest, the fabrication was not material).

**C.    There is ample evidence for a jury to conclude that Officer Cortez's fabrication caused Ms. McCarter a loss of liberty [Answering Point IV pgs. 22-23, headed "Even Assuming For Argument's Sake That Something Was Fabricated, Plaintiff Cannot Establish Causation"].**

The defendants separately argue that "plaintiff cannot meet the causation element." Again, they focus on whether Ms. McCarter would have "been charged with the same crime and prosecuted in the same manner" absent Officer Cortez's fabrication. As a preliminary matter, defendants' assertion is an assumption that should not be the basis for summary judgment motion where all inferences must be made in favor of the Plaintiff. *See e.g. Weyant v. Okst*, 101 F.3d 845, 854-55 (2d Cir. 1996). Though ADA Sullivan, in hindsight, insisted that nothing would have changed even absent Officer Cortez's false statement during her deposition, ADA Sullivan consulted with her supervisors prior to arraignment, Pl. 56.1 Stmt. ¶ 102, and whether her supervisors might have changed their decisions is absent from the record.

32

Even taking ADA Sullivan at her word, the relevant causal question is not whether the prosecution would have proceeded in exactly the same way absent Officer Cortez's fabrication, but whether the fabrication affected Ms. McCarter's liberty interests. There is a genuine issue of material fact on this point. For example, Officer Cortez's false statement appeared in the criminal court complaint reviewed by the judge who ordered Ms. McCarter's remand at the time of her arrest. *See* Def. Ex. W: Criminal Court Complaint. Judge Jackson—who initially denied bail, imposed electronic monitoring tantamount to house arrest for months, and prohibited Ms. McCarter from leaving New York City for mental health treatment or employment—signed multiple warrants based on applications that included the fabricated statement. *See* Pl. Exs. 14–16, 19–22. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Officer Cortez's fabrication contributed to significant restraints on Ms. McCarter's liberty. Summary judgment must therefore be denied.

## V. Officer Cortez and Det. Cruz are liable for the invasive and extensive searches of Ms. McCarter's home, internet accounts, laptop, phone, and prison property [Answering Point V].

The Complaint alleges unlawful searches and seizures against defendants Det. Cruz and Officer Cortez pursuant to 42 U.S.C. § 1983 (Count VI). Defendants Officer Cortez and Det. Cruz are both liable for the harm caused to Ms. McCarter by the unlawful searches and seizures she was subjected to as the result of the authorization of numerous warrants allowing the search of her home, her email, her laptop, her phone, her dating profiles, her social media accounts, her iCloud storage, and her property at Rikers. *See* Pl. Exs. 13-16, 19-20, 27: Search Warrant Applications and Orders. The warrants all relied on Officer Cortez's fabricated account. *See id*.

33

Det. Cruz swore to a warrant application on March 3, 2020 for a search of Ms. McCarter's cellphone and laptop, and two additional warrant applications on March 10, 2020, which allowed for a secondary search of Ms. McCarter's home, and a search of Ms. McCarter's Facebook, Instagram, iCloud, and Google accounts. *See* Pl. Exs. 14-16: Search Warrant Applications of Det. Cruz.

In a civil rights action, to challenge the probable cause for a search warrant, "the plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) *quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991).

Officer Cruz, as the individual whose fabrication was contained within the search warrant, is also liable for the constitutional violations experienced by Ms. McCarter as her life and privacy were ripped apart based on Officer Cortez's fabrication.[13] In order "[t]o establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Alexander v. City of Syracuse*, 132 F.4th 129, 160 (2d Cir. 2025) *quoting Kravits v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023). Therefore, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Kravits*, 87 F.4th at 129 *quoting Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal citations omitted). "The factors necessary to establish a §

---

[13] Even if the Court does not find Cortez liable under a separate cause of action, the search experienced by Ms. McCarter are a damage caused by the fabrication, those still cognizable under Count VI as a damage experienced due to Officer Cortez's fabrication.

34

1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Id.* (internal citations omitted). However, as has been recognized in other Circuits, personal involvement for purposes of § 1983 liability "is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on [her]." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (quotation cleaned up). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (internal citations and quotations omitted). Moreover, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).

