**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
TRACY MCCARTER,

                                        Plaintiff,                          **23-CV-9652 (GHW) (KHP)**

                        -against-                                           **REPORT & RECOMMENDATION**
                                                                            **ON MOTION FOR SUMMARY**
THE CITY OF NEW YORK, OFFICER SAMANTHA                                       **JUDGMENT**
CORTEZ, OFFICER SHAHEL MIAH, DETECTIVE
ALEXANDER CRUZ, SERGEANT JORGE AGUILA,

                                        Defendants.
------------------------------------------------------------------X

**TO:    HON. GREGORY H. WOODS, United States District Judge**
**FROM: KATHARINE H. PARKER, United States Magistrate Judge**

Plaintiff Tracy McCarter brought this civil rights action under 42 U.S.C. § 1983, seeking

compensatory and punitive damages for her incarceration following her arrest for allegedly

killing her husband. (ECF No. 56.)  She alleges eight causes of action under federal and New

York law, claiming false arrest, false imprisonment, malicious prosecution, denial of due process

and a fair trial, unreasonable searches and seizures, and excessive pretrial detention. (*Id.*)

Discovery closed on June 16, 2025 (ECF No. 68), and Defendants now move for summary

judgment. (ECF No. 77.)  For the following reasons, the undersigned respectfully recommends

that the Court **grant** the motion for summary judgment and dismiss the case.

## RELEVANT FACTS[1]

The pertinent facts to this case are generally undisputed.  Plaintiff Tracy McCarter was

involved in the fatal stabbing that killed her husband, James Murray, who was not living with

Plaintiff at the time. (ECF No. 87, Pl. Rule 56.1 Counterstatement ¶ 1.)  According to Plaintiff, on

---

[1] The relevant facts are drawn from Defendants' Rule 56.1 Statement and Plaintiff's submission in opposition. (ECF Nos. 80; 87.)

1

March 2, 2020, Murray came to Plaintiff's apartment drunk seeking money.  Plaintiff let him into the apartment.  According to Plaintiff, Murray "lunged at" Plaintiff, who "held a knife in front of her to protect herself," when he "tripped . . . and fell onto the knife." (*Id.*)  Plaintiff called 911 at 9:04 p.m. (*Id.* ¶ 2.)  She told the emergency dispatcher, "I stabbed my husband on accident." (*Id.* ¶ 3.)  A neighbor, William Vaultz, heard commotion from Plaintiff's apartment and went to the apartment where he spoke with Plaintiff at the scene. (*Id.* ¶ 4.)  McCarter told Vaultz, "I stabbed him trying to protect myself." (*Id.* ¶ 5.)  She also told the emergency dispatcher that her "ex-husband came, drunk and attacked [her]," trying "to take [her] money and . . . he had a knife and he tried to attack [her.]" (*Id.* ¶ 6.)  However, the parties agree that McCarter's claim that Murray had a knife was not, in fact, true, and Murray was unarmed. (*Id.* ¶ 204.)  When asked if she "attacked [Murray] with the knife," she said, "I'm sorry. . . .  I didn't attack him.  He was coming at me." (*Id.* ¶ 7.)  She stated she was applying pressure to the wound and repeated, "He got stabbed with [a knife]." (*Id.* ¶ 7.)

The dispatcher coded an assault in progress with the specification "KNIFE/FAMILY." (*Id.* ¶ 9.)  The first responding police officers to arrive at McCarter's building were Defendant Shahel Miah and his partner, Officer Morsi. (*Id.* ¶ 15.)  When they arrived at McCarter's apartment, they saw Murray wounded on the floor of the apartment; McCarter was applying pressure to his wound, trying to stop the bleeding. (*Id.* ¶ 17.)  Vaultz, McCarter, and Murray were the only individuals in the apartment at the time the officers arrived. (*Id.* ¶ 18.)  McCarter, who worked as a nurse, told Miah that Murray had a chest wound. (*Id.* ¶ 19; ECF No. 86-3, at 26:7-16.)  According to McCarter, "Defendants Miah and Morsi pushed Plaintiff out of the way and failed to put pressure on . . . Murray's wound when instructed to by Plaintiff; instead, they

began CPR, which caused the bleeding to increase." (ECF No. 87 ¶ 20.)  Miah's body camera footage shows the knife that killed Murray. (*Id.* ¶ 21.)  At 9:10 p.m., McCarter said, "Why did you do this, Jim," and "he tried to take my money." (*Id.* ¶ 22.)  Based upon his observations at the scene and the information he had from the dispatcher, Miah believed McCarter caused the fatal wound to her husband. (*Id.* ¶ 24.)

Defendant Samantha Cortez also arrived at the scene around 9:10 p.m., though her body camera fell off and was later recovered by a colleague. (*Id.* ¶¶ 26, 28.)  She recovered the knife and gave it to her partner. (*Id.* ¶ 30.)

Miah questioned McCarter, who told him that Murray had tried to take her money, and then recounted Murray pushing her into glass. (*Id.* ¶ 32.)  Miah told her, "Ma'am, ma'am, we got it." (*Id.*)  Other officers arrived at the scene around this time, including Sergeant Jorge Aguila. (*Id.* ¶ 33.)

Around 9:13 p.m., Miah placed Plaintiff under arrest, handcuffing her, at the direction of Aguila. (*Id.* ¶ ¶ 34-38.)  Aguila made that decision based on information from the dispatcher and his observations at the scene. (*Id.* ¶ 39.)  McCarter told them she lived alone, and she was the only one in the apartment at the time. (*Id.* ¶ 41.)  She said she "just wanted [Murray] to leave and not take [her] money," and that she had "just ruined [her] life." (*Id.* ¶¶ 42-43.)

At 9:14 p.m., Cortez told Aguila of McCarter, "she said he tried to take my money and she stabbed him in the chest." (*Id.* ¶ 44.)  McCarter admits that, at that point, she "had already been arrested and she would have been arrested regardless of whether defendant Cortez told defendant Aguila" what she had said. (*Id.* ¶ 45.)  Nevertheless, McCarter alleges Cortez

3

"fabricated the statement she attributed to Ms. McCarter." (*Id.* ¶ 46.) It is undisputed Plaintiff did not use the word "stabbed" in the presence of Cortez. (*Id.* ¶ 49.)

McCarter was transported to the 24th Precinct, where Miah requested Emergency Medical Services to examine Plaintiff. (*Id.* ¶ 50-52.) EMS arrived at 9:44 p.m. (*Id.* ¶ 54.) McCarter chiefly complained of right knee pain, which EMS noted as non-trauma pain. (*Id.* ¶¶ 56-57.) She had no visible bleeding or signs of trauma and was negative for head, neck, or back injuries or pain, though she reported dizziness, headaches, and being lightheaded. (*Id.* ¶ 60.) EMS also said her complaints involved "some nausea and stomach issues, but no vomiting," which McCarter alleges resulted from Murray kneeing her in the stomach. (*Id.* ¶ 61.) She did not appear to have any other injuries. (*Id.* ¶ 62.)

EMS transported McCarter to Mount Sinai Morningside Hospital, arriving at 10:19 p.m. (*Id.* ¶ 63.) Medical staff asked whether she had any injuries, and she said she didn't think so. (*Id.* ¶ 65.) She said she didn't want triage. (*Id.* ¶ 66.) She also made several statements, including saying Murray was drunk, she shouldn't have let Murray into her apartment or let him live with her, and Murray tried to take her money. (*Id.* ¶ 67.) Hospital staff did not diagnose Plaintiff with any observable physical injury. (*Id.* ¶ 68.)

Cortez prepared a Domestic Incident Report ("DIR"). (*Id.* ¶¶ 73-74.) While Defendants say Cortez based the DIR upon "information she received from the 911 Dispatcher, what she saw and heard after she arrived at [P]laintiff's apartment, what she learned from [P]laintiff's neighbor and what she observed on [body camera footage] that she watched back at her precinct," McCarter alleges the DIR "included fabricated evidence, specifically . . . that [Cortez] wrote Ms. McCarter stated, 'He went for my purse and I stabbed him' which was false, and thus

4

not based on any evidence." (*Id.* ¶ 75.)  At the precinct, McCarter had stated, "I let him stay the night.  I was trying to help.  He went for my purse, my money, whatever it was," which was recorded by body camera, though McCarter disputes that Cortez could have known about this statement at the time of her DIR. (*Id.* ¶ 78.)

