USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
TRACY MCCARTER,                                                    :
                                                                   :
                                    Plaintiff,                     :        1:23-cv-9652-GHW-KHP
                                                                   :
                     -v-                                           :             MEMORANDUM
                                                                   :          OPINION & ORDER
CITY OF NEW YORK, *et al.*,                                        :
                                                                   :
                                    Defendants.                    :
                                                                   :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

This case begins with a frantic 911 call by Plaintiff Tracy McCarter.  She told the dispatcher, "I stabbed my husband on accident," "I stabbed him trying to protect myself," and "He got stabbed with it."  When officers arrived, they found Ms. McCarter next to the body of her estranged husband, a knife wound in his chest.  She was arrested and prosecuted for murder.

The prosecutor's decision to charge Ms. McCarter with second degree murder was influenced by the account of Officer Samantha Cortez, one of the responding officers.  According to Officer Cortez, Ms. McCarter said, "He went for my purse and I stabbed him."  Officer Cortez's account omitted any reference to Ms. McCarter's assertions that it had been an accident or self-defense.  And Officer Cortez later admitted that she never heard Ms. McCarter say those words.  Ms. McCarter spent six months in jail and almost two and a half years on pretrial supervision before District Attorney Alvin Bragg dismissed the prosecution against her.

Ms. McCarter filed this action seeking damages for false arrest, false imprisonment, malicious prosecution, and fabrication of evidence, among other claims.  Magistrate Judge Katharine H. Parker issued a thoughtful and well-reasoned report and recommendation (the "R&R") regarding Defendants' motion for summary judgment, recommending dismissal of all of Ms. McCarter's

claims, principally because there was probable cause for her arrest and prosecution.  Given that Ms. McCarter was found next to the body of her estranged husband and admitted that she had caused his death, that conclusion was sound.

However, probable cause does not vitiate all of Ms. McCarter's claims—in particular, her claim that she was denied a fair trial because Officer Cortez recounted Ms. McCarter's statements in a way that overstated Ms. McCarter's intent to "stab" her former partner, and omitted material facts indicating that the killing was an accident or self-defense.  Because a reasonable jury could find that Officer Cortez fabricated evidence, summary judgment cannot be entered on Ms. McCarter's claim that she was denied a fair trial.  Therefore, the Court adopts the R&R in part, declines to adopt it in part, and grants Defendants summary judgment on all claims except Count VI, Ms. McCarter's claim for denial of a fair trial based on fabrication of evidence.

## II.    BACKGROUND

### A.  Facts[1]

Familiarity with the facts of this case is presumed.  The reader is referred to the R&R for a fuller description of the factual and procedural history.  A brief summary of the facts relevant to Ms. McCarter's remaining objections follows.

On March 2, 2020, James Murray sustained a fatal knife wound at the apartment of his estranged wife Tracy McCarter.  Dkt. No. 87 ("Pl. 56.1") ¶¶ 1, 17, 81; Dkt. No. 96 at 4.  Ms. McCarter contends that Mr. Murray lunged at her and fell onto a knife she was holding in front of herself to protect herself.  Pl. 56.1 ¶ 1.  Ms. McCarter dialed 911 at 9:04 p.m.  *Id.* ¶ 2.  During the 911 call, she stated, among other things, "I stabbed my husband on accident," "He attacked me and

---

[1] The facts are drawn from the parties' Local Rule 56.1 statements and other documents submitted in connection with Defendants' motion for summary judgment.  They are undisputed in relevant part unless otherwise noted, and where disputed, the Court resolves all ambiguities and draws all permissible factual inferences in favor of Ms. McCarter, as the party against whom summary judgment is sought.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

tried to take my money," "I stabbed him trying to protect myself," and "He got stabbed with it." *Id.* ¶¶ 2–8; Dkt. No. 79-1 ("911 Tr.") at 1–2. Before officers arrived, the dispatcher relayed that the call involved a family assault with a knife and that a male had been stabbed by his wife. Pl. 56.1 ¶¶ 9–13.

When Officers Miah and Morsi entered the apartment around 9:08 p.m., they found Mr. Murray on the ground with Ms. McCarter next to him applying pressure to his wound. *Id.* ¶¶ 15–17. Officer Miah asked Ms. McCarter what had happened. *Id.* ¶ 31. She responded, in substance, that Mr. Murray had tried to take her money, pushed her, and was fighting her, and that she had been screaming for help and that the officers could ask her neighbor. *Id.* ¶ 32. According to Ms. McCarter, Officer Miah began handcuffing her before she finished explaining what had happened and told her, "ma'am, ma'am, we got it." *Id.*

Officer Cortez arrived moments after Officers Miah and Morsi around 9:10 p.m. *Id.* ¶ 25. Sergeant Aguila arrived shortly thereafter around 9:12 p.m. *Id.* ¶ 33. After asking, with reference to Ms. McCarter, "that's the, that's the perp?," Sergeant Aguila directed that she be handcuffed. *Id.* ¶¶ 34–35. Ms. McCarter was handcuffed at approximately 9:13 p.m., placing her under arrest. *Id.* ¶¶ 36–37. The parties agree that Sergeant Aguila made the arrest decision based on the dispatcher's information and what he observed on arrival. *Id.* ¶¶ 38–39. At approximately 9:14 p.m.—after Ms. McCarter had already been arrested—Officer Cortez told Sergeant Aguila that Ms. McCarter had said "he tried to take my money and she stabbed him in the chest." *Id.* ¶¶ 44–45. Ms. McCarter contends that statement was fabricated. *Id.* ¶ 46. It is undisputed that Ms. McCarter did not use the word "stabbed" in Officer Cortez's presence. *Id.* ¶ 49. The parties also agree that Ms. McCarter would have been arrested regardless of whether Officer Cortez later told Sergeant Aguila that Ms. McCarter had said "he tried to take my money and she stabbed him in the chest," the alleged fabrication that lies at the heart of this dispute. *Id.* ¶ 45.

Later that evening, Officer Cortez prepared a domestic incident report ("DIR") that

attributed to Ms. McCarter the following statement: "I let him stay the night, I was trying to help. He went for my purse and I stabbed him." *Id.* ¶¶ 73–79; Dkt. No. 79-8 ("DIR") at 1. Ms. McCarter disputes that this statement fairly reflected anything she said to Officer Cortez or that evening's recorded evidence. Pl. 56.1 ¶¶ 78–80.

But that account was carried forward throughout the criminal case. Detective Cruz testified that Officer Cortez told him that Ms. McCarter had stabbed Mr. Murray because of a dispute over money, and Detective Cruz relayed Officer Cortez's description of the incident to ADA Sullivan before arraignment. Dkt. No. 86-26 ("Cruz Dep.") at 41:25–42:7, 53:5–25. The criminal complaint signed by Detective Cruz stated: "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest.'" Dkt. No. 79-18. At arraignment on March 3, 2020, ADA Sullivan told the court that Ms. McCarter "did admit to stabbing the complainant," while defense counsel argued that the case was "a strong case of self-defense." Pl. 56.1 ¶¶ 107–11. The court remanded Ms. McCarter. Dkt. No. 79-10 at 6:19–20.

On May 21, 2020, at a preliminary hearing held in lieu of prompt grand-jury action because of the COVID-19 pandemic, Officer Cortez was the People's sole witness. Pl. 56.1 ¶¶ 115–18; Dkt. No. 79-9 ("Sullivan Dep.") at 142:6–17. Officer Cortez testified that Ms. McCarter said at the scene "why did he make me do this, why did I do this," which Ms. McCarter disputes, and "he tried to take my money." Pl. 56.1 ¶¶ 120–21, 132. On cross-examination, Officer Cortez testified that Ms. McCarter did not say the statement that Officer Cortez attributed to her in the DIR. *Id.* ¶¶ 126–30. The court found reasonable cause to believe that Ms. McCarter had committed a felony and continued remand. *Id.* ¶ 135.