The search warrants at issue rely exclusively or nearly exclusively on Officer Cortez's fabricated statement to establish that Ms. McCarter had committed a crime. As an example, the search warrant application which Det. Cruz swore to on March 10, 2020, which allowed for the prosecution to scour through Ms. McCarter's email, social media, and iCloud accounts, contained only the following evidence that a crime had occurred:

35

a. I am informed by Police Officer Samantha Cortez, Shield# 26910, of the 24th Precinct, that she responded to a Radio Run for an Assault in progress at 640 Amsterdam Avenue apartment 2C in Upper Manhattan. I am informed by Officer Cortez that she entered apartment 2C and observed two other officers rendering aid to a male individual who was later identified as James Murray. I am informed by Officer Cortez that she observed what appeared to be a stab wound to Mr. Murray.

b. I am informed by Detective Rodolfo Bisono, Shield# 4530, of the 24th Precinct Detective Squad that he spoke to a neighbor at the above location named Will Vaultz. Mr. Vaultz informed Detective Bisono that he heard arguing from apartment 2C. Mr. Vaultz further stated that when he opened the door to apartment 2C he observed Mr. Murray laying on the floor bleeding while a woman, later identified as Tracy McCarter, was standing over Mr. Murray and treating a stab wound to Mr. Murray's chest.

c. I am informed by Officer Cortez that she spoke to Tracy McCarter and Ms. McCarter stated in substance: "I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest."

d. I am further informed by Officer Cortez that a knife with blood was recovered from the floor inside apartment 2C by another NYPD Officer.

e. I am informed by Officer Cortez that Mr. Murray was transported to St. Luke's Hospital.

f. Mr. Murray was later pronounced dead as a result stab wound to the right upper chest.

g. I went to apartment 2C and observed that it is a studio apartment on the second floor to the right off the stairwell. I observed blood in the doorway of the apartment, in the living room, and in the kitchen area.

h. On March 4, 2020, I met with members of James Murray's family, his mother Ann Murray, his father Ked Murray, his brother Steve Murray, and his sister-in-law Sarah Murray. The family informed me that James Murray had a significant alcohol abuse problem and that he was in and out of rehab over the course of his adult life. I am informed that after a period of sobriety, James Murray relapsed approximately a year and a half ago. I am informed that James Murray entered a rehab facility in around December of 2019, and he was living in a sober living facility until approximately mid-February 2020. The family further informed me that James Murray met Tracy McCarter approximately 7 years ago and they were married in May of 2019. I am informed that it was the family's understanding that at the time of his death, James Murray was renting an apartment through Air BnB. I am informed that James Murray was to live separately from Tracy McCarter until he could prove his sobriety for a period of about 30 days.

Image Excerpt from Ex. 16 at TM_0000051. Officer Cortez's fabrication is contained in paragraph (c), and represents the *only* evidence that Ms. McCarter committed the Subject Crimes contemplated in the search warrant: Murder in the Second Degree and Manslaughter in the First Degree. *Id.* at ¶ 6. Officer Cortez's fabricated statement was a

36

"necessary to the finding of probable cause" and thus the warrants are invalid. Officer Cortez is liable for this constitutional violation because she provided the fabricated evidence used to justify the invasive searches of Ms. McCarter's life. Det. Cruz is liable because as of March 10, 2020, he had watched the body-worn camera footage. Ex. 26 Deposition of Det. Cruz at 45:19-46:6. As such he knew the statement he included in the search warrant was fabricated, he too may be held liable for the unlawful searches to which Ms. McCarter was subjected.

**VI.    Defendant Cortez is liable for Plaintiff's excessive pretrial detention [Answering Point VI].**

The Complaint alleges excessive pretrial detention against defendant Officer Cortez pursuant to 42 U.S.C. § 1983 (Count VIII). In order to prevail on a claim for excessive pretrial detention, the Plaintiff "must establish (1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Russo* v. *City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007) (internal citations omitted). The *Russo* court expanded on these elements, explaining Plaintiff was "protected . . . from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence." *Id.* at 208. Defendants narrowly construe the first element as requiring that the plaintiff prove, essentially, a *Brady* violation.

But *Russo* and its progeny do not require the plaintiff to show a *Brady* violation occurred. Rather, *Russo* follows a line of cases regarding errors resulting in prolonged detention, such as a case where "a plaintiff, who, following completion of a criminal sentence, had been illegally rearrested and incarcerated for thirty-one days based on misleading and

37

incomplete, if not deliberately false, information provided by state correction services." *Russo*, 479 F.3d at 207, *citing Satchell v. Dilworth*, 745 F.2d 781, 782 (2d Cir. 1984). The *Russo* Court noted that in *Satchell* they had stated the plaintiff "might be able to prevail on his due process claims if he could demonstrate that any of the defendants intentionally concealed or conspired to conceal evidence of the plaintiff's completion of his sentence." *Id.* at 207-208, *citing Satchell*, 745 F.2d at 785.

In any event, the first element of *Russo* has plainly been met: the exculpatory information at issue was that Ms. McCarter never stated, "he tried to take my purse, and I stabbed him in the chest" or anything to that effect. The defendants claim this information was never suppressed because all body worn camera footage was turned over.