Murray was pronounced dead at 9:42 p.m. (*Id.* ¶ 81.)  The medical examiner noted several knife wounds, several that were superficial and one that was fatal.  In particular, Murray was described as having suffered "sharp force trauma of the neck, torso, and right upper extremity," with the neck and right upper extremity injuries noted as "superficial" and the arm wounds noted as "abrasion-like." (*Id.* ¶¶ 84, 87-88.)  Murray also suffered blunt force trauma to the head, right upper extremity, and lower extremities, which were described as "minor blunt impact injuries." (*Id.* ¶ 85.)  Toxicology showed that Murray's blood alcohol content was above the legal limit. (*Id.* ¶ 90.)  The medical examiner estimated the fatal stab wound in Murray's chest to be five-and-one-half inches deep, and it perforated Murray's right lung. (*Id.* ¶ 86.)  The chest wound was deemed his cause of death, and the manner of death was noted as a homicide. (*Id.* ¶ 91.)

Detective Alexander Cruz and Assistant District Attorney Sara Sullivan were assigned to investigate the case on the evening of Murray's death. (*Id.* ¶ 92.)  According to Cruz, Cortez told him Plaintiff "had stabbed" Murray "because of a dispute over money," which he related to ADA Sullivan.  (ECF No. 86-26, at 41:25-42:7, 53:5-25.)  After ADA Sullivan consulted with her superiors, Plaintiff was charged with murder in the second degree and arraigned the next day. (ECF No. 87 ¶¶ 93, 97-98, 102.)  Defendant Cortez's statement in the DIR that Plaintiff "said

[Murray] tried to take [McCarter's] money and she stabbed him in the chest" was a factor in the charging decision. (*Id.* ¶ 101.)

At the arraignment, the court was presented with the complaint, signed by Cruz, stating, "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest.'" (ECF No. 79-18.) The complaint did not mention the defendant's statements that Murray had pushed her or was fighting with her. (*Id.*) At the time he signed the complaint, Cruz had reviewed the body-worn camera footage, among other evidence. Frank Rothman, Esq., appeared on Plaintiff's behalf at the arraignment. (ECF No. 87 ¶ 95.) During the proceeding, ADA Sullivan stated it was a strong case and presented the state's theory of the case, while Rothman called it "a strong case of self-defense." (*Id.* ¶¶ 107, 110-11.) The court denied bail and Plaintiff was taken to Rikers. (ECF No. 79-10, at 6:13-20.) The COVID-19 shutdown occurred later that month. (ECF No. 87 ¶ 119.)

On April 30, 2020, Plaintiff made a bail application in court. During the proceeding, ADA Sullivan stated, "She throughout the night says to the police officer, [h]e tried to take my money; I wasn't going to let him take my money. Why would he come over to the apartment? Why would he try to take my money? There's no allegations by her that night to police that this was self-defense." (ECF No. 86-18; Pl. Ex. 18, Apr. 30, 2020 Bail Hearing, at 27:13-19.) Judge Diane Kiesel presided over the hearing and ordered remand to continue; however, she stated in her decision, "if she were indicted for a manslaughter, I definitely would see that remand would be inappropriate . . . I have to say I have some concerns about whether this woman is a victim of domestic violence and whether this is not part and parcel of a long history in which she felt

6

some need to defend herself, but, you know, I'm not handling a preliminary hearing right now."

(*Id.* at 30:14-19.)  Bail was denied.

On May 21, 2020, the court held a preliminary hearing to determine whether there was reasonable cause to believe a felony was committed by defendant. (ECF No. 87 ¶¶ 115-16.) The prosecution called Cortez, who testified McCarter had stated "Why did he make me do this, why did *I* do this," and "he tried to take my money." (*Id.* ¶¶ 117, 120-21 (emphasis added).) Rothman cross-examined Cortez, asking if McCarter made the statement memorialized in the DIR that Plaintiff said, "I stabbed him," in Cortez's presence.  Cortez acknowledged McCarter had not made that statement in her presence, suggesting she (Cortez) may have gotten it from the video, and that McCarter said it "[a]t some point, just not to [Cortez] directly, and not when [Cortez] got to the scene." (*Id.* ¶ 127-30.)  Cortez also admitted in discovery in this action that McCarter did not say "[w]hy did *I* do this." (ECF No. 87, ¶ 133.)  Nevertheless, it was apparent at the scene that McCarter drew the knife that caused the fatal stab wound, and it is undisputed that McCarter indicated she had been holding the knife and stated she had "ruined" her life that night.  The Court ultimately concluded that there was probable cause to believe McCarter had committed a felony and declined to hear a bail application. (*Id.* ¶ 135; ECF No. 79-12, at 27.)

Seeking information on the homicide and plaintiff's motive, ADA Sullivan obtained multiple search warrants, including for plaintiff's apartment, her personal property, and her dating applications. (*Id.* ¶ 96.)  The search warrants were accompanied by affidavits signed by a Detective Pagan or Detective Cruz and presented to judges who issued the warrants. (*See* ECF Nos. 86-13 to 86-17, 86-19.)  In the affidavits, both detectives said they were informed by

Officer Cortez that she spoke to McCarter and that McCarter stated "in substance" that "I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest." (*See* ECF Nos. 86-13 to 86-16; *but see* ECF No. 86-17, at 2 (indicating that Investigator Robert Delaney omitted "in substance" from his affidavit supporting the warrant application).) The warrants authorized search of McCarter's apartment, phone and computer, social media and email accounts.  Other search warrants, obtained in March and August 2020 by an Investigator named Robert Delaney, included affidavits stating that, "Police Officer Cortez also saw a woman later identified as Tracy McCarter was the only other person inside of the apartment.  Tracy McCarter was crying and stated, 'I let him stay the night, I tried helping him, and then he was taking my purse, I stabbed him in the chest.'" (ECF No. 86-17, at 2.)  Finally, in August 2020, ADA Sullivan swore out an application for seizure of property from Rikers stating, "I am further informed by Officer Cortez that she heard the defendant state, in substance, 'I tried to help him, he tried to take my purse, and I stabbed him in the chest.' I am also informed the defendant stated, in substance, 'he tried to take my money, I was not going to let him take my money.'" (ECF No. 86-20 ¶ 4.)  That warrant too was granted.

In August, the court heard another bail application and a plea from Plaintiff's lawyer that the case presented a very strong case of self-defense.  McCarter's counsel argued at length that Murray had a history of domestic violence against McCarter, while ADA Sullivan argued this argument was "not new" and the domestic violence was "not one-sided." (*See* ECF No. 86-21, at 4:19-6:25, 8:11-10:6.)  Ultimately, the court denied the bail.  Plaintiff points to an argument by ADA Sullivan where she said that the self-defense theory was "different from what [Plaintiff] told police officers that night." (*Id.* at 14:8-18.)  Bail was denied.

On September 10, 2020, the District Attorney presented its case against McCarter to a grand jury in Manhattan. (ECF No. 87 ¶ 136.)  Vaultz testified that, on the night of Murray's death, he heard McCarter yelling at Murray to get out and never come back. (*Id.* ¶ 139.)  He also heard McCarter tell Murray not to take her bag or purse and that she had a knife. (*Id.* ¶ 140-41.)  He further said he heard her say, "What did you do, what did you do," and "help me, somebody help me." (*Id.* ¶ 141.)  He said he only heard her voice. (*Id.* ¶ 142.)  He went to her apartment and knocked on the door after he heard her call for help. (*Id.* ¶ 143.)  He testified he saw Murray on his back, with his feet at the door and head going inside of the apartment, while plaintiff applied pressure to the wound. (*Id.* ¶¶ 144-45.)  McCarter disputes whether portions of Vaultz's testimony were accurate as to what transpired on the night Murray died. (*Id.* ¶¶ 145-48.)

Defendant Cortez likewise testified before the grand jury. (*Id.* ¶ 149.)  She testified to substantially the same facts as at the reasonable cause hearing. (*See id.* ¶¶ 149-54.)  She also testified that McCarter "was screaming 'I stabbed him,'" (*id.* ¶ 157), but has conceded in this litigation that Plaintiff did not say "I stabbed him," in her presence. (ECF No. 86-10, at 126:22-127:9.)  ADA Sullivan interpreted Cortez's testimony to be consistent with the body camera footage, though McCarter never stated "I stabbed him" in the footage.[2] (*Id.* ¶ 156.)

Miah also testified before the grand jury. (*Id.* ¶ 158.)  He said he was the first police officer at the scene, saw Murray unresponsive on the ground with McCarter applying pressure to the wound, spent as many as two hours with McCarter after she was arrested without

---

[2]  McCarter does not dispute that ADA Sullivan testified to her interpretation but rather argues that the interpretation was not "reasonable." (ECF No. 87 ¶ 156.)

observing injuries, and looked around the apartment and did not see blood anywhere except the front entrance where Murray lay. (*Id.* ¶ 159.)