On September 10, 2020, Officer Cortez testified before the grand jury that Ms. McCarter was "screaming I stabbed him. You made me do it. Why did this happen." Pl. 56.1 ¶¶ 149, 152; Dkt. No. 79-13 ("Grand Jury Tr.") at 14:7–8. The grand jury later indicted Ms. McCarter for

murder in the second degree.  Pl. 56.1 ¶ 178.

Ms. McCarter remained at Rikers Island until late September 2020, when the prosecution consented to her release to electronic monitoring and pretrial supervision.[2]  Dkt. No. 86-1 ¶ 12; Dkt. No. 88 at 18; Dkt. No. 96 at 11.  She remained subject to electronic monitoring and travel restrictions for the duration of the prosecution.  Dkt. No. 96 at 11–13.  On December 2, 2022, the indictment was dismissed on the People's recommendation after the Manhattan District Attorney concluded that the case could not be proven beyond a reasonable doubt.  Pl. 56.1 ¶ 211; Dkt. No. 56 ¶¶ 180–81.

### B.  Procedural History

Ms. McCarter filed the operative complaint on November 7, 2024, which asserted eight causes of action arising from Ms. McCarter's arrest:  false arrest under New York state law against the City, Officer Cortez, Officer Miah, and Sergeant Aguila ("Count I"); false imprisonment under New York state law against all Defendants ("Count II"); malicious prosecution under New York state law against the City and Officer Cortez ("Count III"); false arrest under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Officer Cortez, Officer Miah, and Sergeant Aguila ("Count IV"); malicious prosecution under the Fourth, Fifth, and Fourteenth Amendments pursuant to Section 1983 against Officer Cortez ("Count V"); denial of due process and a fair trial based on fabrication of evidence under the Fourth, Fifth, Sixth, and Fourteenth Amendments pursuant to Section 1983 against Officer Cortez ("Count VI"); unreasonable searches and seizures based on fabrication of evidence under the Fourth, Fifth, Sixth, and Fourteenth Amendments pursuant to Section 1983 against Officer Cortez and Detective Cruz ("Count VII");

---

[2] The R&R stated that Ms. McCarter was released on electronic monitoring on May 21, 2020, the date of the preliminary hearing.  Dkt. No. 93 at 31.  That date is incorrect.  The August 24, 2020 bail hearing transcript reflects that remand was continued on that date, Dkt. No. 86-21, and the September 16, 2020 hearing is the first at which the prosecution consented to Ms. McCarter's release, Dkt. No. 86-22 at 4.  Ms. McCarter was thus detained at Rikers Island for more than six months following her arrest.  Dkt. No. 96 at 10.

and excessive pretrial detention under the Fourth and Fourteenth Amendments pursuant to Section 1983 against Officer Cortez ("Count VIII").  Dkt. No. 56.

On June 13, 2025, Defendants moved for summary judgment on all claims.  Dkt. Nos. 77–80.  Ms. McCarter opposed the motion on August 1, 2025.  Dkt. Nos. 86–88.  Defendants filed a reply on August 15, 2025.  Dkt. Nos. 91–92.  On January 6, 2026, Magistrate Judge Katharine H. Parker, to whom this case was referred, entered her report and recommendation in response to Defendants' motion.  Dkt. No. 93 (the "R&R").  The R&R recommended that the Court grant summary judgment to Defendants on all claims and dismiss the case.

Judge Parker first recommended that the Court grant summary judgment on the false arrest and false imprisonment claims, concluding that probable cause to arrest Ms. McCarter existed as a matter of law.  *Id.* at 20.  The R&R found that the undisputed evidence at the scene—that Mr. Murray died from a knife wound in Ms. McCarter's apartment, that Ms. McCarter was the only other person present, that the murder weapon was recovered nearby, that Mr. Murray was unarmed, and that Ms. McCarter was uninjured—established probable cause regardless of Ms. McCarter's statements suggesting self-defense or accident.  *Id.* at 17–23.

Judge Parker next recommended that the Court grant summary judgment on the malicious prosecution claims.  *Id.* at 28.  The R&R concluded that probable cause to prosecute Ms. McCarter for murder in the second degree existed as a matter of law and was not dissipated by any evidence discovered after the arrest.  *Id.* at 23–28.  The R&R further concluded that Officer Cortez's allegedly false testimony before the grand jury was not "crucial to the existence of probable cause" because the grand jury heard from other witnesses—including the neighbor, Mr. Vaultz—and because the other evidence overwhelmingly supported the charge.  *Id.* at 25–26.  The R&R also found no evidence of malice.  *Id.* at 27–28.

The R&R then turned to Ms. McCarter's fabrication of evidence claim (Count VI).  The

6

R&R turned on a correct view of the governing legal standard.  To establish a Section 1983 fair-trial

claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2)

fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that

information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property

as a result."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  The R&R did not

reach the questions whether Officer Cortez fabricated evidence or whether any fabrication was

material because Judge Parker concluded that Ms. McCarter had not satisfied the fifth element of

her claim—she had "failed to show a dispute of fact that any alleged fabrication deprived her of life,

liberty, or property."  R&R at 30.

Judge Parker reasoned that "probable cause supporting McCarter's arrest and murder charge

was overwhelming even absent Cortez's statement, so some level of detention was certainly

justified."  *Id.*  The R&R examined the arraignment, the April 30, 2020 bail hearing, and the May 21,

2020 preliminary hearing, concluding that at each stage, Officer Cortez's statements were either not

mentioned, not material to the court's decision, or contradicted by other evidence in the record.  *Id.*

at 30–33.  On that basis, Judge Parker recommended that "no reasonable juror could find on the

undisputed facts that Officer Cortez's statement led to a deprivation of liberty."  *Id.* at 33.

On the unreasonable search and seizure claim (Count VII), the R&R applied a "corrected

affidavit" analysis and concluded that even removing Officer Cortez's allegedly fabricated statements

from the warrant applications, the remaining facts established probable cause to issue the warrants.

*Id.* at 33–36.

Finally, the R&R recommended summary judgment on the excessive pretrial detention claim

(Count VIII).  Here, too, the R&R correctly stated the standard.  To prevail on such a claim, a

plaintiff must establish "(1) that he has a right to be free from continued detention stemming from

law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions

7

of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007) (citation omitted). The R&R concluded that Ms. McCarter had not shown a dispute of fact that "allegedly mishandled exculpatory evidence would have shortened or eliminated the period during which she was detained," and that Officer Cortez's conduct did not "shock the conscience." R&R at 37–39. In the alternative, Judge Parker recommended that Defendants were entitled to qualified immunity on all claims except on Count VI, since qualified immunity is not available for fabrication claims. *Id.* at 39–43.

Ms. McCarter filed objections to the R&R on January 20, 2026, challenging the recommendations as to the fabrication of evidence claim (Count VI) and the excessive pretrial detention claim (Count VIII). Dkt. No. 96 ("Obj."). She accepted the R&R's determinations regarding probable cause for the arrest and prosecution but argued that the R&R erred in its analysis of the fabrication and excessive detention claims on several grounds.

First, Ms. McCarter argued that the R&R contained a significant factual error: it stated that Ms. McCarter was released from Rikers Island on May 21, 2020, when in fact she was not released until after September 16, 2020—more than six months of incarceration rather than approximately two and a half months. *Id.* at 9–10. Second, Ms. McCarter argued that the R&R failed to recognize that electronic monitoring—to which she was subject from her release in September 2020 until the dismissal of charges in December 2022—constitutes a deprivation of liberty under New York law, which treats a person subject to electronic location monitoring as "held or confined in custody." *Id.* at 11–12 (citing N.Y. C.P.L. § 510.40(4)(d)). Ms. McCarter contended that the relevant period of liberty deprivation therefore extended from her arrest on March 2, 2020 through the dismissal of the indictment on December 2, 2022. *Id.* at 12–13.

Third, Ms. McCarter argued that the R&R implicitly relied on a premise the Second Circuit has rejected—that a finding of probable cause precludes a fabrication of evidence claim—by

reasoning that because probable cause was overwhelming without Officer Cortez's statement, no deprivation of liberty could be attributed to the fabrication. *Id.* at 13–14 (citing *Garnett*, 838 F.3d at 277–78; *Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021)).