Defendants are wrong. First, the standard is not "suppressed" but "mishandling or suppression." Second, Defendants can point to nothing in the record indicating *when* Plaintiff received the body-worn camera.[14] Third, and most importantly, even after  defense counsel obtained the body-worn camera, the Court and prosecutor were led to believe that Officer Cortez heard the statement but it was not captured on the recordings, especially since Officer Cortez was not wearing her body-worn camera at the scene. Officer Cortez did not admit to her lie until her deposition years later, when she admitted that she never heard Ms. McCarter make that statement.

As to the second *Russo* element, Officer Cortez violated Ms. McCarter's right to be free from prolonged pretrial detention by fabricating evidence which was used to justify Ms. McCarter's continued remand. The false statement was squarely before the Judge who

---

[14] As far as Plaintiff is aware, Mr. Rothman, Ms. McCarter's first attorney, never had access to the body worn camera footage. Pl. Ex. 1: Plaintiff Affidavit ¶ 10.

initially remanded Ms. McCarter. Judge Jackson—who initially denied Ms. McCarter bail, then required electronic monitoring that amounted to home confinement for months, and refused to allow Ms. McCarter to leave New York City for mental health treatment and for employment—signed several of the warrants whose application included Officer Cortez's fabricated statement. *See* Pl. Ex. 14: Cellphone Search Warrant; Pl. Ex. 15: Apartment Warrant 2. A jury could easily find that Officer Cortez's fabrication directly led to the harms suffered by Ms. McCarter.

And the callous disregard for Ms. McCarter's basic rights on display here is shocking. "An official's behavior "shocks the conscience" within the meaning of *Russo* when they act with 'deliberate indifference to [an individual's] constitutional rights.'" *Newson v. City of New York*, 2019 WL 3997466 at *6 (E.D.N.Y. 2019) *quoting Russo*, 479 F.3d at 210. Fabricating evidence—and concealing the fabrication from the prosecutors and the courts—falls squarely within this definition of "shocks the conscience." As such, Officer Cortez's motion should be denied.

## VII. Qualified immunity does not protect officers who destroyed Ms. McCarter's life on the basis of intentionally fabricated evidence [Answering Point VII].

As an initial matter, the question of qualified immunity does not apply to claims resulting from fabricated evidence. "Here, a reasonable jury could find, based on the evidence, that defendants . . . violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict. These defendant police officers are not entitled to summary judgment on the ground of qualified immunity. Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and

39

no reasonably competent police officer could believe otherwise." *Ricciuti*, 124 F.3d 123, 130 (2d Cir. 1997).

For the false arrest and malicious prosecution claims, qualified immunity is closely associated with the existence of probable cause to arrest. Qualified immunity exists if there is "arguable probable cause" to support the arrest. *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). Similarly, if there is "arguable probable cause" to support the charge malicious prosecuted, then qualified immunity applies. *Betts v. Sherman*, 751 F.3d 78, 83 (2d Cir. 2014).

But as discussed *supra* §§ I, II, we wholly expect any reasonable jury to find that the defendants did *not* have arguable probable cause to arrest Ms. McCarter in the first place because the police knew she was trying to keep Mr. Murray alive and that her actions did not cause his death. Additionally—and separately—defendants did not have arguable probable cause for Murder in the Second Degree, the specific charge brought against Ms. McCarter. Thus, the defendants are not entitled to qualified immunity for any of the claims brought against them unless they prevail at trial.

## VIII. Defendants provide no basis to dismiss the claim of false imprisonment against all defendants under New York State law.

Though defendants state in passing that all claims should be dismissed, they provide no basis to grant summary judgment on the charge of false imprisonment based on New York State law, which was brought against all defendants. *See* ECF No. 56, Count II. "To establish this cause of action the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Boughton v. State*, 37 N.Y.2d 451, 456 (1975). "The great weight of authority, including New York, recognizes the

40

rule that neither actual malice nor want of probable cause is an essential element of an action for false imprisonment." *Id*. at 457.

The defendants' cursory motion for summary judgement on this claim should be denied. To the extent that defendants are permitted to make new substantive arguments for dismissal of this claim in their reply, Plaintiff requests the Court deny the arguments as untimely or give the Plaintiff an opportunity to file a sur-reply to address them.

## CONCLUSION

For the reasons set forth above, the defendants' motion should be DENIED in its entirety.

Dated:          August 1, 2025
                New York, New York


Respectfully submitted,
ZMO Law PLLC

By: ___/s/ Tess Cohen_____
        Tess Cohen
        Zachary Margulis-Ohnuma
        Shane Finn
        353 Lexington Avenue, Suite 900
        New York, NY 10016
        (212) 685-0999

41