Other witnesses who testified before the grand jury included Officer Kraljevic and the Medical Examiner, Dr. Mecca. (*Id.* ¶ 160-162.)  In particular, Dr. Mecca testified to the difference between a stab wound and an incised wound and reviewed the wounds on Murray. (*Id.* ¶¶ 163-64.)  She further testified to injuries Murray suffered on his right hand, right knee, left foot/ankle, and head. (*Id.* ¶¶ 165-66.)  Dr. Mecca explained her findings regarding the fatal stab wound, where it was located, the damage to the Murray's tissue, and the depth of the wound. (*Id.* ¶¶ 167-69.)  She testified that the wound went from Murray's right to left, then downwards, with the downward trajectory being approximately 45 degrees. (*Id.* ¶¶ 170-71.)  According to her, the chest stab wound was consistent with the knife recovered at the scene, which she said may have also caused the neck wounds. (*Id.* ¶¶ 172-73.)  However, she said the shoulder wounds were likely caused by something serrated rather than pointed. (*Id.* ¶ 174.)  The incised wounds, she said, were fresh. (*Id.* ¶ 175-76.)  She identified the cause of death as the stab wound to the torso. (*Id.* ¶ 177.)  On September 10, 2020, the grand jury returned an indictment charging McCarter with Murder in the Second Degree. (*Id.* ¶ 178.)

The Court held a *Huntley*,[3] *Mapp*,[4] *Dunaway*[5] hearing on July 27, 2022. (*Id.* ¶ 179.)  The purpose of the hearing was to determine whether probable cause existed for the arrest (*Dunaway*), to determine the admissibility of certain physical evidence at the criminal trial

---

[3] *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965).

[4] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[5] *Dunaway v. New York*, 442 U.S. 200 (1979).

alleged to have been obtained as the result of an illegal search (*Mapp*), and to determine whether statements made to the police by Plaintiff should be suppressed because they were involuntary or coerced (*Huntley*).  Among other things, Plaintiff sought to suppress the knife found at the scene, Plaintiff's clothing from the night Murray died, and Plaintiff's statements to police that night. (ECF No. 79-14, at 65:22-72:20.)

Miah testified at the July 27, 2022 hearing about his observations at McCarter's apartment. (ECF No. 87 ¶¶ 180-81.)  His body camera footage was admitted as an exhibit. (*Id.* ¶ 182.)  He testified that McCarter never said in his presence that Murray "was trying to take my money.  I offered to let him stay and when he tried to take my money, I stabbed him in the chest." (*Id.* ¶ 186.)

The court denied Plaintiff's motions to suppress and found the state had proven there was probable cause for the arrest. (*Id.* ¶ 187-89.)  The court expressly approved of the recovery of the knife believed to be the murder weapon, citing *People v. Lucas*, 421 N.E.2d 494 (N.Y. 1981), as a search-incident-to-lawful-arrest. (*Id.* ¶ 190.)  The Court further concluded the seizure of McCarter's clothing was also "seized pursuant to a search incident to a lawful arrest." (*Id.* (citing *People v. Bacon*, 19 A.D.3d 287, 288 (N.Y. App. Div. 1st Dep't 2005).)  The court declined to suppress McCarter's statements to police. (*Id.* ¶ 191.)  Cortez did not testify at the hearing, and the prosecution did not rely on her recitation of any statements made by Plaintiff to demonstrate probable cause for the arrest. (*Id.* ¶ 192.)  Importantly, the court noted that the defense "established before the Court that [McCarter] did not literally say the statement attributed to her in defendant Cortez's DIR," but still found there was probable cause for the

11

arrest. (*Id.* ¶ 193.)  Additionally, the prosecution did not intend to call Cortez to testify at trial and did not list Cortez as a trial witness. (*Id.* ¶ 196.)

Notwithstanding the state court's findings, McCarter disputes Defendants' contention in this case that Cortez's recitation in the DIR of McCarter's statements was not essential or necessary to establishing probable cause.  Notwithstanding Cortez's testimony at the preliminary hearing in 2020 acknowledging McCarter had not made the statement that she stabbed Murray in Cortez's presence, McCarter argues that ADA Sullivan relied on Cortez's false statements "throughout the prosecution of Ms. McCarter and repeatedly cited them in court." (*Id.* ¶¶ 197-99.)

While the parties dispute whether McCarter's version of events objectively contained certain inconsistencies, they do not dispute that ADA Sullivan took the view that Plaintiff's story was inconsistent. (*Id.* ¶ 201-10.)  For the purposes of this motion, it is sufficient to note that ADA Sullivan had a different view of the facts than McCarter.

In 2022, following a public campaign led by advocacy organizations aimed at pressuring her release, New York County District Attorney Alvin Bragg, in a rare personal appearance in court, requested the charges against McCarter be dismissed. *People v. McCarter*, 179 N.Y.S.3d 536, 540, 543-47 (Sup. Ct. N.Y. Cnty. 2022).  The Honorable Judge Diane Kiesel concluded that the charges should be dismissed in the interests of justice but in a written decision harshly criticized the District Attorney for dropping the prosecution noting that it could negatively impact confidence of the public in the criminal justice system.  The opinion contains no reference to Cortez or the statements attributed to McCarter in the DIR, but does reference Cortez's statement at the scene that Plaintiff said she stabbed Murray and Plaintiff's failure to

12

object or correct that statement. (ECF No. 87 ¶ 215.)  The court also referred to Vaultz's

testimony, in which he recited that McCarter said, "I stabbed him," (though McCarter disputes

the accuracy of this testimony). (*Id.* ¶ 216.) *See also McCarter*, 179 N.Y.S.3d at 538, 543-44.  The

court highlighted different and seemingly inconsistent factual accounts of the events leading to

Murray's death offered by McCarter's counsel over the course of the case.  Judge Kiesel

expressly noted that "[n]o evidence presented to the Court establishes as a matter of law that

the defendant was justified in her use of deadly physical force.  Nor does the evidence fail to

establish, as a matter of law, that she intended to cause the death of the deceased." *McCarter*,

179 N.Y.S.3d at 538-39, 542-45.  Ultimately, the court stated that its "dismissal in the interest of

justice is *not* a dismissal on the merits" and did not bar further prosecution (for example for

manslaughter in the first degree). *Id.* at 547.  McCarter disputes statements made by the court

in its opinion, noting that the court did not have all the evidence that the District Attorney had.

(ECF No. 87 ¶ 218.)

This action was filed on November 2, 2023.  On November 7, 2024, McCarter filed an

amended complaint, alleging causes of action for violation of her constitutional and civil rights.

(ECF No. 56.)  Most of her claims are premised on her assertion that Officer Cortez falsely

claimed at the scene, to the grand jury, and in the DIR that McCarter stated she stabbed her

husband because he was trying to take her money.  After the close of discovery, Defendants

filed a motion for summary judgment on June 13, 2025. (ECF No. 77.)

## **LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary

judgment when "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists," but "when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to" an absence of evidence "on an essential element of the nonmovant's claim." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023) (citation and quotation marks omitted); *see also In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 397 F. Supp. 3d 406, 419-20 (S.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), *aff'd sub nom. John v. Whole Foods Mkt. Grp., Inc.*, 823 F. App'x 46 (2d Cir. 2020).

Once a movant has made its showing, "the non-movant must set forth specific facts showing that there is a genuine issue for trial." *Souza*, 68 F.4th at 108 (citation and quotation marks omitted).  "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (citation and quotation marks omitted); *see also Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); *Herlihy v. City of New York*, 654 F. App'x 40, 43 (2d Cir. 2016).  A genuine dispute is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To receive consideration, the evidence in the record must be admissible at trial. *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).  Finally, the Court must "resolve any doubts and ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Rasmy v. Mariott Int'l, Inc.*, 952 F3d 379, 386 (2d Cir. 2020).

**DISCUSSION**

McCarter's amended complaint contains eight causes of action for (1) false arrest and false imprisonment, (2) malicious prosecution, (3) fabrication of evidence, and (4) excessive pretrial detention.  The Court addresses each in turn.

**I.      False Arrest/False Imprisonment Under New York Law and Federal Law**

McCarter's first, second, and fourth causes of action are for false arrest and false imprisonment.  The first cause of action for false arrest is brought under New York law against the City, Cortez, Miah, and Aguila; the second cause of action is brought under New York law for false imprisonment against all Defendants; and the fourth cause of action for false arrest is brought under the Fourth and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Cortez, Miah, and Aguila.

"The common law tort of false arrest is a species of false imprisonment, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.'" *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (citing *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).  Thus, under New York law, the elements of a false arrest claim and a false imprisonment claim are the same: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* (citing *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)) (discussing false imprisonment) (cleaned up); *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (discussing false arrest).  Likewise, "[t]he elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." *Hygh v. Jacobs*, 961 F.2d

15

359, 366 (2d Cir. 1992) (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)) (cleaned up).

"Under both federal and New York state law, probable cause is a complete defense" to these

claims. *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022);*Weyant v. Okst*, 101 F.3d 845, 852

(2d Cir. 1996)  (discussing false arrest); *see also Covington v. City of New York*, 171 F.3d 117, 122

(2d Cir. 1999); *Wong v. Yoo*, 649 F. Supp. 2d 34, 58 (E.D.N.Y. 2009).