Fourth, Ms. McCarter argued that causation is a question of fact for the jury, and that the record contained ample evidence from which a reasonable jury could find that the allegedly fabricated evidence—which was repeatedly placed before the judges making determinations about Ms. McCarter's liberty—influenced those decisions. *Id.* at 14–17. Ms. McCarter pointed to the fabricated statement's inclusion in the criminal court complaint, in multiple search warrant applications signed by Judge Jackson (who also presided over bail hearings), and in Officer Cortez's testimony at the preliminary hearing and grand jury. *Id.* at 15–16. Fifth, on the excessive pretrial detention claim, Ms. McCarter argued that Officer Cortez's conduct—fabricating a confession and repeating it under oath—shocked the conscience, and that a reasonable jury could find that her continued detention stemmed from that fabrication. *Id.* at 17–21.

Defendants filed a response on February 3, 2026. Dkt. No. 98 ("Resp."). Defendants contended that the R&R's conclusions should be adopted in full. On the fabrication claim, Defendants argued that the R&R did not rest on probable cause as a defense but rather on the conclusion that the overwhelming evidence—independent of Officer Cortez's statements—"entirely supported any deprivation of liberty that plaintiff suffered." *Id.* at 7. Defendants relied on *Ganek v. Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017), for the proposition that where probable cause exists independent of the fabrication, "a plaintiff can still prevail on a fair trial claim if fabricated evidence causes some 'further deprivation'"—but argued that Ms. McCarter had failed to identify any such further deprivation. *Id.* at 5–6. Defendants also argued that any factual error regarding Ms. McCarter's release date was "immaterial and otherwise insufficient to disturb the R&R's ultimate conclusion." *Id.* at 7.

9

On the excessive pretrial detention claim, Defendants argued that regardless of whether Ms. McCarter was detained for three months or six, "the rationale behind Magistrate Judge Parker's conclusions remains entirely unchallenged": that the detention was reasonable given the weight of the evidence and the gravity of the charges. *Id.* at 8. Defendants further noted that the R&R had concluded, in the alternative, that Defendants were entitled to qualified immunity on the excessive pretrial detention claim—a conclusion to which Ms. McCarter had not asserted any objection. *Id.* at 10 n.2.

### III.   LEGAL STANDARD

#### A.  Standard of Review of a Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Parties may raise specific, written objections to the report and recommendation within fourteen days of being served with a copy of the report. *Id.*; *see also* Fed. R. Civ. P. 72(b)(2). The Court reviews for clear error those parts of the report and recommendation to which no party has properly objected. *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 359 (2d Cir. 2025); 28 U.S.C. § 636(b)(1). When a party lodges a proper objection, the Court reviews *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also Nambiar*, 158 F.4th at 358–59. A proper objection is both timely and specific, meaning it must have "sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *Nambiar*, 158 F.4th at 359 (citation omitted). "Merely referring the court to previously filed papers or arguments does not constitute an adequate objection." *Id.* (quoting *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)).

"When a timely filed objection raises and properly briefs arguments previously rejected by the magistrate judge, the district judge must review those arguments *de novo*." *Id.* at 361. But

objections that are "nonspecific or merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition" warrant only clear-error review. *Id.* (quoting *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022)).

Finally, a "proper objection generally may not raise new arguments not previously made before the magistrate judge." *Id.* at 359; *accord Piligian v. Icahn Sch. of Med. at Mt. Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." (citation omitted)).

### B. Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). The movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment. Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Id.* (citing *Celotex*, 477 U.S. at 323). To defeat a motion for

11

summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. And the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. At summary judgment, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

On a motion for summary judgment, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The court cannot "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## IV.   DISCUSSION

The Court has reviewed for clear error the portions of the R&R to which neither party objected and reviewed *de novo* the portions of the R&R to which Ms. McCarter objected. For purposes of its evaluation of the R&R, the Court treats Ms. McCarter's objections as sufficiently precise to merit *de novo* review. For the reasons that follow, the Court finds no clear error in the portions of the R&R that were not the subject of objections, adopts those portions, and concludes that summary judgment is warranted on all claims except Count VI.

### A. Clear Error Review

The Court finds no clear error in the portions of Judge Parker's R&R to which neither party objected. Ms. McCarter objects only to Judge Parker's recommendation that summary judgment be granted on Counts VI and VIII. Obj. at 5. The Court therefore reviews the remainder of the R&R for clear error.

Ms. McCarter does not object to Judge Parker's conclusion that probable cause defeats her false arrest, false imprisonment, and malicious prosecution claims. *Id.* Nor does she object to Judge Parker's recommendation that summary judgment be granted on Counts I through V and VII. She likewise does not object to the recommendation that Defendants are entitled to qualified immunity on all counts, including Count VIII, with the sole exception of Count VI, a claim for which the officers can have no qualified immunity. Having reviewed those portions of the R&R and the record, the Court finds no clear error and adopts Judge Parker's analysis and conclusions with respect to those claims.

### B. Count VI: Section 1983 Fair Trial Claim

The Court denies summary judgment on Count VI because a reasonable jury could find that Officer Cortez fabricated evidence by attributing to Ms. McCarter an unqualified inculpatory statement that she did not make, and that the fabrication caused a deprivation of liberty. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To establish a Section 1983 fair-trial claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life,

13

liberty, or property as a result." *Garnett*, 838 F.3d at 279.

A "Section 1983 fair trial claim is available to a defendant even if the underlying criminal charges are dismissed and the fabricated evidence is never presented at trial." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021); *see also Ashley v. City of New York*, 992 F.3d 128, 138 (2d Cir. 2021) ("The plaintiff need not have been tried to make out this claim so long as some deprivation of liberty occurred."). "[T]he (perhaps imprecisely named) fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020) (emphasis in original).

Probable cause is not a defense to a fair trial claim based on fabricated evidence. *See Barnes v. City of New York*, 68 F.4th 123, 132 (2d Cir. 2023) ("While a malicious prosecution claim will be defeated by a showing of probable cause (that is, by a showing of an independently reasonable basis for the deprivation of liberty), a fabricated-evidence claim will not."); *Garnett*, 838 F.3d at 277–78 ("[A] Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff.").

The R&R recommended granting summary judgment on Count VI. R&R at 33. Because neither party objected to Judge Parker's finding that Officer Cortez was an investigating official or that she forwarded information to prosecutors, the Court adopts the R&R's conclusion that those factors are satisfied. *Id.* at 30. Judge Parker did not analyze whether Officer Cortez fabricated evidence or whether any fabrication was material, instead proceeding directly to causation and concluding that "no reasonable juror could find on the undisputed facts that Cortez's statement led to a deprivation of liberty." *Id.* at 33.

14

### i. Fabrication

A reasonable jury could find that Officer Cortez knowingly made false statements and omissions with respect to Ms. McCarter's statements and conduct. "The fabrication element requires only that the defendant knowingly make a false statement or omission." *Ashley*, 992 F.3d at 143 (citing *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015)). "Information may be 'false' if material omissions render an otherwise true statement false." *Morse*, 804 F.3d at 548–49 (describing both "deliberate omissions of material facts" and "affirmative misstatements" as "threaten[ing] the integrity of the judicial process by injecting it with falsity provided by officers of the state whose official status gives the misinformation a special aura of reliability"). The fabrication element turns simply on the knowing falsity of the statement, not the severity of the error. *See Ashley*, 992 F.3d at 143 (finding prejudicial error where the judge instructed the jury that "paperwork errors" or "mere mistakes" by a police officer were not constitutionally actionable). A fabrication claim may be predicated on an officer's false account of what the officer purportedly heard the defendant say. *Garnett*, 838 F.3d at 280. Circumstantial evidence can support an inference of knowing fabrication. *See Bellamy v. City of New York*, 914 F.3d 727, 746–47 (2d Cir. 2019) (triable issue on fabrication where allegedly fabricated statement was absent from the officer's DD-5, was not mentioned during grand jury testimony, and was not corroborated by other officers).