Defendants argue there are no material facts in dispute on the issue of probable cause

and that the existence of probable cause provides a complete defense to these claims such that

summary judgment should be granted as a matter of law.  Plaintiff contends probable cause

was lacking principally because there were exculpatory facts known to the officers before the

arrest, citing to her statement to the 911 operator that she had stabbed her husband "on

accident," that she said Murray attacked her and tried to take her money, and that she was

trying to save him when police arrived.

Probable cause is present where "the arresting officer has knowledge or reasonably

trustworthy information sufficient to warrant a person of reasonable caution in the belief that

an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (citing

*O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)).  "[I]nnocent behavior frequently

will provide the basis for a showing of probable cause; to require otherwise would be to sub

silentio impose a drastically more rigorous definition of probable cause than the security of our

citizens demands." *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) (internal

quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).  "Where

there is no dispute as to the information the defendants had prior to the arrest, the issue of

probable cause is for the court to decide as a matter of law." *Dukes v. City of New York*, 879 F. Supp. 335, 341 (S.D.N.Y. 1995) (cleaned up).

"Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (cleaned up) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Likewise, an arresting officer "has no duty to 'investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.'" *Alba v. City of New York*, No. 23-cv-8619 (LAK) (BCM), 2024 WL 5359912, at *26 (S.D.N.Y. Aug. 26, 2024) (citing *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)), *report and recommendation adopted in part and rejected in part on other grounds by* 2025 WL 26771 ("*Alba II*"), at *1-3 (S.D.N.Y. Jan. 3, 2025). "Needless to say, the existence of a potential exculpatory defense that is unknown to the arresting officer does not vitiate probable cause." *Alba*, 2024 WL 5359912, at *26.

Here, the undisputed facts establish probable cause to arrest. Police arrived at the Plaintiff's apartment and saw Murray lying on his back on the ground with his feet facing the door, dying from a knife wound to the chest; Plaintiff crying hysterically trying to stop the bleeding; and the knife lying on the floor next to Plaintiff and Murray. It was clear that Plaintiff had held the knife that fatally wounded Murray. Plaintiff acknowledged that the knife on the floor was the weapon that caused Murray's fatal wound. There were no other weapons near Murray or found in the apartment, and Plaintiff was uninjured. Further, the neighbor, Vaultz, spoke with police that evening and explained to them what he had witnessed, namely that McCarter had let Murray back in, and he (Vaultz) overheard McCarter telling Murray to get out

of the house, Murray trying to take something, and what sounded like a push. (Pl's Ex. 23.) While Plaintiff did say that Murray attacked her or pushed her and that he tried to take her money, at no point did she say to police on the scene that she feared for her life or that Murray had a weapon, or that Murray tripped and fell onto the knife.

Importantly, under New York law, in a case involving deadly physical force, a justification defense exists where the defendant "reasonably believes that the [victim] is using or about to use deadly physical force" and the defendant "reasonably believes that using deadly physical force is necessary to avert the perceived threat." *People v. Goetz*, 497 N.E.2d 41 (1986) (citing N.Y. Penal Law § 35.15(2)).  Nothing at the scene, however, made it obvious that Murray intended to use deadly force against Plaintiff.  And, indeed, Plaintiff does not dispute that she told the 911 operator that she stabbed Murray "on accident," that she falsely said to the 911 operator that Murray had attacked her with a knife, and that she said multiple times that night words to the effect that she didn't know why Murray had tried to take her money.  At no point during the night did she say Murray tripped and fell onto the knife.  Nor is there any dispute about what her neighbor told police.  At bottom, it was clear that night that Plaintiff held the knife that killed Murray – there were no other suspects – and that Murray was unarmed and Plaintiff was unharmed.  While a justification defense might have been successful at trial, the arresting officers did not have to credit Plaintiff's story about what happened (to the extent there even was a consistent one that night).  A justification defense involves a determination of a defendant's state of mind at the moment when deadly force was deployed. *Jackson v. Edwards*, 404 F.3d 612, 623 (2d Cir. 2005) (citing *Y.K.*, 663 N.E.2d 313; *Goetz*, 497 N.E.2d 41) (standard for justification defense is whether "the defendant believed deadly

18

physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances."). An arresting officer may not deliberately disregard facts known to him which establish an exculpatory defense, but an arrestee's mere claim that he or she was acting in self-defense (or that something was an accident) need not be investigated, and an officer need not accept such assertions at face value, prior to making an arrest.[6] *Jocks*, 316 F.3d at 135-36 (holding a reasonable jury could have concluded the arresting officer who was himself involved in the altercation should have known plaintiff was acting in self-defense); *see also Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997) (finding qualified immunity for believing there was probable cause to arrest individual who got into altercation with off-duty corrections officer even though self-defense was vigorously asserted).  Further, "[w]hile every case turns on its own facts, a number of New York courts have held that where a victim was unarmed, no reasonable defendant could have believed that the defendant was in imminent danger of the use of deadly physical force." *Alba*, 2024 WL 5359912, at *28 (cleaned up) (citing *Steele v. Laclaire*, 2007 WL 2982240, at *6, *8 (S.D.N.Y. Oct. 10, 2007) (collecting cases)).

Plaintiff points to other allegedly exculpatory evidence at the scene, including that she was providing lifesaving aid to Murray when police arrived and that her neighbor, Vaultz, told

---

[6] McCarter argues that it would have been reasonable for officers to investigate her exculpatory defense. (ECF No. 88, at 25.)  But the case law is clear that they need not do so when they first have reasonable basis for believing there is probable cause to arrest. *Panetta*, 460 F.3d at 395.  McCarter points to Officer Miah's comments telling her, "We got it," arguing that they show officers dismissing her insistence on self-defense and, thus, failing to investigate this defense despite notice. Even granting that may be the case, McCarter does not address the context, which paints a very different picture.  In full context, Miah's comments came amid remarks from McCarter, repeatedly rehashing her version of events.  McCarter was obviously in distress at the scene—understandably so—and repeating herself, so not all her remarks were adding to what officers knew or aiding the investigation into what happened at the apartment.

an officer that Plaintiff said Murray "attacked her."  These facts, accepted as true for purposes of this motion, do not eliminate probable cause to arrest her for two reasons.  First, her actions after Murray was stabbed do not vitiate the probable cause that she possessed the requisite intent or motive to kill Murray, which existed due to other facts statements she made to officers that they were alone and he tried to take her money.  Second, even if there would have been some exculpatory effect of her statements at trial, the officers did not have to credit Plaintiff's version of what happened before arresting her due to the other strong evidence favoring probable cause to arrest.  In sum, there was, as a matter of law, probable cause to arrest Plaintiff at the scene regardless of Plaintiff stating to the 911 operator that she stabbed Murray "on accident" and later that Murray "attacked" her, Plaintiff's attempt to save Murray, and her neighbor's statements on the scene. *See Alba*, 2024 WL 5359912, at *4 (granting motion to dismiss false arrest claim because there was probable cause to arrest).

All of the Defendants are entitled to summary judgment, therefore, on Plaintiff's First, Second and Fourth causes of action.  The Court need not separately evaluate what each Defendant knew at the time of arrest to make this recommendation.  "Under what is known as the 'collective knowledge doctrine,' all information known to one officer is imputed to all other officers involved in the same investigation." *De Michele v. City of New York*, No. 09-cv-9334 (PGG), 2012 WL 4354763, at *7 (S.D.N.Y Sept. 24, 2012); *see also United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).  The doctrine is triggered "where law enforcement authorities are cooperating in an investigation." *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003).  The rule exists because an arresting officer "cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his

20

superiors or associates." *Id.* (internal quotation marks omitted) (quoting *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986)).  Thus, the doctrine is typically applied to aid in establishing probable cause and cannot operate "to impute to an officer 'facts known to some [other] members of the police force which exonerate an arrestee.'" *Id.* (quoting *Valez*, 796 F.2d at 28). "The determination of probable cause does not turn on whether the fellow officer's observations were accurate, but on whether the arresting officer was reasonable in relying on those observations." *De Michele*, 2012 WL 4354763, at *7 (quoting *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994)) (cleaned up).

Plaintiff cites to *Jocks* to argue that summary judgment should not be granted on these claims. *See Jocks*, 316 F.3d at 135.  However, *Jocks* does not aid her.  *Jocks* did not involve a situation where the arresting officer arrived at a scene like the officers in this case; rather, *Jocks* involved a situation where the arresting officer/defendant, an off-duty officer, was personally involved in the altercation with Jocks, leading the officer to arrest Jocks for assault.  Jocks claimed he was only trying to protect himself after the officer pulled a gun on Jocks during the altercation.  On summary judgment, the court stated that it had to accept Jock's version of events.  In other words, there was a dispute of fact as to what the arresting officer/defendant knew since he himself was the only other fact witness to the altercation that led to the arrest. A jury had to decide whether Jocks or the arresting officer was telling the truth. *Id.* at 131-34, 136.