The R&R did not analyze whether evidence was fabricated. R&R at 30. Defendants argue that "any claim that defendant Cortez fabricated anything boils down to an exercise in semantics rather than a violation of the constitution." Dkt. No. 78 at 21. On this record, however, a reasonable jury could conclude otherwise. The question here is a limited one. At summary judgment, the Court does not determine whether Officer Cortez in fact fabricated evidence. Rather, the issue is whether, viewing the record in the light most favorable to Ms. McCarter and drawing all reasonable inferences in her favor, a reasonable jury could find that Officer Cortez knowingly made

15

false statements and omissions.

The record would permit a jury to find that Officer Cortez did not merely summarize Ms. McCarter's account but recast it in a more inculpatory form by attributing to Ms. McCarter statements she did not make to Officer Cortez and by omitting statements consistent with self-defense. Minutes after arriving at the scene, Officer Cortez told Sergeant Aguila that Ms. McCarter stated, "he tried to take my money and she stabbed him in the chest." Pl. 56.1 ¶¶ 25, 44. Later that evening, Officer Cortez prepared the DIR, which attributed to Ms. McCarter the following statement: "I let him stay the night, I was trying to help. He went for my purse and I stabbed him." *Id.* ¶¶ 73–77; DIR at 1. Yet it is undisputed that Ms. McCarter never used the word "stabbed" in Officer Cortez's presence. Pl. 56.1 ¶ 49. The issue is not simply that Officer Cortez used different wording than that actually used by Ms. McCarter. It is that the DIR presented the quoted statement as Ms. McCarter's own account, not as Officer Cortez's inference, paraphrase, or summary.

Officer Cortez's preliminary hearing testimony reinforces that inference. Officer Cortez testified that Ms. McCarter was "screaming and crying on the floor," saying, "Why did he make me do this, why did I do this." Dkt. No. 79-12 ("Prelim. Hr'g Tr.") at 11:18–23. Body-worn camera footage, by contrast, shows Ms. McCarter saying, "Why did you do this, Jim? Why did you do this? Why did you do this?" Pl. 56.1 ¶¶ 22, 28. A jury could regard that difference as consequential. "Why did I do this" is more inculpatory than "Why did you do this." And when ADA Sullivan asked whether Ms. McCarter said anything else, Officer Cortez answered, "No. She repeated that over and over." Prelim. Hr'g Tr. at 11:24–12:2. ADA Sullivan then asked if Ms. McCarter said anything about money, to which Officer Cortez responded, "She said, He tried to take my money." *Id.* at 12:2–9. But Ms. McCarter also said that Mr. Murray "pushed me," was "fighting me," and that she was "screaming for help." Pl. 56.1 ¶ 32. Those omissions removed the portion of Ms. McCarter's account most consistent with self-defense.

Ms. McCarter's 911 call is relevant in a narrower respect. On the call, Ms. McCarter stated both "I stabbed my husband on accident" and "I stabbed him trying to protect myself." 911 Tr. at 1. Those statements were not made to Officer Cortez and thus do not show what Ms. McCarter said to her. They do, however, provide some support for Ms. McCarter's contention that when she used the word "stabbed" to describe her actions, she qualified the word in a way that supported her narrative that Mr. Murray had accidentally fallen on the knife, rather than her thrusting it into him.[3]

The preliminary hearing testimony also permits a finding that Officer Cortez herself disclaimed the most inculpatory statement she attributed to Ms. McCarter in the DIR. When defense counsel asked whether Ms. McCarter said, "I let him stay the night. I was trying to help. He went for my purse and I stabbed him," Officer Cortez answered: "She didn't tell me that." Prelim. Hr'g Tr. at 16:16–17:1. Officer Cortez then added that Ms. McCarter "might have said it" to other officers, but "she didn't tell me that flat out when I arrived to the scene." *Id.* When pressed again, Officer Cortez stated, "Not when I arrived to the scene. I might have watched the video first and then put that as a statement." *Id.* at 18:7–12. And when asked, "So she did say that at some point?," Officer Cortez responded, "At some point, just not to me directly, and not when I got to the scene." *Id.* Those answers support the inference that Officer Cortez attributed to Ms. McCarter a direct statement that Officer Cortez knew Ms. McCarter had not made to her.

That inference is strengthened by the way Officer Cortez's account then appeared across the investigative record. The criminal complaint signed by Detective Cruz stated, "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest.'" Dkt. No. 79-18. Detective Cruz's March 10, 2020 search warrant affidavit likewise stated the following: "I am informed by Officer Cortez that she spoke to Tracey [sic] McCarter and that Ms. McCarter stated in

---

[3] The ordinary meaning of "stab" is "to wound or pierce by the thrust of a pointed object or weapon," which connotes an intentional act of thrusting, not merely the passive falling onto a knife. *Stab*, Merriam-Webster, https://www.merriam-webster.com/dictionary/stab (last visited Mar. 28, 2026).

substance: 'I let him stay the night, I tried to help him, he tried to take my purse, and I stabbed him in the chest.'" Dkt. No. 79-11 ("Warrant Aff.") at 2.  Detective Pagan's DD-5 similarly memorialized Officer Cortez having stated that Ms. McCarter said the following:  "I LET HIM STAY THE NIGHT, I TRIED HELPING HIM, AND THEN HE WAS TAKING MY PURSE. I STABBED HIM IN THE CHEST."  Dkt. No. 86-11.  Taken together, these records permit a reasonable jury to find that Officer Cortez conveyed to investigators an inculpatory statement that Ms. McCarter had not in fact made to her.

The deposition testimony of Detectives Cruz and Pagan further supports a finding of falsity because it shows that the omitted portions of Ms. McCarter's account were material.  Detective Cruz testified that Officer Cortez "said that the defendant had said that she had stabbed Mr. Murray because of a dispute over money."  Cruz Dep. at 41:25–42:8.  And when asked whether it would have been important if Officer Cortez had told him that Ms. McCarter said Mr. Murray pushed her, Detective Cruz answered, "I mean, she would have to indicate that on the report . . . ."  *Id.* at 42:20– 25.  Detective Pagan likewise testified that Officer Cortez did not tell him that Ms. McCarter had said Mr. Murray attacked or pushed her, and that he would have recorded that information in his DD-5 if she had.  Dkt. No. 86-12 at 42:11–24.  From that record, a reasonable jury could conclude not only that inculpatory statements were attributed to Ms. McCarter that she did not make but also that material exculpatory features of her account were omitted as the case was transmitted forward.

The same pattern appears in Officer Cortez's grand jury testimony.  On September 10, 2020, Officer Cortez testified before the grand jury that Ms. McCarter was "screaming I stabbed him.  You made me do it.  Why did this happen."[4]  Grand Jury Tr. at 14:7–8.  But at her deposition, Officer

---

[4] To the extent Ms. McCarter would rely on Officer Cortez's grand jury testimony itself, that theory may be barred by absolute immunity.  *See Rehberg v. Paulk*, 566 U.S. 356, 375 (2012).  The Court need not decide the point.  Absolute immunity is an affirmative defense, and Defendants did not raise it.  *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005); *Carroll v. Trump*, 680 F. Supp. 3d 491, 499 (S.D.N.Y. 2023).  And in any event, Ms. McCarter's claim does not

Cortez acknowledged that Ms. McCarter "never verbally stated" in her presence that she stabbed Mr. Murray, and that nothing on the body-worn camera footage shows Ms. McCarter making such a statement. Dkt. No. 79-4 at 74:1–76:25. That evidence further supports the inference that Officer Cortez was not merely imprecise in recounting Ms. McCarter's words but continued to attribute to her a more inculpatory statement than Ms. McCarter had actually made in Officer Cortez's presence.

Defendants argue that these were imprecise summaries made in a fast-moving, chaotic scene and that any inconsistencies were the product of confusion or mistake rather than intentional fabrication. *See* Dkt. No. 78 at 7; Dkt. No. 91 at 10–11. A jury might accept that view. But it would not be required to do so. Taking the record as a whole—the undisputed fact that Ms. McCarter never used the word "stabbed" in Officer Cortez's presence, Officer Cortez's preliminary hearing concession that Ms. McCarter did not make the statement that was presented as a quote in the DIR, the shift from "Why did you do this" to "Why did I do this," and the repeated forwarding of the more inculpatory version while omitting statements consistent with self-defense—a reasonable jury could find that Officer Cortez knowingly fabricated evidence.