Here, even accepting Plaintiff's version of events, this situation is not he-said, she-said like in *Jocks* (nor could it be given Murray's death, which raised the possibility of much more serious charges than in *Jocks*).  Rather, police were called to the scene of a domestic incident

21

with a knife and found Murray dead from a knife wound and Plaintiff uninjured and the person who obviously caused the fatal injury. This was sufficient information to give rise to probable cause to arrest. Plaintiff's arguments against summary judgment are chiefly legal arguments interpreting the facts as she saw and sees them, which she was entitled to present to a jury if she went to trial on the criminal charge. And, of course, even if a jury believed McCarter's story and acquitted her, acquittal still would not, by itself, vitiate probable cause for arrest. *See, e.g.*, *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569-71 (2d Cir. 1996) (finding probable cause to arrest for unauthorized use of a motor vehicle in a case where plaintiff had been acquitted of that charge).

The critical point is that there was no question then and is no question now that McCarter held the knife which pierced Murray's chest, ultimately killing him, and her statements to the dispatcher, Vaultz, and police officers allowed officers to draw the reasonable conclusion that she had committed a crime. *See Panetta*, 460 F.3d at 395. In this case, probable cause was overwhelming. As ADA Sullivan noted when she drafted the complaint, she believed there was a possible "self-defense reason to protect herself with a knife," but stated that she did not view McCarter's statements at the scene as asserting self-defense because they were, in her view, legally insufficient. (Defs' Ex. N, Sullivan Dep., at 79:25-80:3, 136:7-21, ECF No. 79-9, at 47-48, 76.) And, as the state court later noted when dismissing the criminal case against Plaintiff even after investigation, "[n]o evidence presented to the Court establishe[d] as a matter of law that the defendant was justified in her use of deadly physical force." *McCarter*, 179 N.Y.S.3d at 542. While I have independently evaluated the evidence presented on this motion and in the Local Rule 56.1 statements, I agree that the

22

undisputed evidence at the scene prior to the arrest was such that, even granting all favorable inferences to McCarter, the alleged exculpatory evidence was inconclusive and insufficient to vitiate probable cause as a matter of law.

McCarter also argues that false imprisonment must be analyzed separately from false arrest because "[t]he great weight of authority, including New York, recognizes the rule that neither actual malice nor want of probable cause is an essential element of an action for false imprisonment." *Boughton v. State*, 335 N.E.2d 310 (1975).  That much is true; however, McCarter acknowledges that the confinement cannot be "otherwise privileged," *id.*, and it is well-established that a finding of probable cause is sufficient for a confinement to be privileged. *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *De Lourdes Torres v. Jones*, 47 N.E.3d 747 (N.Y. 2016)).  Thus, this argument fails.

Based on the above, I recommend that summary judgment be granted to Defendants on the false arrest and false imprisonment claims.

## II.    Malicious Prosecution Under New York and Federal Law

McCarter raises two counts of malicious prosecution.  The first is brought against the City and Cortez under New York common law and the second is brought against Cortez under the Fourth, Fifth, and Fourteenth Amendments pursuant to Section 1983.

"To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) (citing *Singer*, 63 F.3d at 116-17).  Under New York law, the elements of malicious prosecution are: "(1) that the defendant commenced or continued a criminal proceeding against [plaintiff]; (2)

that the proceeding was terminated in plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Id.* (citing *Lowth*, 82 F.3d at 571; *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)).

In New York, "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). A plaintiff "bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* Mere conjecture is insufficient. *Id.* Like probable cause to arrest, "probable cause to prosecute consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Dukes*, 879 F. Supp. at 341 (cleaned up); *accord Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) ("[P]robable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'"). "A finding of probable cause supporting an arrest defeats a malicious prosecution claim unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause." *Dukes*, 879 F. Supp. at 342. As opposed to claims for false arrest, "in the Fourth Amendment malicious prosecution context, probable cause must support *each* charge brought by the prosecution." *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025). "[I]f an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated. And that is so even when a

24

valid charge has also been brought." *Chiverini v. City of Napoleon, Ohio*, 602 U.S. 556, 563 (2024).

Here, no reasonable jury could find that there was not probable cause to support the sole charge of second-degree murder, and Plaintiff cites no case law to the contrary. McCarter argues new evidence discovered after the arrest dissipated probable cause found by the grand jury. The discovery of new and exculpatory evidence—as well as officers "fail[ing] to examine" the available exculpatory evidence—can result in probable cause "dissipat[ing]." *See Moroughan v. County of Suffolk*, 514 F. Supp. 3d 479, 524 (E.D.N.Y. 2021). McCarter here references her arguments regarding false arrest, but these do not assist her. As noted above, the undisputed evidence establishes probable cause existed as a matter of law insofar as McCarter admits: (1) she and Murray were alone at her residence; (2) Murray tried to take her money, and there was a physical altercation that ensued; (3) McCarter grabbed a knife; (4) Murray was unarmed; (5) McCarter injured Murray, while McCarter was not visibly injured; and (6) the knife she held was the knife that killed Murray. McCarter's statements to the dispatcher and Vaultz—that she had "stabbed" Murray, whether in her own defense or on accident (or both)[7]—further support a finding of probable cause to prosecute her.

McCarter argues the presumption of probable cause does not attach because the grand jury relied on "perjured testimony from Officer Cortez." "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers

---

[7] The Court notes that McCarter's two assertions on the 911 call—that it was an accidental stabbing and/or a defensive stabbing—are at least potentially contradictory. Combined with her admission that she falsely stated Murray had a knife, prosecutors were entitled to theorize that her intent went beyond what she claimed. In other words, probable cause was not dissipated or vitiated by her statements that she stabbed Murray on accident and/or to protect herself.

25

may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (cleaned up).  Here, however, the purported "perjured testimony" of Cortez was not "crucial to the existence of probable cause" for two reasons.  First, as noted above, no rational juror could conclude that probable cause did not exist, even *without* the statement Cortez attributed to McCarter.  Second, McCarter *did* say she "stabbed" Murray—just not to Officer Cortez.  Rather, she said it to the 911 dispatcher and to Vaultz, albeit in somewhat qualified form.  Indeed, Vaultz testified before the grand jury that McCarter said she "stabbed" Murray. (ECF No. 79-13, at 8:9-19.)  Thus, even absent Officer Cortez's testimony, the grand jury heard from an eyewitness — Vaultz — about what he heard that night and that McCarter told him she stabbed Murray.  The main point about McCarter's statement was to identify her as the person who held the knife, as the validity of the justification defense was something to be determined later in the criminal proceeding.  Thus, even without Cortez's statement, probable cause to prosecute was overwhelming based on all the other testimony offered in the grand jury hearing.  As a result, McCarter cannot show Cortez's testimony was crucial to the existence of probable cause.  At best, it merely bolstered what Vaultz said.

McCarter also argues that Cortez should have informed the grand jury about the altercation preceding Murray's death.  However, as noted above, McCarter's assertions that she was "attacked" were insufficient to rebut probable cause because this did not give rise to an unassailable justification defense insofar as Murray was unarmed and McCarter was unharmed.  In any event, prosecutorial decisions which would merely serve to discredit

26

witnesses "do not amount to fraud, perjury or deliberate or intentional suppression of evidence by the police." *Campbell v. City of New York*, No. 999-cv-5129 (LTS) (THK), 2003 WL 660847, at *2 (S.D.N.Y. 2003). Thus, this argument fails to create a triable issue on the continued existence of probable cause.

Nor is there any evidence to support a finding of malice. While New York law typically considers malice to be a jury question, *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994), malice requires "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573 (internal quotation marks omitted). "In most cases, the lack of probable cause . . . tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Id.* (internal quotation marks omitted). Here, McCarter only argues that lack of probable cause supplies the malice and points to Cortez's "falsified paperwork"—*i.e.*, the DIR reporting that McCarter stated in sum and substance, "He went for my purse and I stabbed him"—and that Cortez told Cruz that McCarter indicated she killed Murray "in a dispute over money." But this argument and evidence does not assist McCarter because, in fact, it is undisputed that McCarter *did* say repeatedly that the altercation involved a dispute about money. (*See, e.g.*, ECF No. 87 ¶¶ 22, 32, 42, 67.) In the videos, McCarter stated several times in sum and substance that Murray tried to take her money and never once said to police that it was an accident (that Murray tripped and fell on the knife). McCarter may wish to characterize the dispute as something other than "a dispute over money," but Cortez had a more than sufficient basis to believe that was what it was, notwithstanding McCarter's other shifting explanations of what transpired that night. It makes

27

no difference whether Cortez correctly reported that the dispute involved a purse. While the Court urges accuracy in police work, no error in Cortez's report or grand jury testimony vitiates probable cause. Nor is there any evidence otherwise that Cortez held any sort of malice toward McCarter. McCarter advances no theory of malice apart from the absence of probable cause resulting from errors in Cortez's testimony and police reports. But as noted above, they had no impact on the presence of probable cause. Indeed, the presence of probable cause throughout the prosecution is overwhelming.