### ii.  Likely to Influence a Jury's Verdict

There is a genuine issue for trial about whether the alleged fabrication was material because it goes to the central disputed issue in Ms. McCarter's criminal case: intent. To satisfy *Garnett*'s third element, a plaintiff must show that the fabricated information was "likely to influence a jury's decision." 838 F.3d at 280. The fabricated evidence must, "at the very least, be material to a viable claim or defense in the criminal case." *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018); *see also Carr v. City of New York*, No. 11 CIV. 6982, 2013 WL 1732343, at *7 (S.D.N.Y. Apr. 19, 2013) (finding an officer's allegedly fabricated observation of

---

rise or fall on the grand jury testimony, because the alleged fabrication can be assessed using other evidence on the record.

a drug sale unlikely to influence jury's decision because the evidence was relevant only to charges on which plaintiff was acquitted, so "whether true or not, [it] would not have impacted the jury's verdict"). "Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case." *Roland v. City of New York*, No. 20-CV-05392, 2024 WL 2832691, at *23 (S.D.N.Y. June 3, 2024).

Materiality is a hypothetical inquiry. The question is whether the evidence "would be likely to influence a jury's decision, *were that evidence presented to the jury*," not whether the prosecution actually presented or planned to present it. *See Frost*, 980 F.3d at 250 (emphasis in original); *see also Kee*, 12 F.4th at 168; *Ekukpe v. Santiago*, 823 F. App'x 25, 31 (2d Cir. 2020) (summary order) ("The 'influence' prong does not turn on whether the fabricated evidence is in fact used during a trial; it focuses rather on whether the fabricated evidence, if introduced during trial, could be expected to influence the jury's decision-making process."). The R&R did not reach the issue of materiality. R&R at 30.

On this record, a reasonable jury could find that Officer Cortez's alleged fabrication was material because it went to the central issue in the criminal case—whether Ms. McCarter intentionally stabbed Mr. Murray during a dispute over money or acted in self-defense. The evidence Ms. McCarter identifies as fabricated is not just the DIR's attribution to her of the statement that Mr. Murray "went for my purse and I stabbed him," DIR at 1, and the later reiterations of that account to Detective Cruz and ADA Sullivan. Detective Cruz testified that Officer Cortez told him Ms. McCarter had stabbed Mr. Murray "because of a dispute over money" and testified that he would have conveyed that to ADA Sullivan in the conversations leading up to the criminal complaint. Cruz Dep. at 42:2–7, 53:5–25.

A reasonable jury could also find that this account omitted facts bearing directly on the defense of justification. Officer Miah's body-worn camera footage shows that Ms. McCarter said

20

that Mr. Murray "pushed" her and that "he was fighting me," Pl. 56.1 ¶ 32, and the 911 call transcript reflects that she said, "I stabbed my husband on accident," "He attacked me and tried to take my money," "I stabbed him trying to protect myself," and "He got stabbed with it," 911 Tr. at 1–2. That distinction matters. The R&R recognized that Ms. McCarter's "most significant objection" to Officer Cortez's account "relates to motive and her justification defense, not her identity as the person who wielded the knife." R&R at 29 n.9. Officer Cortez's account recast the episode as dispute over money and stripped it of facts that supported accident or self-defense. Indeed, ADA Sullivan made that argument during the April 30, 2020 bail hearing, reporting that Ms. McCarter "throughout the night says to the police officer, He tried to take my money; I wasn't going to let him take my money. . . . There's no allegations by her that night to police that this was self-defense." Dkt. No. 86-18 at 27:13–19.

On this record, a reasonable jury could find that attributing to Ms. McCarter a statement that she stabbed Mr. Murray because he tried to take her money, while omitting her statements that he attacked her and that the stabbing was accidental or in self-defense, would have materially strengthened the prosecution's proof on intent and materially undermined her justification defense.

### iii.  Deprivation of Liberty as a Result

A reasonable jury could find that Ms. McCarter suffered a deprivation as a result of the alleged fabrication. To satisfy the fifth *Garnett* element, a plaintiff must show that she "suffer[ed] a deprivation of life, liberty, or property as a result" of an investigating official forwarding fabricated information to prosecutors. *See Garnett*, 838 F.3d at 279. The fabrication need not be the *only* cause of the deprivation. *Id.* at 277 (rejecting such an interpretation as "plac[ing] more weight on the 'as a result' language than it can bear"). Instead, the causation inquiry sounds in proximate cause. *See Hoyos v. City of New York*, 650 F. App'x 801, 803 (2d Cir. 2016) (summary order) ("[T]he type of causation at issue in a fabrication of evidence claim is proximate cause, rather than probable

cause."). The deprivation of liberty must be a "legally cognizable result of the initial misconduct." *See Zahrey v. Coffey*, 221 F.3d 342, 350–51 (2d Cir. 2000). Where an arrest is supported by probable cause, a plaintiff may still prevail if the fabrication caused "a further deprivation of liberty." *Garnett*, 838 F.3d at 277; *see also Ganek*, 874 F.3d at 91. Further deprivations could include:

> The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence.

*Garnett*, 838 F.3d at 277. In addition, "the number of court appearances a plaintiff made post-arraignment, constraints such as bail requirements, a period of incarceration or travel restrictions," *Hanson v. New York City*, No. 15-CV-1447, 2018 WL 1513632, at *17 (E.D.N.Y. Mar. 27, 2018), "post-arraignment detention," *Rowell v. City of New York*, No. 16-CV-6598, 2019 WL 280469, at *3 (S.D.N.Y. Jan. 22, 2019), and "the prosecution of an individual based on fabricated evidence may itself constitute a deprivation of liberty for purposes of the due process right to a fair trial," *Barnes*, 68 F.4th at 126.

Where fabricated evidence forms the basis of the charges, a jury can reasonably infer causation. *See Loftin v. City of New York*, No. 15-CV-5656, 2017 WL 3614437, at *9 (E.D.N.Y. Aug. 21, 2017) ("[B]ecause the information provided by the officers was the basis for the charges against Plaintiff, the officers' statements influenced the decision of the District Attorney's Office to charge Plaintiff in the Criminal Complaint."); *Fowler-Washington v. City of New York*, No. 19-CV-6590, 2023 WL 2390538, at *9 (E.D.N.Y. Mar. 7, 2023) ("If fabricated evidence is the basis of the charges brought against an individual, a jury could reasonably conclude that this evidence caused the prosecutor to pursue charges."); *Rowell*, 2019 WL 280469, at *3 (finding a genuine dispute of fact on causation where "the complaint was based on the allegedly fabricated evidence" and "the prosecutor cited this evidence at the arraignment where Plaintiff's bail was set").

22

A reasonable jury could find that the alleged fabrication proximately caused at least some further deprivation of Ms. McCarter's liberty.  The record would permit a reasonable jury to find that the challenged statement mattered most at the front end of the case—when the prosecution was deciding whether to frame the case as intentional murder and when the court was deciding whether to remand Ms. McCarter—and that the later evidence on which Defendants rely goes to the extent of causation, not its complete absence.

The significance of the alleged fabrication is not simply that it identified Ms. McCarter as the person who held the knife.  Ms. McCarter's contemporaneous statements were qualified in ways that bore directly on her claim that it was an accident and that she acted in self-defense.  She said, among other things, "I stabbed my husband on accident," "I stabbed him trying to protect myself," and "He got stabbed with it."  911 Tr. at 1–2; Pl. 56.1 ¶¶ 5–8.  By contrast, the version transmitted forward by Officer Cortez and repeated in later documents stripped away those qualifiers and arguably recast the incident as an intentional stabbing over money.  *See* DIR at 1; Dkt. No. 86-11; Warrant Aff. at 2.  A reasonable jury could find that difference relevant to the prosecution's assessment of intent and justification.