While it is possible, as McCarter suggests, that the prosecution may not have proven its case beyond a reasonable doubt at trial, this standard is not applicable to the claims in this case. It seems likely that DA Bragg may have reached the conclusion that his office would not be able to convict McCarter of second-degree murder on the evidence. The Court does not second-guess this determination. Regardless, Plaintiff has not shown there is a material dispute of fact on the issue of whether a reasonable jury could conclude that probable cause existed to prosecute—it did exist as a matter of law. Therefore, the Court should grant summary judgment on the malicious prosecution claims.[8]

---

[8] Having recommended the Court find that probable cause was present throughout the arrest and subsequent prosecution, the Court need not address Defendants' argument that the independent judgment of prosecutors severed the chain of causation as to the alleged malicious prosecution. Because officers had probable cause to arrest, there was no false arrest; because prosecutors had probable cause to prosecute a second-degree murder charge, there is also no malicious prosecution. In any event, for completeness, the Court adds that there is no evidence that prosecutors were "misled or pressured" by police into charging McCarter for the same reasons McCarter has not overcome the determination of probable cause given Cortez's allegedly erroneous statements. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017). There is also no evidence that the prosecutor failed to review any of the evidence available, including the 911 call record and video, or that she was relying primarily on or colluded with Cortez, at any point in the criminal case. Further, while McCarter argues that her case is like *Dufort*, the facts are distinguishable. In *Dufort*, the Second Circuit found a question of fact "as to whether the District Attorney's office was aware of the limited nature of [the witness]'s identification testimony." 874 F.3d at 352. This issue was predicated on the fact the key witness testified at the criminal trial that she based her eyewitness "identification [of plaintiff] . . . solely on [the plaintiff]'s clothing." *Id.* at 344-45, 352. Thus, a jury needed to determine "[w]hether [the witness] ever told prosecutors prior to trial that she could only recognize [the plaintiff] by the color of his jacket." *Id.* Further, when summary judgment was granted in *Dufort*, prosecutors

### III.    Fabrication of Evidence Under Federal Law

McCarter raises two further Section 1983 claims based on the Cortez's alleged fabrication of evidence: (1) denial of due process and a fair trial for fabrication of evidence under the Fourth Fifth, Sixth, and Fourteenth Amendments against Cortez; and (2) unreasonable searches and seizures for fabrication of evidence under the Fourth, Fifth, Sixth, and Fourteenth Amendments against Cortez and Cruz.  These claims are premised on Cortez's statements on the body camera footage, in interviews with ADA Sullivan, at the preliminary hearing, before the grand jury, and in the DIR , as well as on Cruz's reliance on this evidence for the purposes of obtaining search warrants.[9]  While McCarter separately notes each reiteration of the statements in her Complaint, the essence of her claims is that Cortez erroneously reported that McCarter stated and/or screamed, "He went for my purse, and I stabbed him" and "Why did *I* do this" (as opposed to "why did *he* do this") at the scene.

### A.  Due Process Claim

Fair trial claims predicated on fabrication of evidence require a showing that "an (1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's verdict,

---

had not been deposed, so the record had not been fully developed. *Id.*  On these grounds, the Second Circuit reversed.  Here, the record is fully developed, and Plaintiff points to no portion of it to make out a dispute of fact sufficient to question ADA Sullivan's independence.  Moreover, there was no dispute as to her identification as the person who held the knife involved in Murray's death.  And while Cortez's alleged fabrications were used in the criminal complaint, they played a relatively minor role in the sum total of the evidence as the case advanced.  As this Court has already noted, the evidence otherwise overwhelmingly supported probable cause to prosecute. Accordingly, *Dufort* is not analogous to this case.

[9] The Court notes it has reviewed the body camera footage provided in connection with this motion.  On the video, McCarter repeatedly blamed Murray for causing his own death by coming to the apartment and trying to take McCarter's money.  McCarter's most significant objection to what Cortez reported relates to motive and her justification defense, not her identity as the person who wielded the knife.  But, as discussed above, the exact words used that night did not establish a justification defense as a matter of law or otherwise vitiate probable cause.

(4) forward[ed] that information to prosecutors, *and* (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (emphasis added).  "[G]overnment officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015).  "Information may be 'false' if material omissions render an otherwise true statement false." *Id.* at 548.  There is no dispute that Cortez and Cruz were investigating officers and that their information was forwarded to prosecutors. Defendants dispute chiefly that the evidence was not fabricated, the evidence was not likely to influence a verdict, and the plaintiff did not suffer a resulting deprivation of life, liberty, or property.

The Court need not analyze whether evidence was fabricated or material, because McCarter has failed to show a dispute of fact that any alleged fabrication deprived her of life, liberty, or property.  As noted above, probable cause supporting McCarter's arrest and murder charge was overwhelming even absent Cortez's statement, so some level of detention was certainly justified.  McCarter points to the criminal court's initial denial of bail to support her argument that she was deprived of liberty and to search warrants executed against her effects to support that she was deprived of property.  However, she fails to explain how the result would have been different in the absence of Cortez's statement (or omission of context available from the 911 call).  At the arraignment, when the judge was considering bail, the prosecution made only passing reference to the fact that McCarter "admit[ted] to stabbing the complainant," along with the other overwhelming evidence, and said she had extensive out-of-state contacts. (ECF No. 79-10, at 3:8-4:1.)  McCarter's counsel argued it was "a strong case of

30

self-defense," *id.* at 4:14-18, saying Murray "got physical" the night he died, and she "rented an apartment by herself, . . . let him come over," where he became abusive and tried to take her purse, and then "[t]here was one stab wound." (*Id.* at 5:3-10.)  Cortez's statement was not material to the bail determination given there was no dispute about the identity of the person who wielded the knife, defense counsel's presentation of a justification defense, and the fact that the arraigning judge, after hearing the justification defense, nevertheless denied bail primarily on McCarter's risk of flight – not McCarter's motives or danger to the community.[10] Thus, no reasonable jury could conclude that the period from Plaintiff's initial arrest to April 30, 2020 violated her due process rights.

Nor did any statements or omissions of Cortez cause McCarter's detention for the period from April 30, 2020, to May 21, 2020, when she was released on electronic monitoring. At the April 30, 2020 bail hearing, the Court heard argument regarding McCarter's criminal history, her ties to the community and employment status, Murray's history of alleged abuse and criminal history, her efforts to save Murray on the night of his death, and her family connections to the area which her counsel, Rothman, argued meant she was not a flight risk. (ECF No. 86-18, at 2:19-11:6.)  The prosecution opposed McCarter's request to set bail at $100,000, asking for remand, mentioning McCarter's "deep connections in Texas," her long-standing intentions to leave New York, her potential motives related to alleged infidelity, and her prior threat to hurt him with a knife or scissors. (*Id.* at 11:10-20:18.)  After colloquy about the timing of the Covid-19 pandemic and McCarter's pre-trial detention, *id.* at 20:19-23:20,

---

[10]  New York state courts consider only risk of flight, not whether the defendant poses a risk to the community, when making bail determinations. *See* N.Y. C.P.L. § 510.10(1).

Rothman stated during rebuttal that although both sides had their "own spin, . . . [t]he facts are not much in dispute." (*Id.* at 23:22-23.)  However, he disputed that she would flee to Texas or that she was the real abuser. (*Id.* at 23:23-26:5.)  The prosecution also raised text messages regarding a prior instance where McCarter drew a knife out of fear that Murray would put her in a chokehold again, mentioned that Murray had multiple wounds while McCarter had none, and raised the neighbor's testimony about McCarter saying she had stabbed her husband. (*Id.* at 26:23-27:12.)  Rothman raised that the medical examiner said Murray's other wounds were superficial. (*Id.* at 29:5-12.)  The judge indicated that if the case were a manslaughter case, remand would be inappropriate, but that the denial of bail would not be altered at that point.  The judge also expressed concerns about whether this was a domestic violence situation where she felt the need to protect herself. (*Id.* at 30:6-25.)

The first glaring fact demonstrating summary judgment is appropriate on the deprivation of liberty claim is that the statements of Cortez—and the alleged omissions of context—were not mentioned by any party to the April 30 proceeding, including Rothman.  Moreover, the story McCarter wanted to portray was in fact portrayed—that she was a victim of domestic abuse who was defending herself against her abuser.  The judge expressed sympathy to McCarter's justification defense but, nevertheless, it was insufficient to sway the judge not to order remand.  And to whatever extent the judge would have released her on bail at that point if the charge had been a manslaughter charge, as explained above, the murder charge was adequately supported by the evidence totally independent from Cortez's statements.  In sum, no reasonable jury would conclude the period of McCarter's detention after the April 30, 2020 hearing resulted from Cortez's alleged fabrications or omissions.