ADA Sullivan's testimony supplies direct evidence supporting that inference.  She testified that, after the initial charge, her office was "having a lot of conversations" about whether it would "charge murder or manslaughter in the grand jury," and that, in making that decision, she received information from officers relevant to intent and relied "in part" on the truthfulness of those officers' statements.  Sullivan Dep. at 63:19–64:15.  The challenged statement attributed by Officer Cortez was also a factor in the charging decision.  Pl. 56.1 ¶ 101.  On that record, a reasonable jury could find that the alleged fabrication was part of the prosecution's intent analysis and, in turn, part of the decision to frame the case as intentional murder rather than manslaughter.

The arraignment record permits the same inference.  ADA Sullivan told Judge Badamo that

this was "a strong case" and that Ms. McCarter "did admit to stabbing the complainant." Dkt. No. 79-10 at 3:8–18. ADA Sullivan later testified that this statement to the court was based on "[t]he same information from Officer Cortez, and by this point probably also the -- the 911 ICAD report." Sullivan Dep. at 100:11–19. She also testified that, at the time of arraignment, she was not aware that Ms. McCarter had told law enforcement at the scene that Mr. Murray had attacked her, pushed her, or was fighting with her, and she was not aware that Ms. McCarter had never actually told law enforcement at the scene that she had stabbed Mr. Murray. *Id.* at 100:20–102:8. Judge Badamo then remanded Ms. McCarter:

> Having considered the relevant factors under CPL 510.30[5] and that the defendant is charged with the qualifying offense of Penal Law 125.25 subdivision one, murder in the second degree, considering the pending charges, counsel, I do make an individualized determination she poses a risk of flight to avoid prosecution. I am remanding her.

Dkt. No. 79-10 at 6:14–20.[6] A reasonable jury could conclude from that sequence that the alleged fabrication contributed to the prosecution's presentation of the case as intentional murder, rather than as a puncture by a knife resulting from accident or self-defense, and that this framing in turn contributed to Ms. McCarter's initial remand.

Defense counsel's presentation of a self-defense account at arraignment does not preclude a

---

[5] Judge Badamo referred to the "relevant factors under CPL 510.30." By March 2020, New York's bail statutes had recently been reorganized, and the factor-based flight risk inquiry appeared in C.P.L. § 510.10. The Court does not understand Judge Badamo's reference to suggest application of a different substantive standard. Rather, her remarks reflect the governing framework: an individualized determination of flight risk based on consideration of the statutory factors and the qualifying-offense status of the murder charge.

[6] Under New York's bail statute, the court was required to make "an individualized determination as to whether the principal poses a risk of flight to avoid prosecution," to consider "the kind and degree of control or restriction necessary to reasonably assure the principal's return to court," and to select a securing order consistent with that determination. N.Y. C.P.L. § 510.10(1). In making that determination, the court was required to consider available information, including "the charges facing the principal" and "[w]hether the charge is alleged to have caused serious harm to an individual or group of individuals." *Id.* § 510.30(1)(b), (i). A "qualifying offense" includes, among other things, "any crime that is alleged to have caused the death of another person." *Id.* § 510.10(4)(j). Where the defendant is charged with a qualifying felony offense, the court may commit the defendant to the custody of the sheriff. *Id.* § 510.10(4). So, although the New York bail laws do not on their face permit the court to consider danger to others, the charge by the prosecution is enumerated as a factor to be considered in setting bail. The judge would properly consider whether a defendant was charged with murder rather than manslaughter.

reasonable jury from finding causation. Defense counsel argued that this was "a strong case of self-defense," and told the court that Mr. Murray got physical, demanded money, tried to take Ms. McCarter's purse, and that there was one stab wound. *Id.* at 4:13–5:10. But a reasonable jury could still find that the prosecutor's contrary presentation—that Ms. McCarter had admitted stabbing Mr. Murray, in a case framed as intentional murder—affected the court's assessment at that early stage. *Id.* at 3–6.

The April 30, 2020 bail hearing strengthens that inference. ADA Sullivan argued to Judge Kiesel that Ms. McCarter had said to police, "He tried to take my money; I wasn't going to let him take my money," and that "[t]here's no allegations by her that night to police that this was self-defense." Dkt. No. 86-18 at 27:13–19. Judge Kiesel responded that, "if she were indicted for a manslaughter, I definitely would see that remand would be inappropriate," but she was "not prepared to alter remand status now." *Id.* at 30:6–13. A reasonable jury could read that exchange to mean that the murder-versus-manslaughter decision mattered to continued detention, and that the allegedly fabricated narrative was part of that framing.

That inference is reinforced, though only modestly, by the fact that the same account continued to be forwarded after the initial charge. The criminal complaint signed by Detective Cruz stated, "I am informed by Officer Cortez that the defendant stated in substance, 'I stabbed him in the chest.'" Dkt. No. 79-18. Detective Cruz's March 10, 2020 warrant affidavit repeated that formulation. Warrant Aff. at 2. That repetition does not itself establish that later liberty decisions turned on the challenged statement. It does, however, support an inference that the same account continued to be transmitted after arraignment.

The later record, however, materially weakens Ms. McCarter's broader theory that the alleged fabrication caused every restraint on her liberty through the end of the prosecution. ADA Sullivan decided to charge second degree murder on the night of the arrest, and by then had reviewed body-

worn camera footage, been to the scene, knew the nature of Mr. Murray's wound, knew that Ms. McCarter had no apparent injuries, and knew that Mr. Murray was unarmed.  Pl. 56.1 ¶¶ 98–100. ADA Sullivan also testified that her office would have charged murder even without the challenged statement.  Sullivan Dep. at 71:1–73:25.

In addition, by the May 21, 2020 preliminary hearing, the discrepancy in Officer Cortez's account had been exposed:  Officer Cortez acknowledged that Ms. McCarter had not said the statement in the DIR.  Prelim. Hr'g Tr. at 16–18.  The court nonetheless found reasonable cause to believe Ms. McCarter committed a felony and left remand in place.  *Id.* at 26–28.  That tends to undercut Ms. McCarter's broader theory that the alleged fabrication, by itself, drove every later restraint on her liberty.

On the other hand, later proceedings also support Ms. McCarter's narrower theory that the alleged fabrication mattered because it was what had caused the case to be framed as murder in the first place.  In July 2022, for example, Judge Kiesel explained that she remained concerned about Ms. McCarter leaving the jurisdiction "when faced with a murder indictment."  Dkt. No. 79-14 at 80:22–25.  Judge Kiesel made that remark in denying Ms. McCarter's request to travel to Long Island notwithstanding her electronic-monitoring restrictions, explaining that if she chose to flee, she would be outside the court's jurisdiction.  That statement does not show that the court was still relying directly on Officer Cortez's account, but it does support an inference that the murder charge continued to matter to later liberty restraints.  A reasonable jury could therefore find both that the alleged fabrication's causal force weakened as the record developed and that, to the extent the fabrication influenced the murder charge at the outset, it continued to have downstream consequences.

But that later evidence does not entitle Defendants to summary judgment.  A reasonable jury could credit ADA Sullivan's testimony that statements from officers were part of her office's intent

analysis and that the challenged statement was a factor in the charging decision.  Sullivan Dep. at 63:11–64:15; Pl. 56.1 ¶ 101.  On this record, a reasonable jury could find that the alleged fabrication was a proximate cause of the decision to charge the case as intentional murder and thereby contributed to the initial remand and at least some ensuing restraints on Ms. McCarter's liberty.  The later evidence may persuade a jury that the fabrication's causal force weakened over time.  It does not establish, as a matter of law, that the fabrication caused nothing at all.

For the foregoing reasons, the Court declines to adopt the R&R's recommendation that summary judgment be granted on Ms. McCarter's fair trial-fabrication claim, and Defendants' motion for summary judgment on Count VI is denied.