Further, the ultimate change to electronic monitoring happened by way of agreement with the prosecution in part due to the Covid-19 pandemic; McCarter does not allege that there was any change in the evidence before the court which resulted in the change to electronic monitoring at the May 21, 2020 preliminary hearing. (ECF No. 86-22, at 4:3-6:16.)  Also, the fact that Cortez had not personally heard the statement she attributed to McCarter was elicited at the May 21 hearing, yet the judge still found reasonable cause to believe McCarter had committed a felony. (ECF No. 79-12, at 19:21-20:12, 26:12-27:16.)  Finally, while the criminal complaint contains a summary of Cortez's statement about what Plaintiff said at the scene, the crime was charged as a family offense, and the domestic violence connection and alleged history of Murray's abuse was well understood by the judges who denied bail. (*See* ECF No. 79-18; ECF No. 86-22, at 30:14-19; ECF No. 86-21, at 4:19-6:25, 8:11-10:6.)  Accordingly, no reasonable juror could find on the undisputed facts that Cortez's statement led to a deprivation of liberty.[11]

### B.  Unreasonable Searches and Seizures

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (cleaned up). However, searches and seizures conducted "pursuant to a warrant issued by a neutral magistrate [are] presumed reasonable because such warrants may issue only upon a showing of

---

[11]  The Court does not credit McCarter's speculative assertion that ADA Sullivan's supervisors would have altered their decision-making based only on the allegedly fabricated statement.  This statement is purely speculative and unsupported by record evidence. *See Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 560 (S.D.N.Y. 2010) (citing *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).

probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007). A plaintiff may overcome this presumption where it is shown "that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in" a warrant application, "and that such statements or omissions were necessary to the finding of probable cause." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). "[T]o survive [a] defendants' motion for summary judgment on this issue, [a] plaintiff[] must satisfy three conditions: [1] they must have made an offer of proof supporting specific allegations of deliberate or reckless misrepresentation . . . ; [2] the alleged misrepresentations must be legally relevant to the probable cause determination; and [3] there must be a genuine issue of fact about whether the magistrate would have issued the warrant on the bases of 'corrected affidavits.'" *Id.* at 574 (citations omitted).

The Court need not assess the offers of proof supporting misrepresentation or the relevance because necessity has not been met. Courts assess necessity (sometimes called materiality) "using the 'corrected affidavits' approach," under which the court examines "the hypothetical contents of a corrected application to determine whether a proper warrant application, based on all existing facts known to the applicant, would have sufficed to support probable cause." *Calderon v. City of New York*, 138 F. Supp. 593, 606 (S.D.N.Y. 2015) (cleaned up) (citing *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014)). "A statement is not material if, after eliminating it, the corrected affidavit would still have supported a finding of probable cause." *Id.* at 606-07. Here, Cortez's alleged fabrications or omissions were not necessary to a finding of probable cause to sign off on the warrants.

34

McCarter argues that the alleged fabrication "represents the *only* evidence that Ms. McCarter" committed the crime.  However, the excerpt of the search warrant she attaches to her brief shows that nothing could be further from the truth. (*See* ECF No. 88, at 36; ECF No. 86-16, at 4.)  The statements "I stabbed him in the chest" and "he tried to take my purse" attributed to McCarter represent only a small fraction of the factual background.  When removing that statement, and the statement that he tried to take her purse, the other facts asserted in the various affidavits supporting the warrant applications included that: (1) officers responded to an assault in progress, where they discovered Murray and treated him for an apparent stab wound; (2) Vaultz heard an argument from McCarter's apartment and saw Murray laying on the floor bleeding, with McCarter treating his stab wound; (3) McCarter stated she let Murray stay the night; (4) a bloody knife was recovered from the apartment; and (5) Murray died from a stab wound to his right upper chest.[12]  These facts alone would have allowed the judge signing the warrants to conclude there was probable cause to search McCarter's effects, as Murray was killed by a knife while alone with McCarter in her apartment.[13]  Moreover, the Court could easily correct the application to include the fact that McCarter admitted she and Murray were alone in the apartment before police arrived (which she has never disputed) and/or that she told the 911 operator she stabbed Murray and/or that the neighbor reported that McCarter said to him in sum and substance that she stabbed Murray, and the picture would be clarified. *See Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir.

---

[12]  While there are slight variations between each search warrant, the basic factual allegations are the same in each. (*See* ECF Nos. 86-13 to 86-17, 86-19.)

[13] This conclusion applies with equal force to the warrants obtained with use of Delaney's affidavit, where he omits that Cortez reported the "sum and substance" of McCarter's statements, since the "corrected affidavit" would simply omit both the statements, whether reported "in sum and substance" or as a matter of fact.

2004) (noting that the corrected affidavit standard reviews *all* evidence known to officers at the time of the application).

The critical point is that there is no dispute that Plaintiff is the person who held the knife that killed Murray and that no evidence at the scene (or developed later in the case) established a justification defense as a matter of law, meaning that probable cause existed for all the warrants — as the evidence sought would either be inculpatory or exculpatory. The alleged misrepresentation was simply not relevant the probable cause determination, and a corrected affidavit would still have resulted in the issuance of the warrants. Accordingly, the argument that the officers violated her Fourth Amendment rights fails. Thus, Defendants are entitled to summary judgement as a matter of law on these claims.

## IV.    Excessive Pretrial Detention Under Federal Law

Plaintiff's last claim is for excessive pretrial detention under the Fourth and Fourteenth Amendments pursuant to Section 1983 against Cortez. The Second Circuit has held that this claim is correctly analyzed only under the Fourth Amendment, and not the Fourteenth Amendment's due process clause. *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007). To prevail on this claim, Plaintiff must show "(1) that [s]he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppressing exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." *Russo*, 479 F.3d at 205 (internal quotation marks omitted). "The relevant factors to consider in determining whether a plaintiff's Fourth Amendment right to be free from excessive detention was violated are: (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the defendant officers'

36

possession could have been checked; and (3) the alleged intentionality of the defendants'

behavior." *Cambisaca v. Ruhe*, No. 17-cv-87 (JCM), 2019 WL 2866072, at *10 (S.D.N.Y. 2019)

(internal quotation marks omitted) (citing *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 402

(E.D.N.Y. 2014)).

Applying these factors, Plaintiff has not shown that her right to be free of unreasonable

detention was violated. She was detained for approximately three months from early March to

late May when she was released on electronic monitoring. Given the seriousness of the

charges she faced, she has failed to show that there is a dispute of fact to whether this period

was reasonable—it was reasonable given the weight of the evidence and the gravity of the

charges (which, again, were well supported by probable cause from arrest to dismissal).

Further, the Court's analysis of malice for the purposes of malicious prosecution informs

its discussion about the alleged intentionality of defendants' behavior: Again, McCarter has

raised no argument and offered no evidence to suggest a dispute of fact regarding whether

Defendants intentionally concealed or mishandled exculpatory information. As noted above,

Plaintiff has made no showing of malice, and she has made no showing of any degree of

intentionality of alleged mishandling.

Further, it is not entirely clear what exculpatory evidence McCarter argues was

mishandled or suppressed apart from Cortez's allegedly fabricated reports about what Plaintiff

said the night Murray was stabbed. From this Court's review of the undisputed evidence, the

prosecutor had the alleged exculpatory statements that Murray was stabbed "on accident" or

after Murray "attacked" Plaintiff from the time of the filing of the Complaint, and the state

court was presented with many arguments about a justification defense from the beginning of

the case.  Plaintiff's argument that the record does not indicate when Plaintiff's counsel in the

criminal matter received the body camera footage is not persuasive. (ECF No. 88, at 38.)  It is

immaterial that Defendants cannot identify when the footage was given to McCarter.  Indeed, it

is undisputed that the video footage was given to Plaintiff, and the burden is on the Plaintiff to

show a dispute of fact warranting trial.  The timing of when Plaintiff's defense counsel received

the body camera footage is simply not material to the claims in this case.  Further, Plaintiff

offers no affidavit, emails, or deposition testimony of Rothman indicating when he received the

evidence and no other records regarding how or when prosecutors turned it over to show there

was a delay.  Moreover, there is record evidence that defense counsel had reviewed the body

camera footage early on in the criminal case, given Rothman's specific reference to what it

shows at the April 30, 2020 bail hearing. (*See* ECF No. 86-18, at 7:2-12 ("Judge, you see the body

cams, and the body cams record her trying to save him.").)