### C.  Count VIII:  Unreasonably Prolonged Detention

The Court grants summary judgment on Count VIII because, even correcting the R&R's error as to the length of Ms. McCarter's detention, the record would not permit a reasonable jury to find the kind of mishandling of readily verifiable exculpatory evidence required for a prolonged detention claim.  A claim for unreasonably prolonged detention is based on the Fourth Amendment's protection against unreasonable seizures.  *Russo*, 479 F.3d at 208–09.  To prevail on such a claim, a plaintiff must establish "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'"  *Id.* at 205 (citation omitted).  "The relevant factors to consider in determining whether a plaintiff's Fourth Amendment right to be free from excessive detention was violated are:  (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the defendant officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior."  *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 402 (E.D.N.Y. 2014) (citing *Russo*, 479 F.3d at 209–10); *see also Thompson v. City of New York*, 603 F. Supp. 2d 650, 656 (S.D.N.Y.

27

2009) ("[A] government officer's indifference to a pretrial detainee's innocence will support a damages award under § 1983 if the plaintiff proves that: (i) he was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to do so; and (iv) the defendant-officer acted with a culpable mental state—i.e., with intent to unlawfully detain the plaintiff or deliberate indifference to his constitutional rights." (citing *Russo*, 479 F.3d at 210–11) (collecting cases)).  Even if a plaintiff proves the requisite elements, the plaintiff cannot prevail if the defendant officers are entitled to qualified immunity.  *Russo*, 479 F.3d at 205.

Ms. McCarter objects to the R&R's recommendation that summary judgment be granted on her *Russo* claim on three grounds:  first, that the R&R misstated the duration of her physical incarceration at Rikers Island as approximately three months rather than more than six; second, that Officer Cortez's fabrication of evidence constitutes mishandling of exculpatory information sufficient to satisfy *Russo*'s first element; and third, that a reasonable jury could find Officer Cortez's conduct shocks the conscience.  Obj. at 17–21.  Defendants respond that regardless of the precise duration of Ms. McCarter's detention, the R&R's reasoning is sound because the seriousness of the charges and the weight of the independent evidence justified the detention, and Ms. McCarter fails to explain how any mishandled evidence would have shortened her incarceration.  Resp. at 8–10. The Court reviews the R&R's analysis of Count VIII *de novo*.

### i. Mishandling or Suppression of Exculpatory Evidence

The first *Russo* factor turns in part on the nature of the evidence the officers allegedly failed to investigate.  A prolonged detention claim "may arise where a police officer violates his 'duty to investigate *specific, readily verifiable* claims of *innocence* [made by a detainee] in a reasonable time period.'"  *Gonzalez v. New York City*, No. 16-CV-00254, 2016 WL 7188147, at *4 (S.D.N.Y. Dec. 2, 2016) (emphasis added) (quoting *Russo*, 479 F.3d at 209); *see also Jackson v. City of New York*, 29 F.

Supp. 3d 161, 178 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed *readily available* exculpatory evidence, which resulted in the plaintiff's unreasonably long incarceration." (emphasis added)).  The exculpatory evidence must "conclusively or affirmatively establish[] [Plaintiff's] innocence."  *See King v. City of New York*, Nos. 12-CV-2344, 13-CV-0037, 2014 WL 4954621, at *29 (E.D.N.Y. Sept. 30, 2014); *see also Husbands ex rel. Forde v. City of New York*, No. 05CIV9252, 2007 WL 2454106, at *12 (S.D.N.Y. Aug. 16, 2007) (rejecting *Russo* claim where the "'evidence' in no way affirmatively established [plaintiff's] innocence"), *aff'd*, 335 F. App'x 124 (2d Cir. 2009).  Examples of such exculpatory evidence include a surveillance video showing that the perpetrator lacked plaintiff's distinctive tattoos, *Russo*, 479 F.3d at 208–09, and a visitor register placing plaintiff at juvenile center over thirty miles away at the time of the offense, *Kinard v. Town of Greenwich*, No. 21-CV-474, 2023 WL 1070366, at *4–5, 8 (E.D.N.Y. Jan. 27, 2023).  *See also Creighton v. City of New York*, No. 12 CIV. 7454, 2017 WL 636415, at *46 (S.D.N.Y. Feb. 14, 2017) (finding no "smoking gun" exculpatory evidence where surveillance footage was "at best a wash" and witnesses provided conflicting accounts).

The R&R found that Ms. McCarter failed to identify mishandled or suppressed exculpatory evidence beyond Officer Cortez's allegedly fabricated account of what Ms. McCarter said the night Mr. Murray was stabbed.  R&R at 37.  Judge Parker further found that the prosecution possessed the allegedly exculpatory statements—that Mr. Murray was stabbed "on accident" and after he "attacked" Ms. McCarter—from the time of the criminal complaint, and that the state court was presented with arguments about a justification defense from the outset of the case.  *Id.* at 37–38.  Indeed, Ms. McCarter's own defense counsel specifically referenced the body-worn camera footage at the April 30, 2020 bail hearing.  *Id.* at 38; *see also* Dkt. No. 86-18 at 7:2–12.

The Court agrees.  The undisputed record does not support a finding that mishandled exculpatory evidence would have shortened or eliminated Ms. McCarter's pretrial detention.  This

case is materially different from *Russo*, where police actively concealed a surveillance tape that affirmatively and conclusively established the plaintiff's innocence—the tape showed the perpetrator had no tattoos, while Russo had prominent forearm tattoos visible in prior arrest records.  479 F.3d at 199–203.  Here, there is no comparable "smoking gun."  *See Creighton*, 2017 WL 636415, at *46.  It is undisputed that Ms. McCarter held the knife that killed Mr. Murray.  R&R at 36.  It is undisputed that she told the 911 dispatcher she "stabbed [her] husband on accident" and told her neighbor that Mr. Murray attacked her and she "stabbed him trying to protect myself."  *Id.* at 38; Pl. 56.1 ¶¶ 2–7. Whether Ms. McCarter acted in justifiable self-defense or with the intent required for second degree murder was necessarily a question for the jury—not one that any evidence in Officer Cortez's possession could have conclusively established.

Ms. McCarter contends that the fabricated evidence—Officer Cortez's attribution to Ms. McCarter of a statement she did not make, namely that Mr. Murray "tried to take [her] purse" and she "stabbed him"—is itself the exculpatory evidence that was mishandled, because a correct account would have reflected statements more consistent with justification.  Obj. at 18.  The Court acknowledges that *Russo* encompasses not only the suppression of exculpatory information but also the mishandling of such information.  *See Russo*, 479 F.3d at 205.  But even crediting Ms. McCarter's version of events, a corrected account from Officer Cortez would not have conclusively established Ms. McCarter's innocence.  As Judge Parker correctly observed, Ms. McCarter "never disputed she held the knife, that she told the 911 dispatcher that she stabbed Murray on accident, or that her neighbor reported that she told him that Murray attacked her and she stabbed him, or that she said Murray tried to take her money."  R&R at 38.  A corrected version of Officer Cortez's account— stripping away the specific contested phrasing and restoring what Ms. McCarter actually said on the 911 call and to Mr. Vaultz—would not have conclusively established Ms. McCarter's innocence.  It would have presented the same contested narrative of self-defense that was presented to the state

30

court early in the history of the case.

### ii. Length of Detention

As to the first *Russo* factor, the Court also considers the length of the plaintiff's detention. 479 F.3d at 209. The Second Circuit explained that duration matters because "the lapse of a certain amount of time" is part of the constitutional inquiry, and because "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest." *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). Applying that principle, the court held that both Russo's "total 217-day detention" and even the shorter "68-day detention between Russo's arrest and [the officer's] yielding of the tape to the prosecutor" were "plainly . . . prolonged rather than short and carried constitutional implications." *Id.*

*Russo* did not adopt a bright-line minimum number of days necessary to satisfy this factor. *See Gonzalez*, 2016 WL 7188147, at *4 (explaining that *Russo* "set no bright-line rule"). The inquiry is contextual rather than mechanical. Courts in this Circuit have sustained prolonged-detention claims involving detentions of five days, *Harewood v. City of New York*, No. 09-CV-2874, 2012 WL 12884356, at *6–7 (E.D.N.Y. Feb. 10, 2012), while holding that a materially shorter detention was insufficient, *see Martinez v. City of New York*, No. 06 CIV. 5671, 2008 WL 2566565, at *4 (S.D.N.Y. June 27, 2008), *aff'd*, 340 F. App'x 700 (2d Cir. 2009).