The more significant evidence that may have been mishandled was Cortez's attribution

of statements to McCarter.  But even granting there may be a dispute of fact about whether

Cortez incorrectly reported what McCarter said in her presence, what Cortez reported was not

inconsistent with what McCarter said to others that night.  Plaintiff has never disputed she held

the knife, that she told the 911 dispatcher that she stabbed Murray on accident, or that her

neighbor reported that she told him that Murray attacked her and she stabbed him, or that she

said Murray tried to take her money.  Thus, Cortez's actions did not violate McCarter's right to

be free from continued detention because the state court's rationale for denying bail involved

the murder charge, which was well supported by probable cause, and the court's independent

assessment of Plaintiff's risk of flight.  Neither the correct attributions nor the full context of

Plaintiff's statements to the police on the evening of the stabbing would have changed the Court's determination. As in other cases, here "there was no 'smoking gun' exculpatory evidence available" to prove Plaintiff's innocence at any point in her criminal case. *See Creighton v. City of New York*, No. 12-cv-7454 (PGG), 2017 WL 636415, at *46 (S.D.N.Y. Feb. 14, 2017). Rather, the determination of her guilt or innocence necessarily would have turned on a jury determination had the case gone to trial. Thus, Plaintiff has not shown any dispute of fact that allegedly mishandled exculpatory evidence would have shortened or eliminated the period during which she was detained.

Nor does Cortez's conduct shock the conscience. While the Court could view Cortez's attribution of the statement to McCarter as somewhat careless, it does not rise to the level of genuinely shocking, particularly in light of the fact that McCarter made similar statements on the 911 call, to Vaultz, and other statements to officers which would have allowed Cortez to infer (properly) that McCarter conceded she had held the knife that killed Murray and felt responsible for Murray's fate—*e.g.*, that she should not have let Murray in that night, that he fought with her, that she was alone, and that she ruined her life. There are no facts in the record from which a reasonable jury could conclude Cortez's conduct "shocks the conscience." Accordingly, the excessive pre-trial detention claim fails. The Court should grant summary judgment to Defendants on this claim.

## V.    Qualified Immunity

Finally, the Court analyzes Defendants' claims of qualified immunity. While the Court recommends that summary judgment be granted because McCarter failed to show a genuine

dispute of material fact as to any of her causes of action, it nevertheless addresses these arguments for completeness and in the alternative to the foregoing recommendations.

Qualified immunity shields government officials whose discretionary conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity doctrine has developed into a broad protection for "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A finding of qualified immunity is appropriate where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). The qualified immunity inquiry recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Further, "[i]f the officer's mistake as to what the law requires is reasonable," they receive the benefit of qualified immunity. *Id.* However, it will not shield officers whose conduct objectively falls below the standard of a reasonably competent officer. *Malley*, 475 U.S. at 341. To that extent, with respect to a claim for fabrication of evidence, if the Court concludes that evidence was fabricated, then qualified immunity is unavailable since "no reasonably competent police officer" could believe a fabrication of evidence would not violate a clearly established constitutional right. *See Ricciuti*, 124 F.3d at 130.[14]

---

[14] This Court reiterates, however, that it recommends granting summary judgment on the fabrication claims since no reasonable jury could find that there was a resulting deprivation of liberty from those alleged fabrications. Further, to whatever extent the false arrest/imprisonment, malicious prosecution, and excessive pretrial detention claims are predicated on the alleged fabrications, the Court's analysis indicates those claims fail irrespective of any alleged fabrication since there are no disputes of fact enabling a reasonable jury to conclude the other elements of those claims could be proven.

Regarding false arrest claims, the standard applicable to shield officers' conduct requires only a showing of "arguable probable cause." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (citing *Walczyk*, 496 F.3d at 163).  Arguable probable case exists if it was objectively reasonable to believe that probable cause existed or if reasonably competent officers could disagree on whether probable cause was met. *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).  "The standard for qualified immunity from a malicious prosecution claim is the same as that for false arrest." *Ullah v. Office of Dist. Attorney*, No. 07-cv-2687 (DAB) (GWG), 2009 WL 2151357, at *4 (S.D.N.Y. July 20, 2009); *see also Betts v. Sherman*, 751 F.3d 78, 83 (2d Cir. 2014).

Plaintiff has not shown a genuine dispute of material fact as to the applicability of qualified immunity to the Defendants for the false arrest, false imprisonment, and malicious prosecution claims.  Regarding the false arrest and malicious prosecution claims, even assuming actual probable cause was not present, arguable probable cause certainly was.  The Court will reiterate the facts giving rise to probable cause one more time so there can be no doubt:  Police responded to an assault in progress involving a knife, noted as a domestic matter.  When they arrived, they found Murray, wounded by being stabbed in the chest, on the floor, with McCarter applying pressure to his wound.  She stated they had been alone in the apartment, that she had let him in, he had tried to take her money, and there had been a struggle.  She never indicated she feared for her life or that he was about to use deadly force against her.  There was no mention of a chokehold that night.  The neighbor stated he heard an argument and a struggle.  The knife was recovered, bloody, from the scene.  Murray died from the stab wound.  And Plaintiff was placed under arrest before Cortez made any statement.  Given these

facts are not disputed, it was objectively reasonable for officers to believe McCarter had committed a crime.  Thus, there was arguable probable cause to arrest.

Nothing that prosecutors or investigators learned later negated arguable probable cause.  While McCarter presented evidence in her favor, nothing she presented made probable cause objectively unreasonable.  Indeed, the prosecution discovered evidence they believed furthered their case.  While the investigation did turn up evidence of Murray's abuse in the past, the evidence was equivocal and could have been read by a jury as showing McCarter intended to kill him.  Further, the 911 call demonstrated she had confessed to stabbing Murray—even if she expressed a different level of intent on the call—so prosecutors had all they needed to file and maintain the charges.  Finally, every judge reviewing the case ultimately concluded that there was probable cause to believe McCarter may be guilty of the crime with which she was charged, which determinations this Court has reviewed and concluded the same.  Thus, it was objectively reasonable for prosecutors to conclude there was probable cause to prosecute the murder charge.  Thus, arguable probable cause existed to prosecute.

Finally, as to the unreasonable pretrial detention claim, even if the Court assumes that the detention violated her constitutional rights, Plaintiff has raised no genuine dispute of material fact to enable a jury to conclude that it was objectively unreasonable for Defendants to conclude that they had not violated those rights.  Nor has Plaintiff raised any case law on this point.  On the contrary, all the facts cited above suggest it was reasonable to believe that her continued detention did not violate the law, including the multiple findings of judges that she was a flight risk and there was reasonable cause to conclude she committed a felony.  As Judge Kiesel put it aptly in her decision, "No evidence presented to the court establishes as a matter

of law that the defendant was justified in her use of deadly force.  Nor does the evidence fail to establish, as a matter of law, that she intended to cause the death of the deceased." *McCarter*, 179 N.Y.S.3d at 542.  This Court's review of the criminal record, independent of Judge Kiesel's, finds that statement to be well supported and well-reasoned.  Importantly, the record at that point included evidence that Cortez had not personally heard McCarter say she "stabbed" Murray or that he tried to take her "purse."  Thus, the effect of any alleged mishandled evidence affecting bail determinations or continued detentions at any point during the prosecution is blunted by the fact that this evidence was a part of the record in the criminal proceeding.  Nor could it, in this Court's view, have gone any other way for the reasons explained in this Report and Recommendation.  In short, no reasonable jury could conclude that it was objectively unreasonable to believe her pretrial detention was appropriate, given the gravity of the crime of which she was accused, her out-of-state connections, and the overwhelming evidence supporting the charge.

As a result, the Defendants are each entitled to qualified immunity to the extent they are alleged to be liable for false arrest or imprisonment, malicious prosecution, or excessive pretrial detention.  The Court should grant summary judgment to Defendants on this point.

*                *                *

The Court does not question that McCarter has been through a trying ordeal and acknowledges that McCarter maintains her innocence, as is her right.  Indeed, she is formally innocent due to the presumption of innocence afforded to all criminal defendants:  The charges were ultimately dropped, with DA Bragg expressing doubt about whether the prosecution could prove Plaintiff had the requisite intent for second degree murder, the crime with which she was

43

charged.  But the dropping of the charges does not mean that the police falsely arrested or prosecuted McCarter.  And, as discussed above, no reasonable juror could find that any alleged fabrication or mishandling of evidence by Cortez or any other Defendant impacted the arrest, the charge, or the outcome of any part of her case.  Ultimately, there were serious factual issues regarding Murray's death which could only have been resolved at trial.  Based on the record before the Court on this motion, the Court should grant summary judgment in favor of Defendants on all claims.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, I recommend that Defendant's motion for summary judgment be granted.

DATED:        New York, New York
              January 6, 2026                    Respectfully submitted,


                                                 _____
                                                 KATHARINE H. PARKER
                                                 United States Magistrate Judge

## NOTICE

Plaintiff shall have fourteen days and Defendant shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P.72(b)(2).

Plaintiff shall have fourteen days to serve and file any response. Defendant shall have fourteen days to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and served on the other parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).