Because *Russo* identifies three relevant factors—the length of detention, the ease with which the exculpatory evidence could have been checked, and the alleged intentionality of the officers' conduct—the length of detention is not assessed in isolation. Rather, it is considered together with the other *Russo* factors in evaluating whether the officers acted reasonably under the circumstances. *See Russo*, 479 F.3d at 209–10; *Gallimore v. Feliciano*, 2015 WL 3856694, at *8 (S.D.N.Y. June 19, 2015) ("'[T]he touchstone" is whether the officers' conduct was "objectively reasonable under the circumstances.").

The R&R stated that Ms. McCarter was released on electronic monitoring on May 21, 2020, the date of the preliminary hearing. R&R at 31. That date is incorrect. The August 24, 2020 bail hearing transcript reflects that remand was continued on that date, Dkt. No. 86-21, and the September 16, 2020 hearing is the first at which the prosecution consented to her release, Dkt. No. 86-22 at 4. Ms. McCarter was thus detained at Rikers Island for more than six months following her arrest. Obj. at 10.

Even accepting that Ms. McCarter was detained for approximately six and a half months rather than three, this does not alter the outcome. The relevant inquiry under *Russo* is not whether the detention was lengthy in absolute terms, but whether mishandled exculpatory evidence would have shortened it. *See* 479 F.3d at 209. Ms. McCarter argues that her first defense counsel may not have received the body-worn camera footage until later in the case. *See* Dkt. No. 86-1 ¶¶ 10–11; Dkt. No. 88 at 40–41 & n.14. The record does not clearly resolve when counsel first obtained that footage. But even taking Ms. McCarter's account as true, the footage would not have conclusively established innocence of the kind at issue in *Russo* and similar cases, and the record does not support a finding that earlier access to it would have resulted in her release.

### iii.  Shocks the Conscience

The "shocks the conscience" requirement—the third *Russo* factor—is "a crucial feature going to the 'unreasonableness' of the seizure." *Russo*, 479 F.3d at 210. "The state of mind of a government defendant is an integral aspect of any 'shock the conscience' standard." *Id.* In the custodial setting, where the government owes a special duty of care to the detainee, "deliberate indifference"—but not negligence—can support a finding of liability. *Id.*; *see also Cambisaca v. Ruhe*, No. 17 Civ. 87, 2019 WL 2866072, at *11 (S.D.N.Y. July 3, 2019) (granting summary judgment where officers' failure to forward exculpatory witness statement did not shock the conscience, as officers did not affirmatively misrepresent the substance of the statement or actively hide the

statement from plaintiff).

*Russo* itself illustrates the kind of conduct that can meet this standard.  The Second Circuit held that a reasonable jury could find conscience-shocking conduct where officers actively hid the only copy of exculpatory videotape, falsely described the tape's contents in an effort to induce a confession, failed to investigate whether the tape was in fact exculpatory, and failed to follow police procedures governing its storage.  *Russo*, 479 F.3d at 210.  On those facts, the court concluded that the record "would readily support a jury finding of either intentional violation of, or deliberate indifference to," the plaintiff's constitutional rights.  *Id.*  Later cases have accordingly treated *Russo* as involving affirmative misrepresentation or concealment of readily verifiable exculpatory evidence, not simply a failure to investigate arguably exculpatory evidence.  *See Harewood*, 64 F. Supp. 3d at 402–03 (describing *Russo* as involving officers who had sole custody of clearly exculpatory videotape, purposely hid it, and lied about its contents); *Cambisaca*, 2019 WL 2866072, at *11; *Gonzalez*, 2016 WL 7188147, at *4.

Courts generally decline to find the "shocks the conscience" element satisfied where the officers' conduct falls materially short of the combination of intentional concealment, affirmative misrepresentation, and exclusive control over clearly exculpatory evidence present at issue in *Russo*. *See Russo*, 479 F.3d at 210; *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 225 (E.D.N.Y. 2007); *Harewood*, 64 F. Supp. 3d at 402–03.  Courts have also distinguished *Russo* where the allegedly exculpatory evidence did not clearly establish innocence—for example, where it was testimonial, where the proof was conflicting, or where it was only arguably exculpatory.  *See Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012) (summary order); *Nzegwu v. Friedman*, No. 10-CV-2994, 2014 WL 1311428, at *13 (E.D.N.Y. Mar. 31, 2014), *aff'd*, 605 F. App'x 27 (2d Cir. 2015); *Nelson*, 524 F. Supp. 2d at 225.  Likewise, where the officers did not affirmatively misrepresent the substance of the evidence, did not actively hide it, and did not have exclusive control over it, courts have held that

33

the conduct does not shock the conscience. *See Cambisaca*, 2019 WL 2866072, at \*11; *Nzegwu*, 2014 WL 1311428, at \*13.

The R&R found that Officer Cortez's conduct, while "somewhat careless," did not shock the conscience, reasoning that Ms. McCarter made "similar statements on the 911 call, to Mr. Vaultz, and other statements to officers" that would have permitted Officer Cortez to infer that Ms. McCarter conceded she held the knife that killed Mr. Murray. R&R at 39. Ms. McCarter objects, arguing that Officer Cortez's repeated false attribution of a fabricated statement after having had time to review body-worn camera footage and correct her account, rises to the level of conscience-shocking conduct. Obj. at 19–21.

Even though the record would permit a jury to find that Officer Cortez attributed to Ms. McCarter words she did not say, that conclusion would not, by itself, permit a reasonable jury to find for Ms. McCarter on Count VIII. A *Russo* claim is narrower. It requires continued detention stemming from officers' mishandling or suppression of exculpatory evidence and conduct that "shocks the conscience." *See Russo*, 479 F.3d at 209–10; *Harewood*, 64 F. Supp. 3d at 401–02. Courts applying *Russo* have emphasized that the claim concerns egregious conduct tied to specific, readily verifiable exculpatory evidence; failure to investigate evidence that is only arguably exculpatory does not suffice. *See Harewood*, 64 F. Supp. 3d at 402–04; *Wilson*, 480 F. App'x at 595.

Here, crediting Plaintiff's fabrication theory, the allegedly mishandled evidence was not the sort of readily verifiable proof of innocence at issue in *Russo*, and Plaintiff has not shown the kind of active concealment or exclusive control present there. *Cf. Russo*, 479 F.3d at 208, 210. On this record, no reasonable jury could find the conscience-shocking misconduct required to sustain Count VIII. Accordingly, the Court adopts the R&R's recommendation and grants Defendants' motion for summary judgment on Count VIII.

### iv.  Qualified Immunity

Officer Cortez is entitled to qualified immunity on Count VIII.  The R&R found that Officer Cortez would be entitled to qualified immunity, concluding that "no reasonable jury could conclude that it was objectively unreasonable to believe [Plaintiff's] pretrial detention was appropriate, given the gravity of the crime of which she was accused, her out-of-state connections, and the overwhelming evidence supporting the charge."  R&R at 43.  Because Ms. McCarter did not object to the R&R's recommendation on qualified immunity, the Court reviews this finding for clear error only and finds none.  Therefore, the Court adopts the R&R's recommendation that Officer Cortez is entitled to qualified immunity on Count VIII.

## V.    CONCLUSION

For the foregoing reasons, the Court adopts in part and declines to adopt in part the R&R, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff's claims for false arrest under New York law (Count I), false imprisonment under New York law (Count II), malicious prosecution under New York law (Count III), false arrest under Section 1983 (Count IV), malicious prosecution under Section 1983 (Count V), unreasonable searches and seizures under Section 1983 (Count VII), and excessive pretrial detention under Section 1983 (Count VIII) are dismissed.  Defendants' motion for summary judgment is denied as to Plaintiff's Section 1983 fair trial fabrication claim (Count VI).

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 77.

SO ORDERED.

Dated: March 30, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge

35